Filed 8/18/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
) S097363
      v. )
)
JUSTIN JAMES MERRIMAN, )
) Ventura County
      Defendant and Appellant. ) Super. Ct. No. CR45651
_____ )

In 2001, a jury convicted defendant Justin James Merriman of the 1992 first degree murder of Katrina Montgomery (Pen. Code, § 187, subd. (a)),[1] and found true the special circumstance allegations that the murder was committed while defendant was engaged in the commission of rape and oral copulation (§ 190.2, subd. (a)(17)(C), (F)), and the allegation that defendant personally used a deadly weapon (former § 12022, subd. (b)). The jury also convicted defendant of numerous noncapital crimes that occurred subsequent to the murder, including multiple counts of sexual assault and witness dissuasion. After a penalty phase trial, the jury returned a verdict of death. Defendant moved for new trial (§ 1181), and for modification of his sentence to life without the possibility of parole (§ 190.4, subd. (e)). The trial court denied the motions and sentenced him to

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise indicated.

1

death.[2]  Defendant's appeal is automatic.  (§ 1239, subd. (b).)  For the reasons that follow, we affirm the judgment.

## I. FACTS

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

##### a. The murder of Katrina Montgomery

###### i. Katrina's prior interactions with defendant

Katrina Montgomery was 16 years old in 1989 when she started dating Mitch Sutton, one of the founding members of a Ventura County White supremacist gang called the Skin Head Dogs (SHD).  Defendant, who also was 16 years of age at that time, belonged to the same gang.  Sutton brought Katrina

---

[2]  The court also imposed an aggregate determinate sentence of 63 years, which was comprised of the following consecutive sentences:  The upper term of eight years for the forcible rape of Robyn G. (§ 261, subd. (a)(2)), six years for the forcible oral copulation of Robyn G. (§ 288, subd. (c)), six years for the penetration of Robyn G. with a foreign object (§ 289, subd. (a)), two upper terms of eight years each for the forcible rape of Billie B. on two separate occasions (§ 261, subd. (c)(2)), one year for the attempted forcible oral copulation of Billie B. (§§ 664/288, subd. (c)), an upper term totaling 13 years for personal use of a firearm while resisting an executive officer (§ 69, former § 12022.5, subd. (a)(1)), the mid-term of 16 months for assault on a police officer (§ 245, subd. (c)), eight months for vandalism (former § 594, subd. (b)(2)), three years for each of three counts of dissuading a witness by force or threat (§ 136.1, subd. (c)), and two years for solicitation to dissuade a witness (§ 653f, subd. (a)).  Pursuant to section 654, the court stayed sentence for two counts of brandishing a deadly weapon to avoid arrest (§ 417.8), a second count of resisting an executive officer (§ 69), and conspiracy to dissuade a witness by force or threat, including the gang enhancement associated with that count (§§ 182, subd. (a)(1), 186.22, subd. (b)(1)).  The court also imposed a sentence of 365 days in county jail, with credit for actual time served, for a single count of being under the influence of a controlled substance in violation of Health and Safety Code section 11550.

2

along to SHD parties where she socialized with his fellow gang members and their wives and girlfriends, some of whom became close friends of hers.

Early in Sutton and Katrina's relationship, Sutton enlisted in the Army and was sent to Germany. Katrina moved to Germany for eight months to be with him. By the time Sutton returned from his three years of military service in 1992, he and Katrina had broken up. On his return, Sutton officially left the SHD gang, although he continued his friendship with defendant.

Meanwhile, between January 1990 and March 1992, Katrina was corresponding and conversing with defendant on a regular basis while he was in custody in various juvenile detention facilities and in state prison. In the beginning, defendant's letters encouraged Katrina to "stick with Mitch Sutton" and he asked her to send him "neat pictures" of herself. Defendant's subsequent letters, which sometimes referenced Katrina's breakup with Sutton, became more sexually explicit and suggested that he believed Katrina was interested in him. In August 1990, for example, defendant mentioned a photograph Katrina had sent him, indicating that he wanted to "play with the toys you must have under that buttercup suit." In February 1991, defendant asked Katrina for more photographs "of . . . your fine self so I have something to drool over and think about touching up one great day." In March 1992, defendant wrote to Katrina after she had visited him in prison, saying, "You know deep down inside you enjoy[ed] saying I was 'your' long lost locked-up hubby . . . , secret lover but a real faithful 'boyfriend.' " In the same letter, defendant apologized for his "crude and rude but lewd sexual gestures" during the visit and promised next time "not to toss you around like one of them blowup sex dolls."

From these and defendant's other letters it can be inferred that Katrina had sent defendant revealing photographs of herself, and that she had had physical contact with him during a prison visit. But the correspondence also suggested that

3

Katrina had told defendant she wanted to resume her relationship with Mitch Sutton and that she considered defendant only a friend, which were sentiments that appeared to both confuse and anger defendant. For example, in March 1992, shortly before defendant's release, he wrote "That shit about you need me for a friend just doesn't cut the mustard anymore," and he confronted Katrina with his suspicion that she was using him as a means of reigniting her relationship with Sutton. Defendant also wrote, "I'm burned on the third-grade game and the thought of you trying some kind of snake move like there's something you have to gain but you're stringing me along until the time's right . . . ." Later in the same letter, defendant stated, "I feel you're up to something and it sure isn't me . . . ."

Notwithstanding Katrina's apparent indications to defendant that she wanted to be his friend but not his girlfriend, defendant had communicated to others that he was interested in her. According to Scott Porcho, one of SHD's founding members and a friend of both defendant and Katrina, it was common knowledge that defendant expected Katrina would be his girlfriend after he was released from prison. Porcho's wife at that time, Apryl, also was close to Katrina. She knew that Katrina did not want to become involved with defendant.

Shortly after defendant's release from prison in the spring of 1992, Katrina and a high school girlfriend drove in Katrina's truck to defendant's home in Ventura where he lived with his mother and sister. Katrina went inside to "straighten out a couple of things" while her friend waited in the truck. When Katrina returned, there were red marks around her neck and she said defendant had attacked her. Katrina told her friend she was angry not only with defendant but also with defendant's mother, who had witnessed the attack and done nothing to help her.

The prosecutor presented evidence at trial that Katrina disclosed to her mother another incident at defendant's house after his release from prison, during

4

which he had forced himself upon her.  According to Mrs. Montgomery, Katrina told her that she had gone to visit defendant in Ventura.  When the evening grew late, defendant's mother suggested to Katrina that she spend the night in their guest room so that she would not have to drive all the way back to Los Angeles at that hour.  Katrina accepted the offer and went to sleep in the guest room but later was awakened by defendant, who had climbed into bed with her and was making sexual advances.  When Katrina asked defendant to stop, he refused, saying, "You know you want it."  Katrina told defendant she felt sick and needed to use the bathroom, and he did not prevent her from getting up.  Instead of going to the bathroom, however, Katrina ran from the house, got into her truck, and drove away.  When defendant realized she had fled, he went outside and ran after her, yelling angrily.

The prosecutor also presented evidence that the incident in the guest room was not the first time defendant had forced himself upon an unwilling partner. According to a former girlfriend, Corie G., when defendant was 15 years old, he held her against her will in the camper shell of a pickup truck until she submitted to having sexual intercourse with him, notwithstanding that she repeatedly attempted to leave and was yelling for her friends to help her.

### ii.  Thanksgiving weekend party at the Porchos' house

Katrina spent most of Thanksgiving Day, Thursday, November 26, 1992, celebrating the holiday with her family in Los Angeles.  She had plans to meet her parents at another family gathering in Santa Barbara on Saturday, November 28. On Friday, Katrina left Los Angeles in her truck in the late afternoon to attend a party at the North Oxnard home of SHD gang leader Porcho and his wife Apryl. The couple had invited Katrina to spend the night at their house and she had brought with her an overnight bag in addition to her purse.  According to Porcho,

5

Katrina was one of the first guests to arrive at the gathering, and she was already drunk at that time.

Several other SHD gang members and their wives and girlfriends attended the party. SHD founding member Mike Wozny drove his girlfriend and defendant to the gathering. Although defendant was not one of SHD's original members, he had joined the gang when he was 14 years old and, now 20 years of age, was considered a leader by the gang's younger members.

Other partygoers included members of a White supremacist gang called the Sylmar Peckerwood Family (Sylmar Family). The SHD and the Sylmar Family were on very friendly terms, almost "like one gang." Five of the Sylmar Family members who came to the party, including Ryan Bush and 16-year-old Larry Nicassio, lived together at a "crash pad" in Sylmar.

Partygoers gave varying accounts regarding the interactions between defendant and Katrina during the evening. Bush saw them hugging and joking with each other about sexual matters. Nicassio noticed that they were initially interacting normally but after a while seemed not to be getting along. According to Porcho, however, defendant did not want Katrina anywhere near him and had asked Porcho to keep her away. Defendant twice summoned Porcho to remove Katrina from his side. On one of those occasions, Katrina had her arm around defendant.

Everyone at the party was drinking alcohol throughout the evening, and some of the partygoers smoked marijuana and ingested LSD. Several arguments and fights occurred. For example, defendant kicked a member of the Sylmar Family in the face for disrespecting their hosts by shaking a can of beer and spraying its contents around the kitchen.

At one point during the evening, defendant said to Nicassio that he wanted Nicassio to "get" Katrina and handed Nicassio a steak knife. Nicassio did not take

defendant seriously and put the knife down. According to Nicassio, it was common for the older gang members to tease and play jokes on him because he was only 16 years old. A short time later, however, defendant approached Nicassio and again gave him a steak knife, saying, "We're gonna get that bitch, you're gonna do it." Nicassio again discarded the knife, thinking defendant had to be joking. Defendant handed Nicassio a knife a third time while they were socializing with others in the kitchen and said, "This is the last one I'm giving you. You're gonna do it." Nicassio was standing behind Katrina as she sat on a kitchen chair. To make everyone laugh, he held the knife above Katrina's head and imitated the lead character in the movie Psycho. He then discarded the knife.

During the party, Bush saw defendant and Katrina playfully wrestling on the bed in one of the bedrooms. At first, Katrina was giggling when defendant tried to kiss her. However, when Katrina told defendant to stop and he did not, she became angry and started yelling.

The party's hosts heard someone yelling from one of the bedrooms, but their recollections differed as to what they observed on entering the room. According to Porcho, Katrina was lying on the bed holding her stomach as if she had been punched, with defendant and a number of Sylmar Family gang members standing around her in a semicircle. By contrast, Apryl saw Katrina with only defendant, Bush, and Nicassio, one of whom was holding her down on the bed. Apryl walked Katrina out of the room and took her car keys away from her because she was intoxicated. Porcho and defendant exchanged words over the incident.

After Apryl left the house to drive a partygoer home, defendant and Porcho went to the kitchen and continued their argument about the incident in the bedroom. It was now sometime after 2:00 a.m., and most of the partygoers had departed. According to Nicassio, when defendant said something to the effect that

7

he was going to "get" Katrina, Porcho responded, "You're not going to fuckin' touch her," and then hit defendant on the forehead with a 40-ounce beer bottle. Defendant's head was bleeding from the blow.

Katrina went with defendant to the bathroom where she attended to his wound, cleaning it with a washcloth. Nicassio was standing in the doorway. While Katrina stood over the sink washing up, defendant pointed to her and silently mouthed to Nicassio, "Are you gonna do it or what? Do it now, do it now." As before, Nicassio thought defendant was joking with him. Later, as defendant stood outside the house smoking a cigarette, he told Bush, "I'm gonna get that bitch."

When Apryl returned after driving a guest home and saw the mess defendant and her husband had made during the fight, she decided everyone had to leave. By now, all of the other Sylmar Family members had left the party, and defendant offered to let Bush and Nicassio sleep at his house. Apryl drove the three of them to that destination around dawn. Defendant led Nicassio and Bush upstairs to his bedroom and gave them some blankets, directing them to sleep on the floor at the foot of his bed.

While Apryl was driving back to her home after having dropped off the group at defendant's house, defendant called the Porcho residence and asked to speak with Katrina. Porcho refused to put her on the line. By the time Apryl returned home, however, Katrina had showered, changed her clothes, and was talking with defendant on the telephone. Apryl picked up another receiver, told defendant to go to sleep, and ended the call. Defendant called back again asking for Katrina but Apryl hung up on him, which upset and angered Katrina. A heated argument ensued, during which Katrina demanded the keys to her truck and angrily accused Apryl and Porcho of trying to run her life. After Katrina and Apryl had argued for about 30 minutes, Apryl retrieved Katrina's keys and threw

8

them at her. When Katrina left, Apryl believed she was driving home to Los Angeles.

Instead, Katrina went to defendant's house. According to Nicassio, when Katrina came into defendant's bedroom, she no longer seemed intoxicated. Shortly after her arrival, she left the room to change into shorts and a T-shirt, and then got into bed with defendant.

Soon after Katrina got into bed, defendant straddled Katrina's shoulders with his knees, saying, "Come on, just do it." Katrina protested, "No, not with them in the room." Defendant responded by smacking her in the face, saying "Do it now, bitch."

As Katrina was being forced to orally copulate defendant, neither Bush nor Nicassio intervened. Nor did they try to stop defendant when he got on top of Katrina and had intercourse with her, notwithstanding that she was pleading with him to stop because he was hurting her. As Nicassio explained, he failed to do or say anything because he had seen defendant hurt people and he was afraid of him. Bush likewise feared defendant. Bush looked away as the sexual assault moved closer to the side of the bed. When he finally spoke up, he asked defendant, "What are you doing, man?" Defendant replied, "What the fuck do you think I'm doing."

At one point, defendant left the bed to get a bottle of lotion. After rubbing some of its contents on Katrina's genital area, he resumed intercourse with her. Katrina had started crying and continued begging defendant to stop, saying she did not want to get pregnant. Defendant got off of her, said, "There, you're pregnant," and again forced her to orally copulate him, this time pushing her onto the floor at the foot of the bed while he dangled his legs over the edge. With Katrina now positioned only a couple of feet away from where Nicassio and Bush were lying

9

down, defendant asked them, "Hey, do you guys want some of this?" Nicassio just looked away, and Bush responded, "No."

A short time later, Katrina asked to use the bathroom. Defendant refused, telling her to use a trash can that he put down on the ground next to her. Nicassio finally spoke up to defendant, saying, "Why don't you just let her use the restroom?" When defendant said, "All right," Katrina retrieved her overnight bag and put her clothes back on. As she was kneeling down to tie her shoes, defendant came up alongside her with a knife and stabbed her in the throat.

Katrina was crying and holding her throat, begging defendant not to hurt her, but the attack continued. Defendant covered Katrina with a blanket. He then retrieved a crescent wrench from his top drawer, kneeled down next to her, and struck a blow to her head. Katrina was still alive but her breathing became loud and labored. Defendant then grabbed her by the hair, asking, "Where is her jugular?" He then slit her throat with a knife, and rolled up the body in blankets and sleeping bags. At one point during the assault, while Katrina was still alive, Nicassio suggested they call an ambulance and assured defendant that Katrina would not say anything because "she's afraid of you." Defendant disagreed, saying, "She'll rat on me." Instead, he called the Porcho house, asking if Katrina was there and telling them that she had never showed up at his place.

After the killing, when Nicassio and Bush started pacing around the room in a panic, defendant angrily warned them, "You better not fuckin' say nothing" and "You're part of this, too." Nicassio tried to leave, promising not to say anything. But defendant stood between him and the bedroom door holding the knife and told him, "No, you're not fuckin' going anywhere." He then ordered Nicassio and Bush to help him cover up the crimes, telling them that "[i]f we got caught . . . we would all go down." Fearing retaliation from defendant and other

10

gang members if they refused, Nicassio and Bush complied with defendant's command.

At defendant's direction, Nicassio drove Katrina's truck to the front of the house. Meanwhile, Bush helped defendant carry the body downstairs and loaded it into the back of the truck, along with a plastic sack in which defendant had placed the knife and wrench and some of Katrina's belongings. According to Bush, blood was soaking through the blankets and he was concerned that defendant's mother had seen them as they passed by her bedroom door on their way downstairs. Defendant assured Bush she would not say anything. Indeed, defendant's mother did more than simply remain silent. When defendant's sister awoke that morning, she saw their mother on her hands and knees using rags and a pot of water to clean up blood that had stained the carpeting at the top of the stairs. Defendant's sister helped with the cleanup until the stain was no longer noticeable.

Defendant, Bush, and Nicassio then set about to further cover up the crimes. Nicassio drove the group in Katrina's truck to Sylmar where he and Bush lived. Bush collected rags and paint thinner and borrowed a housemate's truck, signaling Nicassio and defendant to follow him. The two trucks ultimately stopped near a ravine in a rural area called Sunset Farms, where defendant and Bush unloaded the body, dragged it into a drainage pipe, and covered it with tumbleweeds and garbage. A short time later, they drove to Angeles Crest National Forest and stopped at a turnout. Bush, Nicassio, and possibly defendant wiped down the inside of Katrina's truck with the paint thinner to destroy fingerprints. Bush then tried to roll the truck off the side of a hill, but he was unsuccessful and they simply abandoned it there, close to the turnout.

The group left the scene in the truck that Bush had borrowed from his housemate and went to a restaurant to discuss the situation. Pursuant to their plan, Nicassio and Bush drove defendant back to his house. While en route, defendant

11

again warned each of them to "keep your fuckin' mouth shut." Nicassio and Bush then headed back to Sylmar. Before arriving home, they pulled off the freeway in an industrial area and threw the sack containing the murder weapons and Katrina's overnight bag into a dumpster.

Two nights later, also according to plan, Bush and Nicassio returned to the site where Katrina's body had been hidden in a drainage pipe so they could bury her. Bush dug a grave about five feet from the pipe while Nicassio kept a lookout.

Meanwhile, Katrina's mother was becoming increasingly concerned regarding her daughter's whereabouts. Around 2:00 p.m. on the day after the Porchos' party, she received a call from Apryl asking if Katrina was at home. Several hours later, she received a call from the Los Angeles County Sheriff's Department informing her that Katrina's truck had been discovered over an embankment. Katrina's purse was inside the cab and there was blood on the outside of the tailgate and in the truck bed. Later testing showed that the blood belonged to the biological child of Mr. and Mrs. Montgomery.

Mrs. Montgomery immediately started calling family and Katrina's friends, but none knew where she was. When Mrs. Montgomery spoke with Apryl again, Apryl told Mrs. Montgomery that she had not seen Katrina for several months. But, in a telephone call to defendant about five hours later, Mrs. Montgomery learned that defendant had seen Katrina the night after Thanksgiving at the Porchos' home. When Mrs. Montgomery confronted Apryl with that information a short time later, Apryl admitted that Katrina had been at her house. Thereafter, the Montgomery family reported Katrina missing and continued to search for her, distributing flyers and organizing search parties in Ventura and Oxnard and in the area where her truck had been abandoned.

12

### iii. The investigation

A police investigation into Katrina's disappearance began almost immediately, and defendant was a suspect from the outset. When Porcho told fellow SHD gang member Wozny that Katrina's truck had been found abandoned, Wozny left an anonymous message on a tip hotline saying defendant, Nicassio, and Bush might be responsible for Katrina's disappearance. When detectives interviewed Porcho and Apryl at their home on the Sunday after Thanksgiving, they learned that Porcho had gotten into a fight with defendant for slapping Katrina. When one of the detectives asked Porcho who he should speak to in the event something had happened to Katrina, Porcho replied, "I'd talk to [defendant]. That's all I'm gonna say."

Detectives went to defendant's home the same day. A carpet cleaner who was finishing a job there told them he had been called to the house to clean a coffee spill. Defendant's mother was nervous and asked the detectives whether they had a search warrant to go inside her home. They did not. She eventually told the detectives that defendant had come home early Saturday morning with "a couple of boys."

Over the course of the next several days, investigators were able to obtain more information about some of the incidents at the Porchos' party, including Katrina's argument with Apryl and her abrupt departure from the house. But efforts by defendant's mother, sister, and fellow SHD gang members to protect defendant by being untruthful, coupled with the SHD and Sylmar Family gangs' strict code prohibiting interactions with law enforcement, hampered the investigation, which languished for years.

This is not to say that no one was discussing the crimes. The day after the killing, Bush told his older brother, also a gang member, what had happened to

13

Katrina. A short time later, Nicassio gave his girlfriend at the time a detailed account of the incident.

Defendant also spoke about the crimes. Days after the killing, when defendant's sister became aware of Katrina's disappearance and confronted defendant about the blood on the stairs, defendant told her that she did not want to know and said he was "going to hell for sure for the things he had done." About one month later, defendant mentioned to Nicassio that his mother had cleaned up the blood in his bedroom, and he sought confirmation from Nicassio that the body had been disposed of.

As the investigation continued, some witnesses started coming forward. For example, in July 1997, almost five years after Katrina's disappearance, Apryl (now divorced and remarried) met with the prosecutor, telling him that defendant had called Katrina at the Porcho home and asked her to come to his house after the party. However, most of the individuals with knowledge of the case, including Nicassio and Bush, were not forthright with investigators, and many witnesses brought before a grand jury in November 1997 either failed to disclose what they knew or lied outright. No indictment was handed down.

The prosecution's case quickly revived, however, when Bush, Nicassio, and Nicassio's girlfriend were arrested in November 1997, one or two days after the first grand jury had failed to hand down an indictment. Nicassio's girlfriend disclosed what Nicassio had told her about the crimes, and she urged Nicassio to likewise cooperate with the prosecution, which he eventually agreed to do in exchange for being permitted to plead guilty to voluntary manslaughter. The prosecutor later received a letter from an incarcerated SHD gang member, John Crecelius, revealing a statement defendant had made while they were both out of custody. According to Crecelius, defendant expressed concern on learning that his "crime partner" or "buddy" had been arrested for raping and murdering "a girl that

14

he had cut five years ago." Defendant also had told Crecelius that he expected the police would be coming for him soon because he had a strong feeling that Nicassio "was gonna tell on him."

The wall of silence that had protected defendant for many years finally started to give way. In exchange for an early release from prison, SHD gang member Wozny, who had called in the anonymous tip, agreed to drive defendant around in a "bait car" equipped with recording devices that would be monitored by police. While in the bait car in December 1997, defendant solicited Wozny's help in "getting" the Porchos' housemate, John Cundiff, who defendant believed had "ratted on him." When Wozny and defendant discussed the investigation into Katrina's disappearance, defendant said he "wasn't going to do any more time behind this." Wozny attempted a second encounter with defendant in the bait car that same night, but decided to abandon the operation after defendant, with a box cutter in hand, patted Wozny down to see if he was wearing a wire.

Also in December 1997, a prison inmate named Christopher Bowen disclosed to investigators that defendant had asked him during casual conversation four years earlier whether he had ever killed anyone. When Bowen said no and asked defendant the same question, defendant told him that he had killed "Trina."

Defendant made other admissions after being taken into custody in January 1998 following an hours-long standoff with law enforcement that led to a number of separate criminal charges. (See *post*, pt. I.A.1.c.) All of the incriminating statements were elicited surreptitiously and many, but not all, of them were the result of agreements between the prosecution and inmates who agreed to cooperate in exchange for leniency in their cases.

For example, in April 1998, SHD gang member John Crecelius wore a wire while in a courthouse holding cell with defendant. Crecelius told defendant that Nicassio, who was his county jail cellmate, was going to reveal defendant's

15

involvement in the killing. Defendant told Crecelius to beat up Nicassio, and expressed the opinion that Nicassio should take the "rap" for the crimes because he was the youngest.

Also in April 1998, Kristin S. agreed to help the prosecution in its case against defendant. Specifically, she agreed to wear a wire during conversations with defendant's mother, who wanted Kristin to request a jail visit with Nicassio at the same time defendant's mother was visiting defendant so that defendant and Nicassio would be placed in the same visiting area and could communicate with one another. Kristin had spoken with investigators after defendant's arrest, telling them that in December 1997, the month before he was apprehended, defendant told her the police were looking for him and that he was afraid he would go to jail and "never get out." Kristin also described an incident that had occurred several years earlier in which defendant, who was wearing only boxer shorts at the time, cornered her in a bathroom while he injected drugs and tried to get her to touch his penis. When Kristin got upset and tried to leave, defendant told her to shut her mouth or he would "slit [her] throat like Trina's." Kristin decided to assist the prosecution because she hated defendant for what she claimed he had done to her on an even earlier occasion. According to Kristin, sometime in 1994 or 1995, defendant had kept her in his bedroom for two days without food and forced her to masturbate him for hours at a time while he looked at pornographic magazines.

As previously mentioned, Nicassio ultimately entered into an agreement with the prosecution, the terms of which required him to provide information regarding the location of Katrina's body and assist in the ongoing investigation. Pursuant to that agreement, Nicassio directed investigators to the area where he and Bush buried the body, but the land had since been developed and they were unable to locate the body.

16

Nicassio also wore a wire while interacting with defendant on a number of occasions. During the first operation, Nicassio showed defendant an altered version of a probation report that falsely stated Nicassio had refused to cooperate with the prosecution. Defendant told Nicassio to continue refusing to cooperate and he wondered aloud who was talking to the prosecution.

Many of the recorded conversations between Nicassio and defendant occurred in the jail visiting area, interactions that were made possible by Kristin's participation in defendant's mother's plan to have Nicassio and defendant brought to the same visiting area at the same time. During the first such visit, Nicassio asked defendant what would happen if Katrina's body was found. Defendant replied, "If that shit comes out of the ground, we'll both be going to L.A. County." On another occasion, defendant suggested how they could explain away the presence of blood on the stairs in his house and in the bed of Katrina's truck.

The prosecution stepped up its efforts at obtaining an express admission from defendant by instructing Nicassio to inform defendant that Katrina's body had been discovered. During the visiting room conversation in which Nicassio gave defendant the "bad news," defendant reacted by saying, "Oh, God," but then told Nicassio not to believe the "trick." If the body had been found, defendant said, "they would already have charged me." Defendant repeatedly told Nicassio that he had to keep his mouth shut about Katrina being at defendant's house, even when talking to his lawyer or at trial if he was charged, because it would drag defendant and Bush into it. As defendant walked away upset and agitated, he turned back and approached Nicassio with his fists clenched as if to hit him, then turned again and left the visiting area.

Defendant changed his approach with Nicassio several months later, after learning that his sister told investigators that she helped clean up blood on the stairs of their home and that she had been subpoenaed to testify at another grand

17

jury proceeding. Noting that his mother was "involved in this" because of the blood on the stairs, defendant told Nicassio that if Nicassio were to cooperate with police he should say that Katrina was taken out of the house over the "bridge," that is, the catwalk leading directly to defendant's room, and not through the main house. When Nicassio protested that he "didn't do this and [didn't] want to do the time for it," defendant told him to stop saying that. Defendant also told Nicassio that his claim of innocence was making him nervous, and he reminded Nicassio that Nicassio had "fuckin' hauled that shit."

From the time of his arrest in November 1997, Bush had steadfastly refused to cooperate with the prosecution. Around the time defendant was indicted for murder in January 1999, however, he decided he no longer wanted to "live a lie" and agreed to tell investigators what he knew about Katrina's disappearance. Like Nicassio, he led investigators to the general location where Katrina's body was buried.

### b. Sexual assaults subsequent to the murder

Defendant was prosecuted for a number of other crimes in addition to the murder of Katrina, including sexual assault offenses against two other women. The following evidence was presented not only to support these sexual offense counts but also the murder charge and the rape-murder and oral-copulation-murder special-circumstance allegations.

### i. Robyn G.

Robyn G. and defendant used drugs together and sometimes engaged in sex. One day between November 1994 and January 1995, defendant joined Robyn and others on the boat where Robyn was living at the time. Robyn and her visitors were injecting heroin and methamphetamine. At one point, Robyn went downstairs with defendant into one of the boat's bedrooms to use more drugs.

18

After doing so, they started kissing. Defendant then started acting aggressively toward Robyn. When Robyn became uncomfortable and said she wanted to leave, defendant ordered her to sit on the bed. He then demanded that she orally copulate him. Robyn complied because she was afraid. Defendant was flipping through pornographic magazines while Robyn orally copulated him. When she tried to leave, defendant called her names and kept her from getting off the bed.

Defendant continued the sexual assault by forcing Robyn to have intercourse. At various points, Robyn communicated to defendant that she was sore and wanted to stop. Defendant responded by ordering her to assume different positions. At one point, defendant inserted a gun into Robyn's vagina. The assault lasted two to three hours.

### ii. Billie B.

Billie B. met defendant in 1988 when she started attending parties with her SHD gang member boyfriend, Mitch Buley. In March 1992, Billie became involved with defendant after having split up with Buley, who was then in prison. Defendant directed her not to tell Buley about them, or he would hit her.

Billie did not attend the Thanksgiving weekend party at the Porchos' house in 1992, but she learned from her roommate, SHD gang member Wozny, that Katrina was missing. When defendant called Billie's house on the Sunday after Thanksgiving, Wozny told him to " 'not call here anymore.' " Defendant showed up at the door a short time later anyway, but Wozny would not let him inside.

During this period of time, Billie's relationship with defendant started to change, and defendant became increasingly violent and sexually abusive. For example, sometime after August 1994, defendant was visiting Billie in her new apartment when her former roommate Wozny knocked on the door. Not wanting Wozny to know he was alone with Billie, defendant pushed Billie down in the

19

hallway to prevent her from letting Wozny inside. Defendant then forced Billie to orally copulate and masturbate him by repeatedly pushing her head and hand to his penis. Defendant would not let Billie stop or leave. The incident lasted for several hours.

Billie's subsequent sexual encounters with defendant sometimes started as consensual vaginal intercourse but then turned assaultive. An incident occurring at defendant's house between August 1994 and January 1995 is illustrative. After Billie and defendant had engaged in intercourse for four or five hours, Billie indicated that she wanted to stop because she was tired and he was hurting her. At one point she had started to bleed from her vagina. Defendant told her to shut up and continued having intercourse. When he was finished, he became enraged at Billie for having stained his sheets with blood and he dragged her downstairs by the hair to the laundry room, calling her "sick" and angrily disparaging her.

On many occasions, defendant's sexual assaults on Billie were not preceded by consensual sex. Between August 1994 and January 1995, for example, defendant repeatedly forced Billie to orally copulate and masturbate him for hours at a time while he looked at pornography, using the weight of his body to keep her from leaving. In an incident that occurred in Billie's apartment in October or November 1995, defendant kept pulling Billie onto the couch and shoving her hand into his pants. The more she resisted, the angrier defendant became. Billie finally left the couch and went into her daughter's room, trying to avoid defendant. Defendant followed her in and tackled her to the floor. Billie explained that she did not resist having intercourse with defendant at that time because she was afraid he would hurt her if she did not submit.

20

### c. *Standoff with police prior to arrest*

As previously mentioned, defendant was taken into custody in January 1998 after an hours-long standoff with police officers.  The prosecution charged defendant with a number of crimes in connection with the incident and also argued at trial that defendant's conduct evidenced his consciousness of guilt concerning the murder count.  The evidence showed the following events.

Ventura County Sheriff's Deputies Howe and Miller were patrolling a high-crime area in Ventura on a Friday night in late January 1998 when they saw two bicyclists, defendant and a woman, riding without headlights.  The officers pulled alongside them, but defendant ignored Officer Howe's repeated orders to stop and continued riding.  Officer Howe gave chase on foot, joined by other officers who were nearby at the time.  Meanwhile Officer Miller pursued defendant in the patrol car, cornering him several blocks away.  He grabbed defendant by the shirt, but defendant managed to break free.

Other officers joined the chase on foot through a vacant lot, shouting for defendant to stop.  They stopped abruptly after one officer yelled, "Gun!"  Defendant had pulled out a revolver and was holding it to his own head, warning the officers not to approach or he would shoot himself.

Defendant then walked to a chain link fence in a dark area of the lot, climbed over it, and ran to the house where his girlfriend at the time, Annette Berryhill, was visiting Janette Trembley-Rail.  When defendant arrived, he banged on the door, yelling, "Let me in, you gotta let me in, there's cops all over the place."  Berryhill opened the door but did not remove the chain lock.  Defendant pushed his way inside and ran into Trembley-Rail's bedroom.  When Trembley-Rail told defendant to leave, he refused and ordered her to do as he said.  According to Trembley-Rail, defendant was agitated, hostile, and out of breath, and he was holding a triangular object under a dish towel.  Meanwhile, police had surrounded

the house.  When defendant began to barricade himself inside by moving furniture, throwing items around, and trying to cover the windows with blankets, a SWAT team was called in.

Berryhill distracted defendant long enough for the other people in the house, including Trembley-Rail, Trembley-Rail's daughter, and young granddaughter, to escape.  Berryhill eventually exited the house through a window, telling officers at a command post that defendant was not coming out.

After a seven-hour standoff, when all attempts at communicating with defendant had failed, officers fired tear gas into the house.  At one point, defendant opened the front door coughing and gagging, took a breath of fresh air, and went back inside.  He did the same thing a second time.

Defendant ultimately left the house blinded by the tear gas and crawling on all fours.  Officers approached defendant to apprehend him, but saw that he was holding a knife and slashing with it in the direction of any noise.  The officers backed off and tried to subdue defendant with rubber bullets, which did not have the desired effect.  Defendant then crawled back into house.

A short time later, defendant opened the door and emerged from the house again.  As before, officers approached to place him under arrest.  This time, defendant did not have a knife in his hand.  When he reached into his jacket as if to retrieve a weapon, however, one of the officers aimed his rifle, then ordered defendant to lie down.  Defendant refused, but he was grabbed from behind and dragged to the ground.  It took six officers to finally subdue him.

When Trembley-Rail returned to her home, she found the entire residence "knee deep in debris" and estimated the total damage to be $55,000.  Defendant's mother told Trembley-Rail's daughter she would pay for the damage if she agreed not to cooperate with police.

Defendant was transported to the hospital. During the ride, he was unresponsive and seemed to be under the influence. A blood test showed the presence of amphetamines.

After defendant's arrest, he stated in a telephone call to an acquaintance that "If [he] would have known it was for a headlight, [he] wouldn't have ran like that."

During the defense closing argument, defense counsel conceded defendant's guilt of all charges stemming from the incident that culminated in his arrest.

### d. Postindictment witness intimidation

Defendant was first indicted for Katrina's murder and other crimes in January 1999. For the next two months, he undertook efforts to silence the fellow gang members and others who were cooperating with the prosecution. At trial, which was held in 2001, the prosecutor pointed to these efforts not only as evidence of defendant's culpability for the murder but also as the basis for five later-added counts charging defendant with various witness dissuasion crimes, including conspiracy to intimidate witnesses and soliciting the intimidation of witnesses. (§§ 136.1, subd. (c), 182, subd. (a)(1)/136.1, subd. (c), 653f, subd. (a)/136.1, subd. (c).) During the defense closing argument, defense counsel conceded defendant's guilt of these charges.

In connection with the conspiracy count, the prosecution presented expert testimony to support an associated sentencing allegation that the conspiracy occurred to benefit and in association with a criminal street gang. (See § 186.22, subd. (b).) One gang expert testified about the SHD gang's violent White supremacist philosophy and the criminal convictions of its members, which included attempted murder and assault with a deadly weapon. The expert also described the SHD gang's structure and strict code of noncooperation with law

23

enforcement, explaining to the jury how the gang had been heavily influenced by prison culture in this regard. According to the expert, it was incumbent upon all members of the SHD gang to take appropriate action against any person who had been identified as a "rat," so long as there was "paperwork," that is, written proof of cooperation with the police. As one SHD gang member later explained to the jury, gang members were obligated to do "anything necessary" to silence a member of their own gang who had been labeled a rat.

The prosecution also presented extensive evidence regarding defendant's postindictment activities in jail, where, by using his mother and others as go-betweens, he managed to collect information regarding the individuals he believed were "ratting" on him and disseminate that information to fellow gang members. Some of this evidence consisted of letters written by defendant that were seized by jail and prison authorities. In one letter to an SHD gang member incarcerated at Wasco State Prison, defendant told the recipient that Bowen and Nicassio had worn a wire on him. Another letter from defendant that was found during a search of an SHD member's cell in the same prison stated that fellow SHD member Mike Wozny had taken him for a drive in a "wired cop car" prior to his arrest. In a letter to an SHD gang member being housed at Tehachapi State Prison defendant gave a "rundown on all these wire-wearing pieces of poop," naming Wozny, Bowen, Crecelius, and Kristin S.

The paperwork on the individuals who were cooperating with the prosecution came from the transcripts of the grand jury proceeding at which the informants had testified. A search of defendant's mother's home disclosed nine volumes of the grand jury transcripts, one of which had been unbound. Several pages of that volume were found during a search of defendant's cell conducted on the same day. Also recovered from defendant's cell, hidden inside the mattress, were two pieces of paper listing the names, telephone numbers, and addresses of victims and

24

witnesses. On the pages of defendant's Bible were written, in tiny print, the names of a couple who were close to Nicassio and Bush.

Defendant's communications with his fellow gang members were facilitated by a number of persons outside the jail, including defendant's mother, sister, girlfriend, and various women who associated with the SHD gang. The facilitators' roles ranged from simply mailing or dropping off defendant's letters under their own names to "spreading the word" regarding the informants. For example, after learning from defendant that Nicassio was wearing a wire to help investigators, Jennifer Wepplo communicated that information directly to an incarcerated SHD gang member, who later wrote to her saying someone had to "get" Nicassio from inside the jail. According to Samantha Medina, another SHD associate who agreed to assist defendant in his efforts to dissuade witnesses, defendant directed her to inform an SHD gang member named Spencer Arnold that Arnold's girlfriend, Kristin S., was wearing a wire.[3]

Defendant also sought the involvement of John Hernandez, a member of the Ventura Avenue Gangsters who was housed in the cell next to defendant at the county jail. Defendant gave Hernandez grand jury transcripts so that Hernandez could "pass the word around" that Crecelius was "ratting" on him. Defendant also supplied Hernandez with a handwritten list of the individuals who had cooperated

---

[3] Prior to the start of defendant's trial, defendant's mother and two women who helped facilitate his communications outside the jail were convicted of conspiring with defendant to intimidate witnesses. (§§ 182, subd. (a)(1), 136, subd. (c).) In defendant's mother's case, she voluntarily pleaded guilty midtrial after being shown a transcript of the recorded conversation between defendant and Nicassio in which defendant instructed Nicassio to tell police that Katrina's body went over the catwalk, rather than through the house, so as not to implicate his mother.

with the prosecution, asking Hernandez to circulate the names of the "rats" among his "homeboys" for the purpose of having them assaulted. The list named Nicassio, Crecelius, Bowen, Wozny, and Kristin. Nicassio was shown the list by an inmate who said Hernandez had given it to him.

Defendant's list was successfully circulated pursuant to his request. When Nicassio was in the courtroom's holding tank during the grand jury proceedings that led to additional charges of witness intimidation, Nicassio was approached by a member of the Nazi Low Riders prison gang who told him there was paperwork on him throughout the state's prison system and that he would be killed for being a rat. After defendant's efforts to dissuade witnesses had come to light, however, the prosecution made arrangements with officials at the Ventura County Jail and the California Department of Corrections for the protection of its incarcerated witnesses and no harm ever came to Nicassio or any of the other individuals who defendant sought to silence.

### 2. *Defense case*

The defense called defendant's mother to testify regarding her recollection of events at her home around the time of Katrina's disappearance. She remembered nothing remarkable about the Friday after Thanksgiving Day 1992, only that defendant came home late at night. She heard male voices coming from defendant's room, but no female voice, and no unusual sounds like someone running, banging, yelling, or moving about the house.

According to defendant's mother, when she arose around 7:00 a.m. on Saturday, she noticed blood on the stairwell, which she and her daughter cleaned. When she asked defendant a short time later who had gotten hurt, he pointed to his forehead and said, "Check this out," then returned to his room, ignoring her advice

that he needed stitches. She testified further that she saw no one with defendant that morning and that defendant did not leave the house prior to 1:30 p.m.

Defendant's mother confirmed that she had arranged to have the carpets in her home cleaned by an SHD gang member on the Sunday after Thanksgiving, the day after she had discovered the blood on the stairwell. She explained, however, that the cleaning had nothing to do with the blood. Rather, it was because defendant's room "smelled like a brewery."

Contrary to the testimony of the officers who came to defendant's home to investigate Katrina's disappearance, defendant's mother told the jury that she did allow the officers inside and that they went upstairs to defendant's room. She also denied having unbound the grand jury transcripts to copy pages. According to defendant's mother, at the time she was in possession of the transcripts, defendant's girlfriend was living with her and had access to the room where she kept those documents.

Defendant's mother testified that, to her knowledge, defendant was not in a gang. As she saw it, defendant's association with his friends was "just some kids having a good time."

As previously mentioned, defense counsel conceded defendant's guilt of the charges stemming from the incident that culminated in defendant's arrest and the counts involving defendant's postindictment attempts to dissuade the witnesses who had testified against him at the grand jury proceeding.

### 3. *Prosecution's rebuttal*

The prosecution attempted to cast doubt upon defendant's mother's version of events with evidence of her contradictory statements and outright lies. For example, one of the officers who interviewed defendant's mother three years after Katrina's disappearance testified that she said the stains on the carpet were from a

coffee spill, which was consistent with a statement by the carpet cleaner the day after Katrina had disappeared. The prosecutor also presented a tape-recorded conversation between defendant's sister and a friend in which defendant's sister said that when she told her mother she was planning to talk with the prosecutor, defendant's mother "got really scared" and admitted she was "living a lie."

## B. Penalty Phase Evidence

### 1. Prosecution's case in aggravation

The prosecution's case in aggravation focused primarily on the circumstances of the murder and the other crimes of which defendant had been convicted at the guilt phase. In addition, members of Katrina's family testified regarding their memories of her and how her disappearance and death have affected them. The prosecution also presented evidence of eight prior incidents involving defendant's use of violence or threat of violence, some of which occurred while defendant was incarcerated at a juvenile detention facility and the Ventura County jail.

#### a. Victim impact evidence

Katrina's parents, brother, sister, and grandmother testified briefly about their close relationships with Katrina and described how difficult it was to cope, first, with her disappearance and later, with the realization that she was no longer alive. According to Katrina's parents, when Katrina returned home after living in Germany for six months with her then-boyfriend Sutton, she had "turned a corner," and started working full time and attending community college classes to pursue a career in photography. Midway through examining Katrina's mother, the prosecutor played a videotape of Katrina dancing and socializing at a large family celebration. When questioning resumed, Katrina's mother said she always feels Katrina's absence when the family gathers for such events.

28

### b. Prior convictions and incidents involving force or violence

Much of the prosecution's evidence regarding defendant's commission of other crimes involving violence or threat of violence was introduced pursuant to stipulations read aloud by the prosecutor, which the court instructed the jury to accept as proved.

The parties stipulated that in July 1989, defendant pushed a 32-inch wooden club into the face of a man who was engaged in a verbal altercation with defendant's friend, threatening to "beat the crap outta [him]." In connection with this incident, defendant was charged with battery and brandishing a deadly weapon. (§§ 242, 417, subd. (a).)

The prosecution presented evidence of another incident that occurred about one year later in June 1990 while defendant was a ward at the California Youth Authority facility in Paso Robles. A high school teacher at that institution, Ronald Jenkins, testified that defendant entered his classroom embroiled in a racially charged argument with an African -American ward. At Jenkins's directive, the wards took their seats and quieted down. At one point, defendant got up and walked toward the bathroom. After passing the ward with whom he had argued, defendant picked up a chair and used it to hit him in the back of his neck and shoulder blades. A brief fight ensued and lasted until security officers arrived on the scene.

The parties stipulated to defendant's involvement in another altercation at the same California Youth Authority facility one month later. In July 1990, defendant and two other wards were instructed to come out of their cells and walk to the showers. Defendant started walking toward the showers, then turned and struck the escorting officer multiple times with closed fists. As the officer and his coworkers attempted to wrestle defendant to the ground, defendant continued to swing and kick at the officer until he was finally subdued and handcuffed. Two

29

officers were injured in the incident. Defendant said he attacked the officer because he believed he had been talking about his sister and mother, but the officer denied having done so. In connection with the attack, defendant pleaded guilty to forcibly resisting or deterring an officer in the performance of his duties and was sentenced to a two-year prison term. (§ 69.)

The parties further stipulated that on Halloween night in 1992, Deputy Van Davis responded to a party noise complaint and observed defendant and a companion getting up off an individual who was lying on the ground motionless and bleeding heavily from his lip. For that attack, defendant was convicted of misdemeanor battery. (§ 242.)

The prosecutor presented the testimony of two witnesses who described a June 1994 attack on an inmate in the Ventura County jail. June Marsh, a service technician at the jail, testified that while monitoring the inmates' movements within the jail, she observed defendant and two other inmates who were ready to return from the visiting area to their cells. Pursuant to jail procedure, the inmates were instructed to line up in single file with their hands behind their backs. Marsh testified that as she activated the door for them to reenter the cell area, defendant turned around with a raised fist and punched the inmate behind him in the face, knocking him to the ground. According to Marsh, defendant kneeled down and continued striking the inmate in the face for several seconds, then walked away as officers began responding to the scene. Marsh heard someone ask defendant, "What did you do that for?" She recalled that defendant replied, "Because I felt like it."

The prosecution also presented testimony by Sergeant Steven Cargile, the first officer to arrive on the scene of the June 1994 incident in the Ventura County jail. Cargile testified that when he reached the inmate who had been attacked, he overheard the inmate say to defendant, " 'That was a sucker punch, a real P.C.

30

[protective custody] move.' " Defendant responded, " 'I got you though, didn't I?' "

Another stipulation by the parties concerned defendant's April 1996 attack on a patron at a Santa Barbara nightclub. The victim, a university student, was drunk and dancing in the "mosh pit." After being assaulted by skinheads, he left that area of the club and went to the lobby. Defendant approached and punched him in the nose, causing him to fall to the floor. Defendant's companion, fellow SHD gang member Scott Porcho, continued the attack by kicking the victim two or three times in the head. The victim suffered a broken nose, a swollen eye, and lacerations that required 13 stitches. In connection with this incident, defendant pleaded guilty to misdemeanor battery causing serious bodily injury. (§ 243, subd. (d).)

The parties further stipulated that during a January 1998 vehicle stop, an officer discovered a small knife concealed in defendant's front pants pocket while he searched defendant incident to arrest. The knife was admitted into evidence.

The prosecution concluded its case in aggravation with a final stipulation by the parties regarding another incident at the Ventura County jail in November 1998. On that occasion, defendant intervened in a fight between a Black inmate and a White inmate, punching the Black inmate in the face. When another Black inmate told defendant he should stay out of it, defendant became angry and slammed the inmate against a jail cell door, knocking him down. Before officers responding to the fight finally subdued defendant, he broke away from a control hold and attempted to kick the inmate he had knocked down.

31

## 2. Defense case in mitigation

### a. Defendant's upbringing and background

The defense evidence regarding defendant's background emphasized his tumultuous home life, his drug use, fighting, and problems in school beginning at an early age, and his frequent bouts of detention and incarceration that were triggered mostly by his use of drugs.

In brief testimony, defendant's grandmother told the jury that defendant's biological parents separated when he was two years old, and that she had been his primary caregiver off and on for his entire life. She indicated that defendant had always showed her love and respect, and she did not believe he committed the crimes of which he was convicted.

One of the defense experts, Psychologist Patrick Barker, Ph.D., offered the jury a more detailed account of defendant's upbringing and family history, which was based on information provided by defendant, his mother, and his adoptive father. Dr. Barker reported that defendant's biological father was an alcoholic with whom defendant had little contact after his parents' separation. When defendant was five years old, his mother married Dean Merriman, who adopted defendant. Merriman likewise was an alcoholic and their home life was "badly dysfunctional." When Merriman drank heavily, which was often, he would swear angrily, break things, and abuse defendant's mother both verbally and physically. He often belittled defendant in front of others.

According to Dr. Barker, defendant's mother and adoptive father frequently separated and reunited. When they were together, they fought much of the time. When they separated, defendant would move back and forth between the two households.

Defendant told Dr. Barker that to escape the domestic turmoil and instability, he often stayed away from home. At one friend's house, drugs were readily

32

accessible and, at age 11, defendant first began using methamphetamine. When defendant was in his very early teens, he was sexually molested by a woman at a neighbor's house.

Dr. Barker learned that beginning at an early age defendant had significant problems in school that were attributable to his behavior, truancy, and learning difficulties. He attended seven or eight different schools before eventually dropping out of high school. Defendant's mother indicated that because defendant did so poorly in school, he became the class clown. Starting in his early teens, defendant also established a reputation as a good fighter, and prided himself for not backing down in a fight. Dr. Barker's review of defendant's school records confirmed that defendant's behavior, attendance, and performance were poor. One notation indicated that in seventh grade defendant was caught distributing methamphetamine to his fellow students.

Defendant's association with skinheads and White supremacists likewise began in his early teens. Defendant's mother believed defendant's involvement was influenced by Dean Merriman's racist views and an incident at a party in which defendant was stabbed by an African-American.

Defendant's criminal history began at 15 years old when he was arrested for vandalism and other crimes and sent to a medium-security juvenile detention facility. Defendant spent most of the next 10 years as an inmate at one sort of facility or another, including prison. Most of his detentions were due to his use of drugs. Defendant told Dr. Barker that he was addicted to heroin and abused other drugs and alcohol.

### b. Expert testimony

The defense sought to show through its mental health experts that defendant suffered from severe brain damage that was further exacerbated by his drug and

alcohol use, and that these serious mental deficits were the source of a long history of unplanned, impulsive behavior, including Katrina's murder.

Dr. Barker, a forensic and clinical psychologist, testified regarding the results of various tests he administered to defendant to assess his intelligence and pinpoint dysfunctional personality traits. The Wechsler Adult Intelligence Scale, a test of intellectual functioning, showed defendant in the low-average range with a full-scale I.Q. of 88. The results of two tests for traits associated with personality disorders, the Minnesota Multiphasic Personality Inventory (MMPI) and the Millon Clinical Multiaxial Inventory, showed defendant matched a profile type that is thought to be among "the most difficult of the criminal offenders." Such individuals are distrustful, anti-social, cold, unstable, impressionable, hostile, and violent. His answers on the tests further reflected alcoholic and addictive tendencies.

Dr. Barker emphasized that individuals with defendant's personality profile have poor impulse control, that they act without thinking about the consequences, and blame others when they do get in trouble rather than learn the consequences of their actions. He further believed that, in defendant's case, his heavy drug and alcohol use would make him even more impulsive and unpredictable. But even were defendant not under the influence, Dr. Barker observed, he likely would exhibit a lack of respect for others and fail to take into account the consequences of his behavior. On cross-examination, Dr. Barker indicated that he had diagnosed defendant as suffering from antisocial personality disorder.

Jordan Witt, Ph.D., a clinical psychologist with special training in clinical neuropsychology, conducted a neuropsychological examination of defendant in order to assess brain function. His conclusion was that defendant suffered from brain damage, which manifested itself in his very limited concentration span, his extreme hyperactivity, his inability to properly manage, process, and react to

34

information, and his memory difficulties. According to Dr. Witt, defendant's brain dysfunction leads him to operate in "kind of a living present," in which he acts at the whim of his impulses and emotions and cannot rely upon his memories, reasoning, and information from his environment. Based on defendant's background and the results of the battery of neurological tests, Dr. Witt believed that defendant's brain was defective at birth and that his dysfunction worsened over time due to both his substance abuse and multiple head injuries with loss of consciousness from fights and an automobile accident. Like Dr. Barker, Dr. Witt diagnosed defendant as suffering from antisocial personality disorder, as well as other cognitive and learning disorders and polysubstance dependence.

The defense bolstered its argument that defendant suffered from brain damage by calling Psychiatrist Joseph Wu, M.D., who testified in relevant part regarding the results of a positron emission tomography (PET) brain imaging scan that was performed on defendant in August 2000, prior to the start of the guilt phase of trial. Dr. Wu found brain activity abnormalities in defendant's scan that showed "more likely than not" that defendant had brain damage or disease in the frontal lobe of the brain, the area involved with functions such as the regulation of aggression, long-term planning, and judgment. His findings from the PET scan were corroborated by the results of an earlier electroencephalogram, which showed abnormal electrical activity in the brain's frontal and temporal lobes, and which was consistent with possibility of complex partial seizures, a type of epilepsy that can affect certain emotions and movements.

The defense called its fourth expert, Forensic Psychologist Leonard Diamond, Ph.D., to show that the adverse effects of defendant's serious brain deficits had begun to manifest themselves many years before the capital crime. Dr. Diamond first evaluated defendant in 1989 while he was in a juvenile detention facility. According to Dr. Diamond's report, defendant operated on pure

35

impulse, had no insight into his own actions, and, because he lacked an orderly progression of thoughts, was incapable of planning. After reevaluating defendant prior to the penalty phase, Dr. Diamond concluded that defendant had changed little during the intervening 12 years. For example, Dr. Diamond explained, defendant still showed no insight into his behavior and still had extremely poor judgment and very poor social skills. Also like before, defendant was impulsive, "acts out," and "blows up easily." According to Dr. Diamond, defendant is not psychotic but rather has "a long-standing characterological disorder" that was formed early in life, possibly at the time of birth. During cross-examination, Dr. Diamond agreed with the prosecutor that it would be fair to characterize defendant as having antisocial personality disorder and to describe him as a very violent, dangerous, and vengeful person.

### 3. *Prosecution rebuttal evidence*

The prosecutor presented two mental health expert witnesses who disagreed with the methodology and findings of the defense experts.

Neuropsychologist Ari Kalechstein, Ph.D., evaluated Dr. Witt's opinion that defendant suffered from brain damage. In his view, Dr. Witt had an inadequate basis on which to reach that conclusion and committed errors in scoring the diagnostic tests. Dr. Kalechstein observed, for example, that Dr. Witt failed to take into account that defendant was in solitary confinement for the two months prior to their meeting, which, in Dr. Kalechstein's view, would have explained why defendant seemed distracted and inattentive. According to Dr. Kalechstein, Dr. Witt also failed to properly explore the possibility that defendant was faking his mental status, and should either have obtained information from sources other than defendant's self-reporting or be tested for malingering. When

Dr. Kalechstein scored some of the neurological tests administered by Dr. Witt, the results showed defendant in the average range of neurological functioning.

Neurologist Helen Mayberg, Ph.D., offered her views regarding Dr. Wu's opinion that the results of PET brain imaging showed an abnormality in defendant's frontal lobes. Dr. Mayberg's critique began with concerns regarding the normal control group against which Dr. Wu had compared defendant's scan. For example, as she pointed out, normal brains have tremendous variability in shape and activity levels, and she was unsure whether defendant's scan actually deviated from an expected pattern. She also faulted Dr. Wu for not taking into account defendant's medical conditions and medications, which, she explained, can suppress activity in the frontal lobe.

Dr. Mayberg was leery of Dr. Wu's opinion that defendant had brain damage in the frontal lobe because, in her view, a diagnosis cannot be made solely on the basis of a PET scan. She believed furthermore that any lower activity in defendant's frontal lobes could be explained by an infolding of the brain at that spot, and she saw no pattern of variations in defendant's brain activity or anything appearing on the scan itself that could be considered abnormal.

### 4. *Defendant's statement*

In an unexpected development just before closing arguments, the court reopened the penalty phase trial so that defendant could testify on his own behalf. Defendant took the witness stand against counsel's advice, and read from a rambling statement he had prepared the previous night in which he offered his sympathies to Katrina's family, complained that his counsel did not provide him with a proper defense, and maintained his innocence. Before testifying, defendant indicated to the court he was aware he likely would be subject to cross-

examination.  After reading his statement, defendant nonetheless refused to answer any of the prosecutor's questions.

## II. DISCUSSION

### A. Refusal to Sever Trial on Murder Charge from Trial on Other Counts

Defendant contends that the trial court abused its discretion by refusing to sever trial on the murder count from trial on the rest of the charges against him. He furthermore asserts that a joint trial on all charges deprived him of his constitutional rights to a fair trial and due process.  His claim fails, as we explain below.

#### 1. Background

The Ventura County Grand Jury initially returned a 25-count indictment against defendant in January 1999.  The first three counts of the indictment charged defendant with special circumstance murder and other crimes involving Katrina.[4]  Seven of the counts charged defendant with sexually assaulting Robyn G. and Billie B., and nine counts arose from the circumstances surrounding defendant's attempt to evade arrest in January 1998.  The remaining six counts charged defendant with being under the influence of a controlled substance at various times predating his arrest.  A second, five-count indictment was issued in May 1999, about four months after the first indictment, charging defendant with crimes stemming from various attempts to dissuade witnesses who had testified at the earlier grand jury proceeding.

---

[4]     The murder count included rape-murder and oral-copulation-murder special-circumstance allegations.  The first indictment also charged defendant with the substantive crimes of rape and forcible oral copulation in connection with the same incident, but those counts were dismissed before trial on the prosecutor's motion because the six-year statute of limitations had expired.

In 2000, the court conducted a hearing on two pretrial motions by the parties, granting the prosecution's motion to consolidate the two indictments, and granting as to certain counts a defense motion to sever trial on the murder charge from trial on the other charges in the first indictment.[5] The court denied the request to sever the murder count from all other charges, however. In making that determination, the court found the evidence that supported the charges involving defendant's attempt to evade arrest was cross-admissible to show his consciousness of guilt as to the murder, and that the evidence underlying the sexual offense charges involving women other than Katrina appeared to be cross-admissible because sexual assault was part of the murder case.

### 2. *Statutory requirements for joinder of charges*

Section 954 authorizes the joinder of "two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." The statute further provides that "if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." (§ 954.)

As a threshold matter, we conclude that the charges in question met the statutory requirements for joinder. The sexual offense charges were properly joined with the murder count because they are assaultive crimes against the person and therefore belong to the same class of crimes. (*People v. Maury* (2003) 30 Cal.4th 342, 395; *People v. Alvarez* (1996) 14 Cal.4th 155, 188.) The counts

[5] The court severed trial on (1) drug- and firearm-possession charges connected with defendant's arrest that required proof of defendant's status as a convicted felon and drug addict and (2) five counts charging defendant with being under the influence of a controlled substance that were based upon events unrelated to his arrest. As to these charges, the court found that joinder would prejudice defendant.

involving defendant's attempts to evade arrest and to dissuade and intimidate the witnesses who testified at the grand jury proceeding were connected together in their commission with the murder count because defendant's apparent motive for resisting arrest and intimidating witnesses was to avoid criminal liability for Katrina's murder. (Cf. *People v. Alvarez, supra*, at p. 188 [the charged rape was connected in its commission to the vehicle theft count because the theft may have been motivated by a desire to avoid arrest for the rape]; *People v. Valdez* (2004) 32 Cal.4th 73, 119 [notwithstanding the passage of time, a charge of escape from custody was connected in its commission to the murder charge because the apparent motive for the escape was to avoid prosecution for murder].) We observe that the one count charging defendant with being under the influence of a controlled substance at the time of his arrest is neither in the same class of crimes nor connected together in its commission with the murder charge. Because the drug offense occurred in conjunction with the other crimes stemming from defendant's arrest, however, it was connected together in its commission with *those* offenses and therefore properly joined. (See *People v. Johnson* (1988) 47 Cal.3d 576, 587 [concluding that joinder of an additional charge connected in its commission to one of several properly joined counts met the requirements of § 954].)

Defendant does not suggest there was any failure in meeting the statutory requirements for joinder. He points out, however, that a court has discretion to order severance of charges "in the interests of justice and for good cause shown," even when the requirements of section 954 are satisfied. (§ 954.) Defendant contends that the court abused its discretion by refusing to sever trial on the murder charge from trial on all other joined counts.

### 3. A court has discretion to order separate trials

The law favors the joinder of counts because such a course of action promotes efficiency. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.) Nonetheless, as defendant correctly observes, a trial court has discretion to order that properly joined charges be tried separately. (§ 954; *People v. Sapp* (2004) 31 Cal.4th 240, 257-258.) Likewise, although a trial court is authorized to consolidate two or more accusatory pleadings for trial in an appropriate case, it is not required to do so. (§ 954; *People v. Marlow* (2004) 34 Cal.4th 131, 143.)

In exercising its discretion in this regard, the court weighs "the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial. [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92, 126.) To succeed on a claim that the trial court abused its discretion in denying severance or ordering consolidation, the defendant must make a " 'clear showing of prejudice' " and establish that the ruling fell " ' " ' " "outside the bounds of reason." ' " ' " (*Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1220, italics omitted; accord, *People v. Soper* (2009) 45 Cal.4th 759, 774; *People v. Lucky* (1988) 45 Cal.3d 259, 277.) An appellate court evaluates such claims in light of the showings made and the facts known by the trial court at the time of the court's ruling. (*People v. Avila* (2006) 38 Cal.4th 491, 575; *People v. Mendoza* (2000) 24 Cal.4th 130, 161; *People v. Balderas* (1985) 41 Cal.3d 144, 171.)

If the evidence underlying the joined charges would have been cross-admissible at hypothetical separate trials, "that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*People v. Soper, supra*, 45 Cal.4th at p. 775; see also *Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1221; *People v. Mendoza, supra*, 24 Cal.4th at p. 161.) Relevant to our inquiry here, it is sufficient that evidence supporting the various noncapital crimes would be admissible in a separate murder

trial. As this court has explained, " 'two-way' cross-admissibility is not required." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1129; accord, *Alcala v. Superior Court, supra*, at p. 1221.)

As we explain in greater detail below, the evidence known to the court at the time of its rulings that supported the charges of sexual crimes against Robyn G. and Billie B., resisting arrest, and the dissuasion of witnesses generally would have been cross-admissible in a hypothetical separate trial of the murder charge. Accordingly, defendant fails to make the requisite clear showing of prejudice to establish that the court abused its discretion in denying severance and ordering consolidation.

### a. Joinder of the sexual assault counts

The initial indictment charged seven sexual assault counts involving victims other than Katrina: one count each of rape, forcible oral copulation, and penetration with a foreign object against Robyn G. (§§ 261, subd (a)(2), 288, subd. (c), 289, subd. (a)), and three counts of rape and one count of attempted forcible oral copulation against Billie B. (§§ 261, subd. (a)(2), 664/288, subd. (c).)

The charges involving Robyn G. were based upon her testimony at the grand jury proceeding, which was similar to her testimony at trial. According to Robyn G., during the course of what had started out as a consensual sexual encounter in the bedroom of a boat where she was living at the time, defendant prevented her from leaving, forced her to orally copulate him while he viewed pornographic magazines, raped her, and put a gun into her vagina.

Billie B.'s trial testimony likewise tracked her earlier testimony at the grand jury proceeding. Billie B. described an hours-long incident in which defendant forced her to orally copulate and masturbate him by repeatedly pushing her head and hand to his penis. She also recounted a different incident lasting four to five

hours that began as a consensual encounter. On that occasion, defendant ignored Billie's protestations that she was tired and that the intercourse was hurting her, telling her to shut up while he continued having intercourse. On still another occasion, Billie related, defendant repeatedly pulled her onto the couch with him and shoved her hand into his pants. He became angry when she resisted. When Billie eventually got up and went into her daughter's room to avoid defendant, he followed her and tackled her to the floor. As Billie explained, she did not resist having intercourse with defendant at that time because she was afraid he would hurt her if she refused.

The grand jury testimony regarding the sexual assaults against Robyn G. and Billie B. was known to the court at the time of its ruling on the defense motion to sever. At the hearing on the severance motion, the prosecutor argued that the evidence supporting the sexual assault counts was cross-admissible in the murder trial to show common plan or scheme and propensity to commit sexual offenses. Defense counsel countered that the evidence was inadmissible because its prejudicial effects substantially outweighed its probative value. The court made no finding in that regard, noting only that the prosecutor had indicated he intended to file a motion regarding the admissibility of the sexual assaults evidence. For purposes of ruling on the severance motion, the court assumed cross-admissibility and denied severance subject to reconsideration of the issue in light of later rulings. The court observed, however, that given the statements of Nicassio and Bush describing the events that occurred in defendant's bedroom on the night in question, sexual assault was part of the murder case.

During a later pretrial hearing at which the court considered the prosecution's offer of proof supporting admission of both charged and uncharged sexual assaults, the court ruled in relevant part that the evidence underlying the seven sexual offense charges was cross-admissible as to the special circumstance

allegations associated with the murder count. Specifically, the court found that the evidence regarding the crimes against Robyn G. and Billie B. had distinctive, unusual, and significant similarities to the sexual assault special circumstances, for example, the involvement of drugs and alcohol, and victims who were "skinhead groupies . . . who come back for more no matter how badly they're treated." The court further found that the probative value of the evidence was "very significant" and not prejudicial, and that the evidence was therefore admissible both under Evidence Code section 1101, subdivision (b), and under Evidence Code section 1108. (See Evid. Code, §§ 1101, subd. (b), 1108, 352.) The court did not revisit its denial of severance at the time of those rulings, and the defense did not thereafter ask the court to reconsider its earlier ruling.

Defendant argues that the court's findings regarding the factual similarities between the sexual assaults against Robyn G. and Billie B. and the sexual assaults underlying the murder charge were insufficient to establish cross-admissibility under Evidence Code section 1101, subdivision (b).[6]

For her part, the Attorney General argues that similarities in the type of victims targeted by defendant, in the circumstances surrounding the assaults, and in the sexual acts defendant forced upon his victims raised reasonable inferences

---

[6] Evidence Code section 1101, subdivision (b) (Evidence Code section 1101(b)) states, "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

that defendant acted with the requisite intent to force Katrina to orally copulate him and to rape her before killing her.

We need not resolve the parties' debate concerning whether the evidence supporting the sexual assault crimes was sufficiently similar to the evidence underlying the murder charge to permit admission under Evidence Code section 1101(b) to prove intent, common plan, or identity in a separate trial on the murder count. This is because the sexual assaults evidence would have been cross-admissible pursuant to Evidence Code section 1108 to show defendant's propensity to commit the rape and forcible oral copulation upon which both the murder charge and the special circumstance allegations were based.

Evidence Code section 1108 provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Defendant was "accused of a sexual offense" within the meaning of Evidence Code section 1108 because it was alleged he murdered Katrina during the commission of rape and forcible oral copulation (Pen. Code, §§ 261, 288a), both of which are "sexual offenses" as defined by Evidence Code section 1108, subdivision (d)(1). (Cf. *People v. Loy* (2011) 52 Cal.4th 46, 60 [for purposes of Evid. Code, § 1108, the defendant was " 'accused of a sexual offense' " in a prosecution for murder during the commission of a lewd and lascivious act on a child]; *People v. Story* (2009) 45 Cal.4th 1282, 1291-1292.)

We are persuaded furthermore that the evidence supporting the sexual assault crimes that was known to the court at the time of the severance motion would not have been inadmissible under Evidence Code section 352 in a separate trial on the murder count. A court deciding whether evidence of one or more sexual offenses meeting the definitional requirements of Evidence Code section 1108 should

45

nonetheless be excluded pursuant to Evidence Code section 352 undertakes a careful and specialized inquiry to determine whether the danger of undue prejudice from the propensity evidence substantially outweighs its probative value. Specifically, the court weighs factors such as the "nature, relevance, and possible remoteness [of the evidence], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses . . . ." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) Balancing these considerations, we conclude that the risk of undue prejudice from the sexual assaults evidence would not have outweighed its probative value were it admitted at a separate trial on the murder count.

The probative value of the sexual assaults evidence was substantial. First, the evidence supporting the sexual assault charges involving Robyn G. and Billie B. was relatively similar to that supporting the murder count. Each of the victims was an SHD "groupie," in each incident defendant raped his victim and forced her to orally copulate him and, in each instance, defendant forcibly prevented the victim from leaving and ignored her pleas to stop. The sexual assaults occurred no more than three years after the murder and were therefore not remote, which further increased their probative value. In addition, the evidence supporting the sexual assaults was independent of the evidence supporting the murder; Robyn G. and Billie B. initially described the crimes against them without any knowledge of the sexual crimes against Katrina. (See *Falsetta, supra*, 21 Cal.4th at p. 917; *People v. Balcom* (1994) 7 Cal.4th 414, 427.)

46

Defendant repeats his contention, previously mentioned, that the factual similarities between the two sets of charges were insufficient to permit inferences regarding intent, common plan or scheme, or identity.  (See Evid. Code, § 1101(b).)  Such dissimilarities ordinarily would diminish the probative value of the proffered sexual assaults evidence.  (See *People v. Balcom, supra*, 7 Cal.4th at p. 427.)  But defendant's argument ignores the distinction between admissibility under Evidence Code section 1101(b), which requires a sufficient degree of similarity between charged and uncharged offenses, and admissibility under Evidence Code section 1108, which does not.  As we have observed, although lack of similarity is relevant to the court's decision whether to exclude Evidence Code section 1108 propensity evidence as more prejudicial than probative, that factor is not dispositive.  (*People v. Loy, supra*, 52 Cal.4th at p. 63.)

If the prejudicial effect of the sexual assaults evidence would substantially outweigh its probative value in a separate trial on the murder count, it would defeat cross-admissibility of the evidence.  The admission of this evidence would not have been unduly prejudicial, however.  Although the sexual assaults were demeaning, disturbing, and unsavory, their underlying facts paled in comparison to the horrendous nature of the murder.  The sexual assaults evidence was considerably less inflammatory than the murder and, therefore, its admission would not likely have had an unduly prejudicial impact on a jury.  (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1287-1288 [evidence of a prior rape was less inflammatory than the charge that the defendant raped, strangled, and cut the throat of the murder victim while her children were asleep upstairs].)  And although defendant complains generally that "this sort of evidence" distracted the jury from its main area of inquiry, he fails to explain *why* the sexual assaults evidence would have confused, misled, or otherwise distracted the jurors from their task of deciding defendant's guilt of Katrina's murder.  We observe in this

47

regard that the testimony of Robyn G. and Billie B. at the grand jury proceeding was not extensive and its presentation at a separate trial on the murder count would not have been unduly time consuming.

Finally, defendant emphasizes that at the time of the court's ruling he had not been convicted of the sexual assaults against Robyn G. and Billie B. We agree that the absence of a conviction would increase the prejudicial impact of the evidence at a separate trial on the murder count because the jury might be tempted to convict defendant of murder as punishment for having escaped criminal liability for subsequent crimes. (See *Falsetta, supra*, 21 Cal.4th at p. 917; cf. *People v. Balcom, supra*, 7 Cal.4th at p. 427.) This circumstance does not tip the balance against cross-admissibility, however. Just as defendant bears a heavy burden to overcome the preference for a single trial of properly joined counts, he likewise faces a presumption favoring the admissibility of sexual offense evidence under Evidence Code section 1108 to show propensity to commit the charged offense. (*People v. Loy, supra*, 52 Cal.4th at p. 62; *People v. Soto* (1998) 64 Cal.App.4th 966, 984.)

We conclude that defendant has failed to carry his burden of rebutting the strong presumption of admissibility of the sexual assault crimes evidence under Evidence Code section 1108. Because the sexual assaults evidence clearly would have been cross-admissible in a separate trial on the murder count, that circumstance alone is sufficient to dispel any potential of prejudice arising from the joinder of these counts (*Alcala v. Superior Court, supra*, 43 Cal.4th at p. 1221), and we find no reason that this rule should not apply here. Accordingly, we conclude the trial court did not abuse its discretion in refusing to sever trial on the sexual assault counts from trial on the murder charge.

48

*b. Joinder of the resisting arrest counts*

The indictment charged defendant with nine crimes in connection with the incident in late January 1998 in which he fled from officers and then barricaded himself inside a residence until tear gas forced him outside and he was apprehended. As relevant here, the charges included two counts of resisting an executive officer (§ 69), two counts of brandishing a handgun to resist arrest (§ 417.8), and one count each of assault on a peace officer, felony vandalism, and being under the influence of a controlled substance. (§ 245, subd. (c), former § 594, subd. (b)(2); Health & Saf. Code, § 11550, subd. (a).)

The prosecution made the following offer of proof in opposition to the defense motion to sever trial on these counts from trial on the murder count. By late 1997, defendant was aware he was a suspect in Katrina's murder. On the evening of January 30, 1998, officers noticed two individuals, one of whom was later identified as defendant, riding bicycles without headlights. When they approached the pair, defendant fled, ignoring the officers' order to stop. The officers gave chase. As they got closer, defendant pulled a gun from his waistband and threatened to shoot himself. Defendant then jumped a fence and ran to a nearby home, where he beat on the door and demanded to be let inside. The occupants complied, but eventually left the house. Meanwhile, defendant barricaded himself inside. A Ventura County SWAT team was called to the scene but the standoff continued for hours. After tear gas was deployed, defendant went out of the house and back inside several times. On one occasion, he crawled on his hands and knees with a knife in his hand, and slashed at one of the approaching officers, then retreated into the house. He was apprehended the next time he emerged when a group of officers managed to tackle and handcuff him. A blood sample taken from defendant shortly after the incident showed the presence of methamphetamine. Subsequent to defendant's arrest, he told an acquaintance that

49

he felt like a "dumb fuck" for running from the police because he thought he was being arrested for murder, not for a bicycle infraction.

After hearing extensive argument from the parties, the trial court denied severance on all but two of the counts arising from the incident.[7] The court acknowledged the six-year gap between the alleged murder and the events surrounding defendant's arrest. It also acknowledged the defense argument that, given defendant's status as a chronic drug user, gang member, and prison parolee, he likely fled from the police for reasons other than consciousness of guilt. But the court found that the prosecution had "plugged those holes" with evidence that was clearly admissible, and it determined that defendant would not be unduly prejudiced by the use of that evidence both to prove the separate charges and to show consciousness of guilt as to the murder.

Evidence that defendant, thinking he was being arrested for murder, fled from police and resisted arrest by engaging in a dramatic, hours-long standoff generally would be admissible at a separate trial on the murder charge to show his consciousness of guilt for killing Katrina. Likewise, evidence of the murder generally would be cross-admissible in a separate trial on the resisting arrest charges to help explain the intensity of his efforts to evade police. (See *People v. Arias* (1996) 13 Cal.4th 92, 127-128 [evidence the defendant kidnapped and robbed one victim would be cross-admissible in a separate trial for the robbery murder of a gas station clerk that occurred 13 days earlier because the defendant's need for money and transportation to avoid arrest for the murder showed his

---

**7** The indictment charged two additional counts in connection with this incident — possession of a firearm by a narcotic addict and felon in possession of a firearm (former § 12021, subd. (a)(1)). The court granted the severance motion as to those counts.

consciousness of guilt; evidence of the murder in turn would be admissible in the kidnapping-robbery trial to show motive]; see also *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1027 [evidence that the defendant attempted to avoid arrest by jumping fences before being apprehended was properly admitted as tending to show his consciousness of guilt for the capital crimes].)  We reject defendant's assertion that the bulk of the evidence of events surrounding his arrest served no purpose other than to prejudice him.

Defendant repeats the argument advanced by his trial counsel at the hearing that there were any number of reasons why defendant would have fled the police other than a consciousness of guilt for Katrina's murder.  His argument demonstrates only that the evidence proffered by the prosecution regarding defendant's motive for evading police was disputed by the defense.  He points to no case, and we have located none, suggesting that a finding of cross-admissibility is an abuse of discretion simply because the defense has challenged the inferences that may be drawn from the proffered evidence.  (See *People v. Kraft* (2000) 23 Cal.4th 978, 1032 [upholding the trial court's ruling denying severance of 16 murder charges in which evidence relating to one or more of the murders, some of which was disputed by the defense, was cross-admissible to refute anticipated defenses].)

Because any inference of prejudice from the joinder was dispelled by the cross-admissibility of the evidence, the court did not abuse its discretion in declining to sever trial on the murder count from trial on the charges arising from incident relating to defendant's arrest.

### c. *Consolidation of the witness dissuasion counts*

After defendant was charged with Katrina's murder, the sexual assaults on her and two other victims, and the crimes stemming from the incident relating to

51

his arrest, a second indictment was issued in May 1999 charging defendant with five counts that involved various attempts to dissuade witnesses who had testified at the earlier grand jury proceeding. Specifically, defendant was charged with three counts of dissuading a witness by force or threat, and the solicitation of, and conspiracy to commit, those crimes. (§§ 136.1, subd. (c), 653f, subd. (a), 182, subd. (a)(1).) In connection with the conspiracy count, it was alleged that the crime was committed for the benefit of and in association with a criminal street gang, for purposes of sentence enhancement under section 186.22, subdivision (b).

The prosecutor later moved to consolidate the two indictments. At a brief hearing on consolidation that preceded the hearing on the defense severance motion, defense counsel acknowledged that the evidence of intimidation and threats would be admissible at trial on the other charges. The trial court granted the consolidation motion without elaboration, impliedly rejecting defense counsel's argument that consolidation of the two indictments would be unduly prejudicial to defendant.

We conclude the court did not abuse its discretion in ordering consolidation. Notably, the victims identified in the second indictment were the witnesses who testified against defendant in the grand jury proceeding that led to the original 25-count indictment. Evidence supporting the witness dissuasion charges therefore generally would have been cross-admissible in a separate trial on *all* of the charges in the first indictment to show defendant's consciousness of guilt as to those counts. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 948 [evidence that the defendant solicited someone to kill the robbery victim before he testified against the defendant at a pending trial on that crime would have been admissible at a separate trial on conspiracy to murder a detective to prevent his testimony at the robbery trial]; see also *People v. Pinholster* (1992) 1 Cal.4th 865, 945 [evidence that defendant threatened to kill a witness if he testified was properly admitted at

52

trial to show his consciousness of guilt]; *People v. Hannon* (1977) 19 Cal.3d 588, 599.)

On appeal, defendant again acknowledges that evidence of his attempts to dissuade witnesses from testifying was relevant to show his consciousness of guilt as to the murder count. He asserts, however, that the inference of prejudice was not dispelled by the cross-admissibility of the evidence because of the voluminous amount of highly inflammatory evidence relating to his gang membership and White supremacist views, his obscene and vulgar writings, his "Mansonesque" psychosexual power over young women, and his perverse relationship with his mother that was admitted to prove the witness dissuasion counts and the associated gang enhancement.

In these respects, defendant's argument is based on evidence developed later at trial, not on the facts known to the trial court at the time it ruled on the motion to consolidate the indictments. Although the points he raises are relevant to the question whether consolidation of the charges and denial of severance *resulted* in gross unfairness in violation of his right to due process (see *post*, pt. II.A.4), these argument have no bearing on the question whether the court's ruling on the motion to consolidate was an abuse of discretion. (*People v. Mendoza, supra,* 24 Cal.4th at p. 162, fn. 3 [an appellate court reviews the trial court's ruling on a motion to consolidate charges in light of the facts then known to the court].)

### 4. *Constitutionality of trial on the joined charges*

Even when we conclude, as we do here, that the trial court acted well within its discretion in denying severance or consolidating charges, we must further inquire whether events *after* the court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's constitutional right to fair trial or due process of law. (*People v. Rogers* (2006) 39 Cal.4th 826,

851; *People v. Mendoza, supra,* 24 Cal.4th at p. 162; *People v. Bean* (1988) 46 Cal.3d 919, 940.)  Our review of the trial record in the case discloses there was no gross unfairness.

Defendant does not dispute that the evidence regarding the sexual assaults against Robyn G. and Billie B. known to the court when it ruled the evidence admissible with regard to the murder count differed little from the evidence actually presented at trial.  He argues, however, that the presentation of this evidence under Evidence Code section 1108 to show his propensity to commit sexual crimes created a "fundamentally unfair paradigm" that unconstitutionally prejudiced him in the eyes of the jury.

We previously have upheld the constitutionality of Evidence Code section 1108 against a similar challenge and find no persuasive reason to revisit our conclusion.  (*Falsetta, supra,* 21 Cal.4th at pp. 916-922; see also *People v. Fitch* (1997) 55 Cal.App.4th 172, 180-184.)  The record shows the trial court carefully weighed the probative value of the sexual assaults evidence against its potential prejudicial effect before allowing its admission in connection with the murder count and the associated special circumstances, and defendant does not suggest the court failed to undertake the requisite inquiry.  The due process clause does not require more.  (*Falsetta, supra*, at pp. 917-918.)  We observe furthermore that because the sexual offenses against Robyn G. and Billie B. were *charged*, rather than uncharged crimes, there was no risk that the jury would have found defendant guilty of murder to punish him for escaping criminal liability for the other sexual offenses.  (See *People v. Balcom, supra*, 7 Cal.4th at p. 427; *People v. Bean, supra*, 46 Cal.3d at p. 939.)  The joinder of the murder charge with the sexual offense counts did not render defendant's trial grossly unfair.

Defendant argues more generally that the result of the court's refusal to sever the trial on the murder count from trial on all other counts was a trial in which the

"jury's view of the actual evidence of the capital crime was hopelessly entangled with evidence of defendant's character." For example, defendant argues, joinder permitted the admission of evidence of his "bizarre and scary behavior" while attempting to evade arrest, as well as evidence of the vulgar, antisocial, and frightening beliefs he embraced by virtue of his membership in a White supremacist gang. According to defendant, the "sheer amount of evidence that was extraneous and fundamentally irrelevant" to the murder charge "had everything to do with the jury's willingness to convict defendant of it."

We disagree with defendant that the evidence supporting the sexual offenses, resisting arrest, and witness dissuasion counts was extraneous and irrelevant to the murder count. Rather, for the reasons previously discussed, all three groups of crimes were bound up with proving defendant's guilt of the murder and the evidence developed at trial was properly admitted for that purpose. For example, the evidence regarding the SHD gang explained the code of silence, which tended to show why the two eyewitnesses did not report the murder to law enforcement until years after the incident. Nor was the evidence of guilt of the murder count substantially weaker than the evidence supporting defendant's guilt of the other crimes so as to render his trial grossly unfair. (*People v. Soper, supra*, 45 Cal.4th at p. 784; *People v. Jenkins, supra*, 22 Cal.4th at p. 949.) All of the crimes were proved by strong, direct evidence, which included testimony either by eyewitnesses or the victims themselves.

To support his claim of a constitutional violation, defendant points to numerous items of evidence that were not before the court at the time of its severance ruling, specifically, his jailhouse letters to fellow gang members and female "gang groupies," as the trial court described them. Defendant argues that this evidence so inflamed the jury as to render his trial grossly unfair. We have reviewed the complained-of evidence and find that the bulk of it is easily

55

dismissed as flip and adolescent rants and ramblings. Furthermore, defendant's suggestive drawings and use of profanity and vulgarity, although distasteful, would not have unduly inflamed the jury. As one prosecution witness explained during cross-examination, letters from inmates commonly contained crude sexual references. Moreover, given the jurors' knowledge that the SHD was a White power, male-dominated gang, they likely would not have been surprised or shocked by defendant's drawings of swastikas and expressions of admiration for Adolf Hitler, his racist, anti-Semitic, and homophobic remarks, or his demeaning characterizations of women.

Two items of evidence cited by defendant warrant further discussion. The first exhibit is a jailhouse letter from defendant to an unknown inmate that includes a vulgar and unsavory poem describing anal intercourse. The other exhibit is a letter from defendant to a fellow gang member containing a reprehensible, demeaning poem mocking African Americans. We observe, however, that although these exhibits were admitted into evidence, the text of the poems was neither read to nor summarized for the jury.

Defendant did not ask the court to redact the complained-of exhibits to remove the offensive material before they were placed into evidence. But even if the letters should have been redacted, their admission did not render defendant's trial grossly unfair. The facts of the murder far overshadowed any evidence of defendant's vulgar and racist musings, and defendant's guilt of that charge was supported by strong evidence, including detailed testimony by the two eyewitnesses. Although the evidence of defendant's jailhouse letters was not insubstantial, neither was it pervasive.

Pointing to the prosecutor's closing argument, which urged the jury to consider the various sexual crimes against the different victims as "not just one evil act [but as] all the evil together," defendant argues finally that the jury could

56

not reasonably have been expected to "compartmentalize the evidence" so as to decide each count individually on the evidence presented. (*People v. Soper, supra*, 45 Cal.4th at p. 784.) The record does not support his assertion. The prosecutor's point was that were the jury to find defendant committed rape and forcible oral copulation against some of the victims, it could infer that defendant had a disposition to commit, and likely did commit, all of the charged sexual offenses, an argument he was entitled to make. (Evid. Code, § 1108.) The record shows moreover that the jury was instructed on the elements of each of the charged crimes, told that "each count charges a distinct crime," and directed to "decide each count separately." (CALJIC No. 17.02.) Absent some showing to the contrary, we presume the jury followed the court's instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) No such showing was made here.

In resolving a claim that joinder resulted in gross unfairness in violation of a defendant's right to a fair trial and due process, we have observed that a judgment will be reversed on this ground only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt." (*People v. Bean, supra*, 46 Cal.3d at p. 940.) For all the reasons explained above, we conclude there was no reasonable probability that the joinder of counts tainted the jury's verdicts in this case.

**B. Excusal of Two Prospective Jurors for Cause**

Defendant asserts that his death sentence must be reversed because the trial court erred when it granted the prosecution's challenges for cause against two prospective jurors, depriving him of his rights under the Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.**8** We conclude that the trial court did not err in excusing the prospective jurors in question.

The governing principles are well settled. Under the state and federal Constitutions, a criminal defendant is entitled to trial by an impartial jury. (*People v. Clark, supra,* 52 Cal.4th at p. 895; *Wainwright v. Witt* (1985) 469 U.S. 412, 424.) " 'To achieve the constitutional imperative of impartiality [in a capital case], the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the court's instructions and the juror's oath.' [Citations.]" (*People v. Martinez* (2009) 47 Cal.4th 399, 425.) As this court has explained, absent a finding of substantial impairment, a trial court may not exclude a person from jury service in a capital case based upon his or her "personal conscientious objection to the death penalty." (*People v. Stewart* (2004) 33 Cal.4th 425, 446.)

---

**8** Defendant invokes these and other state and federal constitutional provisions in nearly every other claim raised in this appeal. "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17, italics omitted.) " ' "No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." [Citations.]' " (*People v. Clark* (2011) 52 Cal.4th 856, 890, fn. 7.)

"During voir dire, jurors commonly supply conflicting or equivocal responses to questions directed at their potential bias or incapacity to serve. When such conflicting or equivocal answers are given, the trial court, through its observation of the juror's demeanor as well as through its evaluation of the juror's verbal responses is best suited to reach a conclusion regarding the juror's actual state of mind. [Citation.] ' " 'There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.' " ' [Citation.]" (*People v. Jones* (2012) 54 Cal.4th 1, 41.)

A trial court's ruling on a challenge for cause is reviewed for abuse of discretion. (*People v. Martinez, supra*, 47 Cal.4th at p. 426.) We will uphold the court's decision " ' " 'if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 975; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 60.) When there is no inconsistency or ambiguity, we will uphold the court's ruling if it is supported by substantial evidence. (*People v. Pearson* (2012) 53 Cal.4th 306, 327-328.)

### 1. Prospective Juror S.B.

S.B.'s responses in her juror questionnaire indicated that she supported both the death penalty and life without the possibility of parole. Specifically, when asked to give her general feelings regarding the death penalty, S.B. wrote that if "a person killed someone they should serve a life sentence or receive the death penalty." Although she believed life without parole was a more severe punishment for defendants because "they have to deal with this for the rest of their

lives," she also checked "Yes" to the question whether she would be open-minded regarding which penalty should be imposed in the case.

At the outset of voir dire questioning, the court asked S.B. whether there was any reason she could not be fair in this matter. She shrugged her shoulders and said, "No, I guess not." When the court then asked whether there was anything else about her views regarding the death penalty, she qualified her questionnaire response by stating, "I'm not really for it unless they're a serial murderer or something, but if it's just one murder, I think they should [get] . . . life without parole." In response to the court's further question whether she was saying she would automatically vote for life without parole in a case involving only a single murder victim, S.B. replied, "Yes, yes." The prosecutor then challenged her for cause.

Defense counsel questioned S.B. first, eliciting from her that she would make certain exceptions to her view that the death penalty should be reserved for serial killers. She agreed that death would be appropriate, for example, for someone who killed a child. When defense counsel observed that S.B. seemed "right in the middle" and "would consider both [penalties], depending on the circumstance," S.B. agreed, indicating, "Yeah, I think I would." She also agreed with defense counsel's observation that "in the right case with only one victim" she could vote to impose the death penalty, depending on what she heard at trial. As S.B. stated in her own words, "I'm willing to listen to the case . . . before I make my decision."

S.B. retreated somewhat from those views while being questioned by the prosecutor, however. Although she confirmed she could consider the death penalty in a case involving only one victim, she indicated, "I don't know if I would do it." She also answered "Yeah," when the prosecutor asked whether there was a possibility she would not be "fair" on the death penalty issue. When

60

the prosecutor then inquired into S.B.'s view that life without parole was a harsher punishment than death, she agreed that if she thought the harsher penalty was appropriate, it was more likely she would vote for life without parole because "they'd have to think about it forever." S.B. then agreed with the prosecutor again "there was a good chance in a case like this that [she] probably won't be fair in a penalty stage."

The parties then conducted another round of questioning, eliciting somewhat vacillating responses from S.B. When defense counsel asked S.B. what she would do if she was convinced by the evidence that death was appropriate, S.B. replied, "I would say yes if it was appropriate." The prosecutor, after reminding S.B. that she had previously agreed with him that there was a good chance she could not be fair in the case, then asked whether in a case with only one victim, it would be very unlikely for her to return a verdict of death. S.B. answered, "Yes."

The court conferred with the parties outside the presence of the prospective jurors, indicating at the outset that it was "leaning" toward excusing S.B. Defense counsel argued that her answers consistently indicated she would consider, and return, a death verdict in an appropriate "one victim" case. For his part, the prosecutor noted that at the outset of voir dire questioning, before any prompting and leading questions by either side, S.B. responded to the court's open-ended question by indicating she could not be fair. In the prosecutor's view, because S.B. was going to say whatever the attorneys wanted her to say, her remarks during the initial questioning by the court were the best indicator of her true state of mind.

Finding the question "close," the court granted the challenge for cause over a strenuous defense objection. The court observed that S.B.'s views were difficult to read "because she just swayed with the wind." It found, however, that her comment at the outset of questioning was "very revealing," and concluded

61

accordingly that her duty as a potential capital juror would be impaired by her reluctance to impose the death penalty in single-victim cases.

Under the circumstances presented here, the trial court's impression of S.B.'s true state of mind is entitled to deference by this court, and we conclude that its ruling is supported by the record. It is true that S.B. indicated during questioning by defense counsel that "in the right case with only one victim" she could vote to impose the death penalty. But she had expressed the opposite view at the outset of questioning without any prompting, and then vacillated back and forth in her responses to leading questions by the parties. Those responses, when considered in conjunction with S.B.'s demeanor, could have left the court with the " ' "definite impression" ' " that she would be unable to faithfully and impartially perform her duties as a juror in the case. (*People v. Moon* (2005) 37 Cal.4th 1, 14, see *id*. at pp. 15-16; *People v. Friend* (2009) 47 Cal.4th 1, 61 [the court's excusal of a prospective juror after determining he would be unwilling to consider the death penalty for a defendant who had committed only one murder was fairly supported by the record]; *People v. Hawthorne* (2009) 46 Cal.4th 67, 84 [same].)

Defendant asserts that because S.B.'s views regarding the death penalty were neither ambiguous nor equivocal, the trial court's determination of her state of mind is not entitled to deference. He observes that S.B. quickly retreated from her initial comment that the death penalty should be imposed only on serial killers. According to defendant, as voir dire continued and S.B. became more familiar with the process, her understanding evolved and she unambiguously expressed her ability to apply the law and vote for death in an appropriate case. Defendant may be correct that, when considered separately, S.B.'s views were not *ambiguous*. But the record supports the trial court's observation that S.B. "swayed with the wind" depending on which of the parties was questioning her. For example, after having agreed with defense counsel that she "would consider both [penalties],

62

depending on the circumstance," S.B. then agreed with the prosecutor that in a case with only one victim it would be very unlikely for her to vote for death. Contrary to defendant's argument, the record does not show that the continued questioning in this case solidified and clarified the prospective juror's views. (Cf. *People v. Williams* (2013) 56 Cal.4th 630, 667 [upholding the trial court's refusal to excuse a prospective juror whose initial responses appeared conflicting but whose views were clarified in the final round of questioning].) In any event, the court's resolution of the conflict in S.B.'s responses, which was based upon its firsthand observations of the prospective juror's answers and demeanor, is entitled to deference here. (See *People v. Wilson* (2008) 44 Cal.4th 758, 780 [observing that the court "was in the best position to assess the juror's state of mind, based on her conflicting responses, her demeanor, her vocal inflection and other nonverbal cues"].)

Defendant contends furthermore that the court applied an erroneous standard to excuse S.B. when it found she was impaired by her reluctance to impose the death penalty in single victim cases. Specifically, he complains there was no finding whether S.B. could set aside her personal beliefs and carry out her duties as a juror without substantial impairment. As defendant points out, under applicable law, even a juror who "might find it very difficult to vote to impose the death penalty" is not necessarily substantially impaired unless he or she was unwilling or unable to follow the court's instructions in determining the appropriate penalty. (*People v. Stewart, supra*, 33 Cal.4th at p. 447, italics omitted; see also *People v. Rountree* (2013) 56 Cal.4th 823, 848 [prospective juror was properly excused for cause, not because he believed judging the defendant would be difficult, but because he indicated it would be difficult for him to set aside his religious beliefs in order to carry out his duties as a juror].) We disagree, however, that the court employed an erroneous standard here. The focus of

63

questioning by the court and the parties was whether there was a likelihood that S.B. fairly could consider both the death penalty and life without parole. We have repeatedly explained that such an inquiry is a proper formulation of the standard set forth in *Wainwright v. Witt, supra*, 469 U.S. 412. (See *People v. Martinez, supra*, 47 Cal.4th at p. 432.) As previously discussed, the record supports the trial court's determination that S.B.'s views would substantially impair the performance of her duties as a juror because those views rendered her incapable of returning a death verdict in an appropriate case involving only a single murder victim. The trial court did not err in excusing S.B. for cause.

### 2. *Prospective Juror B.T.*

Prospective Juror B.T.'s questionnaire responses indicated a consistent and emphatic opposition to the death penalty. He checked "Yes" in answering the question whether his opposition to the death penalty was so strong that he would always vote against the death penalty, no matter what the evidence, and he included comments that the death penalty "promotes a culture of state sanctioned killing, " it is "irreversible," "mistakes are made," and it does not "serve[] any good purpose." He also marked "No" when asked whether he could be open-minded as to which penalty should be imposed were the case to proceed to a penalty phase, reiterating his earlier comment that he opposes the death penalty.

During voir dire questioning, however, B.T. appeared less certain of his views, telling the court he "couldn't tell you for sure" that he felt he could never vote for the death penalty but that he "dread[ed] the thought" of ever having to do so. When asked whether he would be open-minded as to either penalty, B.T. indicated that he was "open-minded to following the law." As he explained, "I always try and do everything I can to follow the law . . . but to try to tell you how I would consider voting on the death penalty, I couldn't even tell you. I couldn't

even tell you my own mind." B.T. reiterated his opposition to the death penalty and indicated he "would start out with my mind opposing the death penalty." He then explained, "I . . . always do everything I can to follow the law and I would do . . . the same thing as a juror, cause I think if I was accused of a crime, I'd want every possible safeguard I could have to see that the laws are followed." He acknowledged, however, that he could not say how his feelings would affect him. And when asked if there were any scenarios in which he felt he could vote for the death penalty, he responded, "No." The prosecutor challenged B.T. for cause but did not question him further.

Defense counsel began his questioning by confirming with B.T. that he understood a juror's various roles during a capital case and that a juror takes an oath to follow the court's instructions when making the penalty determination. When counsel asked B.T. whether he could do that, B.T. replied, "Yes," and again indicated he "would always follow the law." B.T. indicated, however, that he also opposed the death penalty and didn't know whether he could vote for death. In response to counsel's further question whether his opposition to the death penalty was so strong that he could not consider it as an option, B.T. said, "No," reiterating that, "as a juror, I would always do everything I could to follow the law."

Defense counsel then elicited from B.T. several responses suggesting his views would not substantially impair his ability to perform his duties as a juror. B.T. agreed with counsel that he would follow the law and the instructions given to him at the penalty phase. And when asked if he could set aside his general opposition to the death penalty and be as fair to the prosecution as he would be to the defendant, B.T. answered, "Yes, I believe I could." In response to the question whether his mind was foreclosed to the possibility of choosing death as a penalty, he indicated, "No it's not."

65

After neither defense counsel nor the prosecutor indicated he wanted to be heard on the issue, the court excused B.T. for cause without comment.

B.T.'s responses to questions regarding his views on the death penalty were, at best, equivocal and conflicting. His answers on the questionnaire showed strong opposition to capital punishment, but during questioning in open court he was unable to say for sure how those views would affect his ability to vote for death in an appropriate case. And although B.T. told the court there was no scenario in which he felt he could vote for the death penalty, he indicated later during defense counsel's questioning that his mind was *not* foreclosed to the possibility of choosing death as a penalty. We defer to the court's resolution of the ambiguities and conflicts in B.T.'s views, which was informed by the court's firsthand observations of the prospective juror's responses and demeanor. We conclude furthermore that the record fairly supports the court's determination that B.T.'s views regarding the death penalty would substantially impair the performance of his duties as a juror. B.T. twice indicated on his questionnaire that he would not be able to set aside his personal views and apply the law. The trial court, having considered B.T.'s demeanor during voir dire questioning, was entitled to accept those responses, notwithstanding B.T.'s contradictory answers during voir dire questioning. (*People v. Whalen* (2013) 56 Cal.4th 1, 49-50.)

As defendant correctly observes, this court has made clear that a juror's strong opposition to the death penalty does not necessarily disqualify him or her from serving on a jury in a capital case. (*People v. Jones, supra,* 54 Cal.4th at p. 42; *People v. Martinez, supra*, 47 Cal.4th at p. 427; *People v. Stewart, supra*, 33 Cal.4th at p. 446.) He does not persuade us that the trial court's excusal of B.T. is contrary to that pronouncement, however. "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in

deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176.) During voir dire questioning, B.T. indicated repeatedly that he strove to always "follow the law." But whether he could set aside his views regarding the death penalty was not so clear. Although B.T. answered, "Yes" when defense counsel asked whether he could set aside his general opposition to the death penalty, his questionnaire responses indicated that his beliefs in that regard were so strong that he always would vote against the death penalty, regardless of the evidence. Having assessed B.T.'s demeanor firsthand during questioning, the trial court could properly find the questionnaire responses the better reflection of B.T.'s true state of mind. (*People v. Whalen, supra,* 56 Cal.4th at p. 49.)

### C. Evidentiary Rulings at the Guilt Phase

#### 1. *Admission of uncharged misconduct*

Before the start of the guilt phase, the prosecution filed a detailed trial brief seeking admission of evidence of defendant's uncharged misconduct through the testimony of his alleged victims. Defendant claims the trial court erred by allowing the prosecutor to present the resulting evidence involving sexual assaults and other violence against women, and he asserts that the admission of this evidence deprived him of a fair trial and due process. We conclude the challenged evidence was properly admitted.

##### a. *Testimony of Kristen S.*

According to the prosecution's offer of proof, Kristen S. was acquainted with defendant because they used methamphetamine together. Sometime between 1993 and 1996, Kristen went home with defendant after a party. She probably would have consented to "normal" sexual activity with him. At one point, however, defendant started to "get weird," ordering her to undress and then holding her hand on his penis while he lay on his bed and looked through pornography. Kristen

67

manually stimulated defendant for hours, but he was unable to maintain an erection and demanded that she perform other sexual acts, also for an extended period of time. She orally copulated him for so long that it became painful for her.

The offer of proof further indicated that Kristen S. wanted to leave but never actually told defendant so because she was scared and confused. She believed that defendant knew she wanted to leave, however, because when she said she had to use the bathroom, defendant escorted her there and stood over her until she was finished. The entire incident lasted for almost two days, at the end of which Kristen left defendant's bedroom and went home. She did not contact the police to report what had happened.

Kristen S. encountered defendant again several nights later when she was at a tattoo shop having a "White power" design that was created by defendant tattooed on her buttocks. Defendant, who was hanging around the shop watching the tattoo artist at the time, slapped Kristen's buttocks repeatedly, saying it would help set the ink. When Kristen complained to defendant about his behavior, he forced her into the bathroom and made her sit on the toilet. Holding her there with one hand, he attempted with the other hand to inject drugs into his arm. While doing so, defendant drew his own blood with the syringe and started squirting it at Kristen's face, angrily saying that he did not like "mouthy girls" and warning her that if she continued to mouth off he "would slice her throat like he did to Trina."

### i. Evidence regarding the sexual assault

At a hearing concerning the admissibility of various uncharged sexual assaults, the court ruled that the incident with Kristin S. in defendant's bedroom was admissible as propensity evidence under Evidence Code sections 1108 and 1101(b). The court found significant similarities between that event and the other

68

charged and uncharged crimes, and determined that the probative value of the evidence was not outweighed by its prejudicial effects.

We uphold the court's ruling for reasons similar to those on which we rejected defendant's challenge to the court's refusal to sever the murder count from the sexual assault charges. (See *ante*, pts. II.A.3.a, II.A.4.)

Evidence Code section 1108 permits the prosecutor in a sexual offense trial to present evidence of the defendant's other sexual offenses, so long as the other sexual offenses are not inadmissible pursuant to Evidence Code section 352. As previously explained, defendant was accused in the present matter of sexual offenses against Katrina because it was alleged she was murdered during the commission of rape and oral copulation. In addition, he was charged with sexual offenses against Robyn. G. and Billie B. that fell within the scope of Evidence Code section 1108. (See Evid. Code, § 1108, subd. (d)(1) [listing rape, sexual penetration with a foreign object, and forcible oral copulation as qualifying sexual offenses].)

Defendant does not dispute that he was being prosecuted for sexual offenses within the meaning of Evidence Code section 1108. He argues, however, that Kristen S.'s testimony regarding the incident in the bedroom should not have been admitted under Evidence Code section 1108 or otherwise. Pointing to Kristen's heavy drug use at the time of the events in question and her failure to report the incident to authorities until long after it had occurred, he first asserts that her recollection of these events was so vague, disjointed, and inherently unreliable as to be inadmissible on that ground alone. It is well settled, however, that the reliability of a witness's testimony is a matter for the jury to decide and therefore concerns the weight of the evidence, and not its admissibility. (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

69

Defendant further contends that the incident as described by Kristen S., even if believed, did not amount to a sexual offense for purposes of admission under Evidence Code section 1108. Specifically, he argues there was no showing that defendant forced Kristen to do anything against her will or that the sexual encounter was otherwise nonconsensual. Defendant's characterization of the evidence is belied by the prosecution's offer of proof and Kristin's testimony at trial. Although Kristen acknowledged that she did not expressly refuse defendant's orders to perform various sexual acts or try to escape, she explained that she did not attempt to resist defendant because he had gotten "weird" and she was scared and confused. Given Kristen's vulnerability by being alone with defendant in his bedroom, and the testimony regarding her awareness of his membership in a violent skinhead gang, her acquiescence to and continued participation in sexual acts with defendant is not inconsistent with the conclusion that a forcible sexual assault occurred.

Characterizing the sexual assault evidence as "yet another bizarre and disturbing incident" involving drugs and "strange sex" that created an "aura of evil around him," defendant argues finally that the evidence was not properly admitted under Evidence Code section 1108 because it was "inadmissible pursuant to section 352." (Evid. Code, § 1108, subd. (a).) A court has broad discretion to exclude, as substantially more prejudicial than probative, sexual offense evidence that meets the requirements for admission under Evidence Code section 1108, and its ruling in this regard is reviewed for abuse of discretion. (*People v. Loy, supra*, 52 Cal.4th at p. 61.)

As previously explained in the discussion regarding defendant's challenge to the court's denial of his motion to sever the murder charge from the sexual assault offenses (see *ante*, pt. II.A.3.i.), a court considering the admissibility of evidence under Evidence Code section 1108 examines a number of specified factors to

determine whether the danger of undue prejudice from the evidence in question substantially outweighs its probative value regarding defendant's propensity to commit the charged sexual offenses. (*People v. Loy*, *supra*, 52 Cal.4th at p. 61; *Falsetta, supra*, 21 Cal.4th at pp. 917-918.) Here, the relevant factors amply support the conclusion that the court did not abuse its discretion in admitting evidence of defendant's sexual assault of Kristen S. for purposes of showing defendant's propensity to commit the charged sexual assaults.

First, the nature and quality of the offenses against Kristen S., each of which amounted to a forcible sexual assault, were identical to the nature and quality of the charged sexual offenses, suggesting their strong probative value as evidence of defendant's disposition to commit such crimes. Although the incident involving Kristen occurred several years after the sexual crimes against Katrina, it happened around the same time as the sexual assaults against Robyn. G. and Billie B. and showed defendant's continuing pattern of sexual crimes against the women who befriended him. (See *People v. Story, supra*, 45 Cal.4th at p. 1293 [defendant's history of sexual assaults was probative of the sexual conduct that preceded defendant's strangulation of the victim].)

We observe furthermore that the sexual assaults against Kristen S. bore many similarities to the charged offenses, further supporting the probative value of the evidence in question. Kristen, like Katrina, Robyn G., and Billie B., was, as described by the court, a "skinhead groupie" who considered defendant either a friend or a boyfriend. In addition, the assaults against all four victims involved a multiplicity of forced sexual activities and, in the case of Kristen, Robyn G., and Billie B., they were lengthy ordeals during much of which defendant flipped through pornographic magazines. Notably, and likely related to the manner in which Katrina escaped from defendant's home during the first unwanted sexual

71

encounter, defendant prevented all four victims from using the bathroom without his supervision.

That defendant had not been charged and convicted of any sexual crimes in connection with the incident involving Kristen S. arguably increased the potential for undue prejudice because of the risk that the jury might want to convict defendant of the charged offenses because he had escaped punishment for his crimes against Kristen. We observe furthermore that because there was no prior conviction, defendant's commission of the offenses against Kristen was less certain and he bore some additional burden defending against that evidence. (See *People v. Loy, supra*, 52 Cal.4th at p. 61 [prior conviction for a sexual offense admitted as propensity evidence under Evid. Code, § 1108 diminishes its potential for prejudice].) None of these factors is dispositive, however. And although the incident in question may have been "bizarre and disturbing" as defendant asserts, it was not so horrendous as to have inflamed the jury. Nor did the prosecutor belabor its details at trial. Given the strong probative value of the evidence in question, the potential for prejudice did not overcome Evidence Code section 1108's presumption in favor of admissibility of the sexual offense evidence to show defendant's propensity to commit the charged sexual offenses. (See *People v. Loy*, *supra*, at p. 62.)[9]

### ii. Tattoo parlor incident

After extensive argument by the parties, and over defense objection, the court ruled that Kristen S. could testify about the incident at the tattoo parlor in its

---

[9] Like our resolution of defendant's challenge to the court's denial of his motion to sever trial on the murder count from trial on the sexual offense charges, we need not, and do not, address whether the court acted within its discretion in admitting the evidence under Evidence Code section 1101(b).

entirety.  Although the court acknowledged that the evidence placed defendant in an unfavorable light, it found the prejudicial impact of the evidence was not outweighed by its significant probative value in providing context for defendant's admission.  Kristen's eventual testimony at trial differed only slightly from the prosecution's offer of proof.  She testified at trial that defendant, who was clad only in boxer shorts at the time, was angry at her for refusing to touch his penis and wanting to leave the bathroom.

Defendant does not challenge the admissibility of his statement to Kristen S. to the effect that he "sliced" Katrina's throat.  He argues, however, that the court's ruling admitting the facts surrounding the entire incident at the tattoo shop exposed the jury to irrelevant and highly prejudicial "criminal propensity" evidence forbidden under subdivision (a) of Evidence Code section 1101, and inadmissible under Evidence Code section 352.  For example, defendant asserts, the evidence that before he made the admission regarding Katrina he was injecting drugs and then using the syringe to squirt his own blood at Kristen demonstrated to the jury that he acted with depraved indifference to Kristen's life.

Defendant's challenge to this evidence does not succeed.  As defendant acknowledges, his unsolicited statement to Kristen S. about slicing Katrina's throat constituted an admission and was therefore properly allowed into evidence to show the identity of the perpetrator.  (See *People v. Robinson* (2000) 85 Cal.App.4th 434, 445.)  Furthermore, the circumstances surrounding that admission were relevant because they placed his statement in context.  (*Ibid.*)  The jury was entitled to know, for example, that defendant's admission was made neither in passing nor in jest but rather for purposes of instilling fear in Kristen for refusing his demand for sexual stimulation.

A "trial court," of course, "has broad discretion" under Evidence Code section 352 "to exclude even relevant evidence 'if its probative value is

73

substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Clark, supra,* 52 Cal.4th at p. 893 [quoting Evid. Code].) But we cannot say that the tattoo parlor evidence was *unduly* prejudicial within the meaning of Evidence Code section 352. (*People v. Karis* (1988) 46 Cal.3d 612, 638 [" ' "prejudicial" is not synonymous with "damaging" ' "]; accord, *People v. Lopez* (2013) 56 Cal.4th 1028, 1059.) Nor does defendant persuade us that the prejudicial impact of the complained-of evidence outweighed its strong probative value in giving context to his admission, particularly when that evidence is compared to other unsavory evidence properly before the jury, such as the horrific facts underlying the capital crime. (*People v. Harris* (2013) 57 Cal.4th 804, 842; *People v. Jones* (2011) 51 Cal.4th 346, 371.) We conclude the court did not abuse its discretion in admitting evidence regarding the incident at the tattoo shop.

### b. *Testimony of Corie G.*

Before trial, the prosecutor also sought a ruling admitting evidence that defendant sexually assaulted Corie G. According to the prosecutor's offer of proof, defendant and Corie first started dating in 1988 when defendant was 15 years old and she was two years his senior. Defendant, who was a member of the SHD gang at the time, was incarcerated during much of their relationship. On one occasion when he was not in custody, defendant held Corie against her will in the camper shell of a truck parked in front of a residence and forced her to engage in sexual intercourse. Although Corie told defendant she did not want to do so, she submitted because she believed if she did not let defendant do what he wanted, it was "gonna get bad" and defendant would become violent.

At a hearing on the prosecutor's motion, the court expressed strong doubts that the incident was sufficiently similar to the charged offenses to justify its

74

admission under Evidence Code section 1101 (b). It concluded, however, that the dissimilarities did not render the evidence inadmissible under Evidence Code section 1108. Ruling that it would allow the evidence under the latter provision, the court explained that it found the incident was not inflammatory when compared to the other sexual crimes and that it was relevant to show defendant's treatment of women. Corie G.'s testimony at trial was substantially the same as the prosecution's offer of proof, although she added that during the incident she yelled for her friends in a nearby house to help her but that no one came out. She also indicated during cross-examination that, after the incident, she continued to "hang out" with defendant and other SHD gang members and that she felt safe with defendant "because he was the toughest guy."

Defendant argues that the court erred in admitting evidence of the sexual assault against Corie G. because the evidence was substantially more prejudicial than probative. For reasons similar to those supporting the admission of evidence regarding the sexual crimes against Kristen S. (see *ante*, pt. II.C.1.a.), we conclude that the court did not abuse its discretion in allowing the challenged evidence. The probative value of the evidence in question was shown by the forcible nature and quality of the sexual offense, which mirrored the nature and quality of the charged sexual offenses. Although the incident had occurred five or more years before the sexual assaults against Katrina and the victims of the other charged crimes, the evidence was highly probative of defendant's lengthy history of sexually assaulting "skinhead groupies" who considered him a boyfriend or friend but feared a violent response if they refused his commands. As for the issue of prejudice, there is no question that forcible sexual intercourse is a serious and demeaning crime. However, the admission of evidence regarding the circumstances surrounding defendant's rape of Corie cannot be characterized as unduly prejudicial when compared to the facts underlying the charged crimes.

75

Defendant points out, correctly, that, like the sexual assault against Kristen, the incident involving Corie did not result in a prior conviction, which creates a potential for prejudice. Nor did the incident involve a demand for sexual acts other than intercourse or occur over an extended period of time, similar to some or all of the charged sexual offenses. These factors, however, do not compel the conclusion that the potential for prejudice by admitting the challenged evidence substantially outweighed its probative value, as described above. As previously mentioned, there is a strong presumption in favor of admitting sexual assault evidence under Evidence Code section 1108 to show propensity to commit charged crimes. (*People v. Loy, supra*, 52 Cal.4th at p. 62.) Contrary to defendant's argument, the presumption of admissibility was not overcome as to the evidence of defendant's sexual assault against Corie.

### c. Testimony of Susan V.

The prosecutor also sought admission of evidence regarding an incident that occurred after Katrina's murder, arguing that the evidence was admissible to show defendant's consciousness of guilt. Susan V. was a former girlfriend of defendant's. She also was a good friend of John Cundiff, an SHD gang member who was living with the Porchos at the time of Katrina's disappearance. About two years after Katrina disappeared, Susan had a conversation with Cundiff regarding that subject and defendant somehow became aware of their talk. About one week after Susan spoke with Cundiff, she drove to defendant's home to visit him. Defendant came out to the car and walked with Susan toward the house, then turned abruptly and punched her in the face with a closed fist. Susan ran back to the car and locked herself inside, but defendant followed, apologizing for hitting her, and telling her they needed to talk. Susan accepted the apology, got out of the car, and walked along with defendant. As they approached defendant's house,

76

however, defendant started punching her in the face again. Susan eventually ended up in defendant's room. During an ensuing conversation, defendant asked Susan what she had spoken to Cundiff about and then told her not to talk about Katrina again.

The court admitted the proffered evidence, rejecting defense counsel's argument that presenting the incident in its entirety would show defendant's bad character and propensity for violence. The court acknowledged the prejudicial impact of evidence that defendant "sucker-punched" a woman and then lured her out of her car and did it a second time. But the court concluded that the inferences to be drawn from the incident had significant probative value that outweighed any prejudice, remarking that "[s]ome things we've got to take as they allegedly happened and let the jury sort it out."

Citing to *People v. Nelson* (2008) 43 Cal.4th 1242, defendant complains that the trial court abdicated its responsibility for deciding the admissibility of evidence by ruling that it would allow the jury to "sort it out." We have no quarrel with defendant's contention that the task of resolving questions regarding the relevance of evidence is a "hallmark responsibility of the trial judge." (*Id.* at p. 1265.) Contrary to his assertion, however, the record of the court's ruling on the admissibility of the evidence regarding defendant's attack on Susan V., when read in its entirety, amply demonstrates that the court thoughtfully and carefully carried out its judicial obligation in this respect. Placed in context, the court's comment about letting the jury "sort it out" meant that the jury ultimately would determine the inferences to be drawn from the challenged evidence.

We likewise reject defendant's substantive challenge to the admission of this evidence. Defendant's warning to Susan V. not to talk about Katrina's disappearance was highly probative of his consciousness of guilt and the central issue of his identity as the killer. Even more probative in this regard were the

77

violent assaults that preceded the warning. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 669 [evidence that the defendant's sister's threat to dissuade a witness was accompanied by a violent assault was more powerful than evidence the defendant had only verbally threatened the witness].) Defendant's sudden, unprovoked assault on a former girlfriend, coupled with the deceptive manner in which he coaxed her out of the car for a second beating, undoubtedly placed him in a negative light. But, in ruling the evidence admissible, the court acted well within its discretion in finding that its probative value substantially outweighed any prejudicial impact.

### 2. *Admission of Katrina's out-of-court statements*

The court conducted a number of pretrial evidentiary hearings to decide whether to allow prosecution witnesses to relate Katrina's statements describing two incidents involving assaultive conduct by defendant that occurred several months prior to her disappearance. Defendant claims the court's rulings admitting the out-of-court statements violated state evidentiary law and his state and federal constitutional rights to due process and to confront the witnesses against him. We conclude the trial court did not abuse its discretion in admitting two of the statements in question. Although we will assume the court erred in admitting a third statement, we conclude its admission did not prejudice defendant. We conclude furthermore that the admission of the out-of-court statements did not deprive defendant of any constitutional rights.

### a. *Spontaneous statements*

Two of the three out-of-court statements in question were admitted, for the truth of the matters asserted, under the spontaneous statement exception to the

hearsay rule. (Evid. Code, § 1240.)[10] The admissibility requirements for such out-of-court statements are well established. " '(1) [T]here must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) A statement meeting these requirements is "considered trustworthy, and admissible at trial despite its hearsay character, because 'in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief.' [Citation.]" (*People v. Clark, supra,* 52 Cal.4th at p. 925.)

A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was "time to contrive and misrepresent." (*People v. Poggi, supra*, 45 Cal.3d at p. 318.) Such factors include the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for

---

**10**     Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

79

reflection and fabrication.  (*People v. Clark, supra*, 52 Cal.4th at p. 925, *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1525.)  This court has observed, however, that these factors "may be important, but solely as an indicator of the mental state of the declarant."  (*People v. Farmer* (1989) 47 Cal.3d 888, 903-904.)  For this reason, no one factor or combination of factors is dispositive.  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 810; see, e.g., *People v. Poggi, supra*, at p. 319 [a statement made calmly and coherently also may have been made spontaneously]; *People v. Trimble* (1992) 5 Cal.App.4th 1225, 1234 [the lapse of time between the startling event and the statement is not determinative of its spontaneity].)

Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion.  (*People v. Poggi, supra*, 45 Cal.3d at p. 318.)  We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception.  (*People v. Lynch* (2010) 50 Cal.4th 693, 752; *People v. Brown* (2003) 31 Cal.4th 518, 540-541.)

### i. *Katrina's statements to Shawna Torres*

The summary of facts in the prosecution's trial brief included a statement by Katrina's friend Shawna Torres regarding an incident that occurred when Katrina paid a visit to defendant shortly after his release from prison in the spring of 1992.  According to Torres, Katrina wanted to make clear to defendant that she was not his girlfriend and to tell him to stop calling and writing her.  Katrina was inside defendant's home for about 20 minutes while Torres waited in the truck.  When Katrina returned, she was visibly upset and told Torres that defendant had grabbed

her by the neck and started choking her while his mother stood by and did nothing. Torres noticed red marks on Katrina's neck.

The defense objected to the proposed testimony on the ground it was based upon inadmissible hearsay, and the prosecutor countered that Katrina's out-of-court statement qualified for admission under the spontaneous statement exception to the hearsay rule. At an initial hearing on the matter, in which the parties debated the admissibility of the evidence both under the excited utterance exception and under Evidence Code section 352, the court remarked that it found the probative value of the evidence "astronomical." However, the court did not then issue a ruling, and granted a defense request to conduct a hearing at which Torres could be questioned regarding her anticipated testimony.

At the hearing, Torres provided an account of events substantially similar to what had appeared in the prosecution's trial brief, adding that Katrina was both upset and "really angry" when she returned to the truck. At the conclusion of Torres's testimony, and after considering further argument by the parties, the court overruled the defense objections and concluded without elaboration that the entire incident was admissible under the spontaneous statement exception to the hearsay rule. Torres testified at trial that Katrina told her that defendant "got upset" with her and then attacked her, and that she showed Torres the red marks on her neck.

We conclude the court acted well within its discretion in finding Katrina's statements to Torres met the requirements of the spontaneous statement exception. Because Katrina's statement to Torres described a physical assault by defendant, it clearly satisfied the requirement that the statement in question relate to an occurrence that was startling enough to cause nervous excitement. The record also amply supports the trial court's finding that Katrina spoke to Torres while she was under the "stress of excitement" and before there was time to contrive or misrepresent what had happened. Torres testified that Katrina was in defendant's

81

house for only 20 minutes and that when she returned to the truck she was upset and angry. Torres testified further that Katrina immediately told her that defendant had tried to choke her while his mother stood by doing nothing, and Torres could see red marks on Katrina's neck.

Defendant does *not* assert that Katrina's statement to Torres failed to satisfy any of the requirements for admission under Evidence Code section 1240. Rather, he raises a more general challenge to the statement's admissibility, arguing that Katrina's association with defendant and his violent and hateful gang, and her efforts to hide the truth of those affiliations from the other people in her life, "made contrivance and misrepresentation a way of life" and therefore rendered her statement to Torres innately unreliable.

Defendant's argument is not well taken. Permitting the admission of an out-of-court statement satisfying all of the requirements of Evidence Code section 1240 is based upon the long-held recognition that a statement uttered while under the stress of excitement interferes with the process of reflection and fabrication, and therefore is considered a true expression of the declarant's observations and impressions. (*People v. Clark, supra,* 52 Cal.4th at p. 925, *People v. Farmer, supra,* 47 Cal.3d at p. 903.) Under defendant's reasoning, the statement of an individual who lives an "unreliable or unpredictable" lifestyle is *always* unreliable, no matter what the circumstances under which it was made. Such a proposition ignores the "crucial element" in determining the admissibility of a purportedly spontaneous statement, namely, the mental state of the speaker at the time the statement was uttered. (*People v. Gutierrez, supra*, 45 Cal.4th at p. 811.) Although defendant's focus on Katrina's "dual life" may be relevant to the weight of the evidence in question, it has no bearing on its admissibility.

We also reject defendant's assertion that the admission of Katrina's statements to Torres violated his federal constitutional rights to due process and to

82

confront the witnesses against him. Because the evidence was properly admitted under Evidence Code section 1240, its admission did not deprive defendant of due process. (*People v. Riccardi* (2012) 54 Cal.4th 758, 809-810 [the "routine and proper application of state evidentiary law does not impinge on a defendant's due process rights"].) Nor did its admission violate the confrontation clause. (*People v. Griffin* (2004) 33 Cal.4th 536, 579-580, fn. 19 [admission of the declarant's out-of-court statement to a friend at school does not implicate the confrontation clause because it is not " 'testimonial hearsay' within the meaning of" *Crawford v. Washington* (2004) 541 U.S. 36].)

### ii. *Katrina's statements to her mother*

The admissibility of Katrina's statements to her mother regarding defendant's attempt to rape her presents a closer question. At an evidentiary hearing regarding the admissibility of those statements, Katrina's mother testified that their conversation took place one morning in the late spring or summer of 1992, the year of Katrina's disappearance. Katrina had returned from a weekend in Ventura. Shortly after her mother had arisen that morning, Katrina started following her around the house. She was acting nervous and "like something was upsetting her." When they finally sat down together in Katrina's mother's bedroom, Katrina told her mother she wanted to talk about something that had happened to her in Ventura. According to Katrina's mother, Katrina seemed emotional, agitated, afraid, and "shocked at her own vulnerability."

Katrina's mother then testified regarding what Katrina said about the incident in question. Katrina told her that she had stopped by defendant's house the previous night to say hello. When the hour got late, defendant's mother suggested she stay overnight instead of driving back to Los Angeles and she accepted the offer. Katrina went to sleep in an extra bedroom, but awoke to find defendant in

bed with her making sexual advances. When she told defendant to stop, he responded that he knew she wanted it. She managed to flee by telling defendant, falsely, that she was sick and needed to use the bathroom. She went into the bathroom for a moment but then grabbed her things, ran out of the house, and got into her truck. As she was driving off, defendant came outside, yelling at her.

Although Katrina's mother repeatedly stated that she believed the events Katrina described to her had occurred the previous night, she could not say so with absolute certainty and indicated that the incident could have happened the night before that. She also indicated during cross-examination that she was unsure whether Katrina had come home and gone to bed the night before their conversation or had arrived home that same morning.

After considering further briefing and argument by the parties, the court ruled that Katrina's conversation with her mother was admissible as a spontaneous statement. The court noted that Katrina's mother was being "very cautious" regarding the timeframe but it found, as a factual matter, that the incident had occurred the night before Katrina's conversation with her mother, rather than two nights earlier. The court further found that the revelations in question had all the "earmarks" of the hearsay exception for spontaneous statements. In the court's view, Katrina would not have raised the issue with her mother at all "unless it was bothering her to the point where she was still under the stress of what happened." The court was impressed by the testimony that Katrina had followed her mother around the house until she could talk to her alone, and it found Katrina "clearly" needed to get something "off her mind." The court also noted, "based on everything [known] about this case up to that point," how traumatic the incident appeared to have been for Katrina. The court found it significant that Katrina was the *victim* of the startling event rather than simply an eyewitness.

At trial, Katrina's mother's testimony regarding her conversation with Katrina was substantially similar to her testimony at the pretrial hearing.

Like Katrina's statements to Shawna Torres, Katrina's statements to her mother described an assault by defendant, and therefore clearly satisfied the requirement that the statement in question relate to an incident that was startling enough to have caused nervous excitement. Defendant does not argue otherwise. Rather, he asserts that Katrina was no longer under the stress of the startling event when she recounted the sexual assault to her mother because their conversation occurred after a substantial amount of time, possibly as much as 36 hours, had elapsed.

We observe at the outset that the trial court expressly found a shorter duration of time between the purported incident and the conversation, a determination we conclude is supported by substantial evidence. As the record shows, Katrina's mother repeatedly stated that she believed the incident Katrina described to her had happened the night before their conversation. Although Katrina's mother indicated that the events in question could have occurred one night before that, she said so only because she was not absolutely certain of the time frame. On this record, the court was entitled to find that her reference to a lengthier timeframe was made out of an abundance of caution and that it did not call into question her other testimony.

We do not disagree with defendant that, in any event, an appreciable amount of time had elapsed between the sexual assault and Katrina's statements to her mother describing those events. Our cases suggest that allowing admission of a statement that was made approximately eight hours after the startling event may be the exception rather than the rule. (See, e.g., *People v. Lynch, supra,* 50 Cal.4th at p. 754 [trial court erred in admitting murder victim's statement describing to her daughter the beating that had occurred more than one hour earlier]; see also

85

1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 180, p. 1035 [statements made at a time substantially after the event are likely to be excluded].)

For her part, the Attorney General argues that notwithstanding the passage of time following the sexual assault, Katrina's conversation with her mother may have been her first opportunity to disclose the traumatic event to a person whom she trusted. (See *People v. Trimble, supra*, 5 Cal.App.4th at p. 1235 [the defendant's departure from the family's residence presented the first secure opportunity for the young child who had witnessed the fatal assault on her mother two days earlier to describe the incident to her mother's sister].)

We need not decide whether the trial court reasonably determined that Katrina remained under the stress of the asserted sexual assault up to and including the time she disclosed to her mother the incident in question. Even assuming the court abused its discretion in permitting the prosecutor to introduce the out-of-court statement, its admission does not require reversal because there is no reasonable probability that defendant would have obtained a more favorable result had the evidence been excluded from trial. (*People v. Gutierrez, supra*, 45 Cal.4th at p. 813; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The evidence regarding defendant's rape and murder of Katrina was strong, and included consistent accounts of the crimes by the two eyewitnesses, Bush and Nicassio. Other properly admitted evidence, such as the testimony of the sexual assault victims and Apryl Porcho, raised a strong inference that Katrina would not have consented to sexual activity with defendant on the night of the murder. Still other evidence, including Katrina's statement to her friend Torres and Nicassio's testimony that defendant repeatedly directed him to stab Katrina with a knife at the Porchos' party, showed that defendant had both engaged in and solicited prior acts of violence against Katrina. The admission of Katrina's statement to her mother describing a sexual assault in the guest room of defendant's house several months

86

before the murder, which comprised but a minor part of the prosecution's case, was cumulative of, and no more inflammatory than, the properly admitted evidence at trial. Any error in its admission did not prejudice defendant.

Defendant asserts that the admission of this evidence infringed his federal constitutional right to due process. We have recognized that the admission of evidence in violation of state law may also violate due process, but only if the error rendered the defendant's trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Defendant fails to show that the introduction of a hearsay statement describing an uncharged and unsuccessful attempt to sexually assault Katrina, even if erroneous, was so prejudicial as to render his trial unfair. For reasons previously discussed, we also reject defendant's further argument that the admission of Katrina's statement to her mother deprived him of his United States Constitution Sixth Amendment right to confront the witnesses against him. (See *People v. Gutierrez, supra*, 45 Cal.4th at pp. 812-813 [three-year-old declarant's statement to his aunt was not testimonial and therefore did not implicate the defendant's rights under the confrontation clause, within the meaning of *Crawford v. Washington, supra,* 541 U.S. 36].)

### b. Statement by Katrina admitted for a nonhearsay purpose

The court conducted another pretrial evidentiary hearing to consider the admissibility of a different out-of-court statement by Katrina concerning the same sexual assault that she previously had described to her mother. According to Katrina's girlfriend, Lee Jensen, Katrina called her "within a few days" of the incident, crying and upset. She told Jensen that defendant had gotten on top of her and when she told him to get off, he covered her mouth with his hand and started pulling off her boxers. When Katrina then convinced defendant she was starting

to feel sick and needed to visit the bathroom, she left the guest room, grabbed her purse, and ran out of the house.

The court ruled that Katrina's statement to Jensen was *not* admissible as a spontaneous statement because the evidence did not meet the statutory requirements for admission under that exception to the hearsay rule. (See discussion *ante*, pt. II.C.2.a.) Just before Jensen's testimony at trial, however, and over defense objection, the court granted the prosecutor's request to allow him to question the witness about Katrina's statements for the purpose of showing Katrina's state of mind regarding whether she would have consented to sexual intercourse with defendant. The court qualified its ruling by directing the prosecutor to ask Jensen about the incident without giving the details.

In accordance with the court's ruling, the prosecutor asked Jensen whether Katrina had disclosed to her that "something had happened" at defendant's house in the summer of 1992. Jensen replied, "Yes." The court interrupted the prosecutor's continued questioning to give a limiting instruction, informing the jurors that the witness's reference to an incident at defendant's house was being admitted, not for its truth, but to illustrate Katrina's state of mind toward defendant.[11]

---

[11] The court instructed the jury as follows. "The last testimony appears to be in reference to something that you heard from Mrs. Montgomery as well, an incident, and to the extent this witness has referred to it, the out-of-court statements by Katrina Montgomery that this witness has referred to are not offered for their truth, that is, not offered and not to be considered by you to prove this incident happened  but for whatever light they may or may not shed about Katrina Montgomery's state of mind in relation to the defendant at the time in question. [¶] As opposed to this limiting instruction, the previous testimony by Mrs. Montgomery about Katrina Montgomery relating the details of an incident that took place when she allegedly fled the defendant's house, that evidence can be considered by you for the truth of the matter, that is, evidence that what was said

*(footnote continued on next page)*

We conclude the court did not abuse its discretion by admitting evidence of Katrina's disclosure to her friend that "something had happened" at defendant's house. As the court made clear, the evidence was not being admitted to establish that defendant had in fact sexually assaulted Katrina on a previous occasion. Admitting the evidence for that purpose would have contravened the hearsay rule. Rather, the disclosure was allowed as circumstantial evidence of Katrina's then-existing state of mind for the nonhearsay purpose of showing she would not have consented to sexual activity with defendant on the night of the murder. "In the case of forcible rape, evidence of any circumstance that makes it less plausible that the victim consented to sexual intercourse is relevant. [Citations.]" (*People v. Harris, supra,* 57 Cal.4th at p. 843 [letters written by the rape-murder victim to a friend one week before her murder in which she described her and her boyfriend's future plans together was circumstantial evidence of the victim's then state of mind and properly admitted for the purpose of showing she would not have had consensual sex with another person].)

We have observed that statements admitted for a nonhearsay purpose present an increased risk of prejudice "if the jury is unable to distinguish between the truth of the matters asserted and the inferences concerning the declarant's state of mind." (*People v. Riccardi, supra,* 54 Cal.4th at p. 823.) The potential for such prejudice, however, did not outweigh the probative value of the state of mind

---

*(footnote continued from previous page)*

did happen, if you accept it. [¶] Of course, it's up to you whether to do that or not, as it is as to all factual issues." Even assuming the court erred in admitting under the spontaneous statement exception to the hearsay rule Katrina's out-of-court statement to her mother, the court's reference to that evidence in the limiting instruction did not prejudice defendant, for the reasons discussed *ante*, in part II.C.2.a.ii.

evidence in this case. Almost immediately after the testimony in question, the court instructed the jury on the limited purpose for which the evidence could be considered. We find nothing in the record that would rebut the presumption that the jury followed the court's directive. (*People v. Cox* (2003) 30 Cal.4th 916, 963.)

Pointing to the trial court's finding that Katrina's statements to Jensen failed to satisfy the requirements for admission as a spontaneous statement, defendant complains that if the evidence was so unreliable as to fall outside that hearsay exception, it should be inadmissible for all purposes. Defendant's argument, which ignores the limited, nonhearsay purpose for which the testimony in question was admitted, is contrary to law. The evidence was admitted for a purpose other than for the truth of the matter asserted, and therefore need not have met the reliability requirements of a hearsay exception. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 157 [because the defendant's statement was properly admitted for the nonhearsay purpose of showing his consciousness of guilt, it was unnecessary to show that it met the requirements for admission under Evid. Code, § 1221, the adoptive-admission exception to the hearsay rule]; *People v. Jablonski* (2006) 37 Cal.4th 774, 820-821 [murder victim's statement that she feared the defendant was not admissible under the state of mind hearsay exception set out in Evid. Code § 1250 to establish she was actually fearful of him, but was relevant to, and admissible for, the nonhearsay purpose of its effect on the defendant's mental state when going to visit the victims].) Defendant's challenge to the reliability of Katrina's statement to Jensen, at most, goes to the weight of the evidence, and not its admissibility.

Defendant's argument that the admission of Katrina's statement to Jensen deprived him of his federal constitutional rights likewise fails. An out-of-court statement properly admitted for a limited nonhearsay purpose does not render a

90

trial fundamentally unfair in violation of a defendant's Fifth Amendment right to due process. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1163.) Nor does it deprive a defendant of the Sixth Amendment right to confront the witnesses against him within the meaning. (*Crawford v. Washington, supra,* 541 U.S. at p. 60, fn. 9; *People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6.)

### 3. *Admission of evidence defendant was in possession of a stolen car*

Defendant contends the trial court erred by allowing the prosecutor to elicit testimony that defendant was in possession of a stolen car on the morning of the hours-long standoff with police that ended with his arrest. As we explain, the court did not abuse its considerable discretion in admitting the evidence.

### a. *Background*

As previously discussed in part II.A., the defense brought a pretrial motion to sever trial on the murder count from trial on all other charges, including the various counts stemming from the incident in January 1998 that preceded defendant's arrest. In arguing for the severance of those crimes, the defense presented an extensive offer of proof that defendant was not the person who police had attempted to stop for riding a bicycle at night without a headlight. According to the defense brief, on the morning that preceded the incident, defendant's friend Naomi Sponza let him borrow her Ford Escort. Defendant used the vehicle to visit the homes of assorted friends and acquaintances in the vicinity, and a number of witnesses stated they had seen him driving the Ford that day. Later in the evening, defendant drove to a residence where his girlfriend was socializing and parked the car in front. Around the same time, and in close proximity to where defendant had just parked, police were pursuing an individual who fled on foot after being approached for the headlight violation. Witnesses told defense investigators that the individual running from police was *not* defendant. According to the defense

91

brief, the day after defendant had been taken into custody, his friend Sponza retrieved her vehicle from the spot where defendant had left it.

Although the defense ultimately did not present the proffered evidence at trial, some of it was presented in the prosecution's case-in-chief during the testimony of defendant's acquaintance, Roy Miller. Miller testified in relevant part that he was with defendant earlier in the day before the standoff with police that evening.

During cross-examination, the defense asked Miller for further details regarding his activities with defendant on the morning of the day the standoff occurred. Miller indicated that he and defendant had been partying and using drugs at someone's house the night before and parted company around 9:00 a.m. When defense counsel asked how defendant left the house, Miller indicated that he saw defendant and another individual drive off in a car.

The prosecutor followed up on that point during redirect examination, eliciting from Miller that defendant had asked him to drive the car to someone's house. When the prosecutor then asked the witness whether defendant told him where he had gotten the car, the trial court sustained a defense relevancy objection.

The court reversed its ruling, however, after hearing further argument from the parties at a sidebar conference. At that time, the prosecutor indicated that his question would elicit from Miller that the car was stolen and that defendant wanted Miller to help him sell it. The prosecutor argued that the evidence was relevant because the defense had opened the door to that issue by asking how defendant had left the party in the morning. The trial court agreed with the prosecutor, finding the evidence relevant because defense counsel's question regarding defendant's departure suggested the defense would be pursuing the theory, disclosed to the prosecution during discovery, that because defendant was

92

driving a car on the day of the standoff, he could not have been the person on the bicycle who fled from the officers.

When questioning resumed, the prosecutor elicited from Miller that defendant told him the car was stolen and asked him to help drive the vehicle to someone's house to get rid of it. When defense counsel asked Miller during recross-examination whether defendant informed him that Naomi Sponza had given him the car, he replied, "I don't think so." Defense counsel did not later call Sponza as a witness or present any other evidence during the defense case to challenge the testimony identifying defendant as the person officers approached for riding without a headlight and, in closing argument, the defense conceded defendant's guilt of the charges stemming from the incident that preceded his arrest.

### b. Discussion

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Under Evidence Code section 210, relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." A trial court has "considerable discretion" in determining the relevance of evidence. (*People v. Williams* (2008) 43 Cal.4th 584, 634.) Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. (*People v. Clark, supra*, 52 Cal.4th at p. 893.) An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) We will not reverse a court's ruling on such matters unless it is shown " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that

93

resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Brown, supra,* 31 Cal.4th at p. 534.)

Defendant contends the trial court's ruling was in error because the defense had not placed before the jury the issue whether or not defendant was driving a car on the morning of his arrest. Defendant's argument misses the mark. The issue in dispute was not simply whether defendant was driving a car that morning but rather whether it could be inferred from his possession of a car at that time that he would not have been riding a bicycle later in the evening. Evidence that defendant solicited Miller's help early in the morning to unload a stolen vehicle was relevant to counter that inference.

It is true that at the time of the trial court's ruling the defense had not presented any affirmative evidence in support of the theory, advanced prior to trial, that defendant was not the person stopped by police for a bicycle headlight violation. The trial court reasonably found, however, that the defense had begun to lay the groundwork for raising the inferences upon which its misidentification theory was premised by asking the witness during cross-examination what defendant did when they parted company on the morning in question. Although the defense ultimately declined to challenge the testimony identifying defendant as the bicyclist stopped by police, counsel represented to the court at the time of its ruling that the defense "may or may not go there." On this record, we conclude that the court did not abuse its discretion in finding the evidence regarding defendant's possession of a stolen car relevant and admissible, on redirect examination, to counter the inferences supporting a defense theory that counsel had started to develop during cross-examination. (See Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 268, p. 385 [purpose of redirect examination is, among others, to rebut inferences developed during cross-examination].)

Defendant further contends that even if the evidence in question bore some relevance to a disputed issue at trial, it should have been excluded as unduly prejudicial under Evidence Code section 352 because it branded him as a criminal. We disagree. The evidence regarding the events that culminated in defendant's arrest included defendant's assaults on officers and his destruction of the interior of the house in which he had barricaded himself. Miller's brief testimony that defendant was in possession of a stolen vehicle on the morning of that incident would not have " 'tend[ed] to evoke an emotional bias against [him] as an individual' " and would have had " 'very little effect on the issues.' " (*People v. Karis, supra,* 46 Cal.3d at p. 638.)

### 4. *Admission of evidence attacking defense witness's credibility*

Defendant's mother, Beverlee Sue Merriman, was the principal witness for the defense at the guilt phase. Defendant contends the trial court erred in overruling a defense objection and permitting the prosecutor to challenge his mother's credibility with irrelevant and prejudicial evidence that defendant had asked her to facilitate certain possibly illegal activities for him. We conclude that the court's ruling was proper.

### a. *Background*

As previously noted, defendant's mother was charged with conspiring with defendant and others to dissuade the witnesses who testified against defendant at the grand jury proceeding that led to his indictment for murder. During trial on the charges against Ms. Merriman, she was shown a transcript of the recorded conversation between defendant and Nicassio in which defendant implicated himself in Katrina's murder by instructing Nicassio to say Katrina's body went over the catwalk, rather than through the house, so as not to involve his mother. Sobbing uncontrollably after reading the transcript, Ms. Merriman said she "didn't

95

know" and apologized, first to the prosecutor and then to Katrina's mother. The following day she pleaded guilty to the charges.

In the course of the prosecutor's cross-examination of Ms. Merriman at defendant's trial, the court held a hearing outside the jury's presence to rule on the prosecutor's request to place into evidence a letter defendant wrote to his mother from jail chastising her for thinking she was guilty of the charges against her. The prosecutor pointed out that shortly after receiving that letter, defendant's mother told a probation officer she was *not* guilty of the charges but pleaded guilty because her counsel told her to. The letter impeached the witness's credibility, the prosecutor argued, because it showed Ms. Merriman would say and do whatever defendant wanted her to say and do. The court allowed the prosecutor to ask Ms. Merriman about some portions of the letter.

When cross-examination resumed, the prosecutor elicited from Ms. Merriman that she had received a letter from defendant in which he told her he was upset about her guilty plea. She denied, however, that the letter caused her to tell the probation officer she was not guilty. Defendant's mother agreed with the prosecutor that when defendant asked her for something, she would do her best to get it for him. When the prosecutor then asked her whether she would agree to carry out defendant's wishes even if the requests involved illegal activity, the defense objected on relevance and prejudice grounds and the court held a sidebar conference.

Outside the earshot of the jurors, the prosecutor proffered a number of letters from defendant to his mother that were written while defendant was in custody. In one series of letters, defendant asked her to retrieve a .45-caliber gun from someone. In another exchange, defendant wanted his mother to fill out paperwork in order for him to receive disability benefits on his release from prison. The court agreed with defense counsel that these activities were not illegal. However, it

96

found the evidence relevant to illustrate the prosecutor's point regarding the witness's relationship with defendant, and ruled it would allow a "brief inquiry."

Before questioning resumed in open court, the court directed the jury to disregard the prosecutor's previous reference to criminal behavior. The court then admitted into evidence several letters from defendant to his mother that Ms. Merriman read aloud to the jury. In one of the letters, defendant wrote in relevant part, "What up with that .45? Did you go and pick it up . . . from Mike's friend yet? No. Okay. I didn't think so. So this is another reminder, go pick up — go pick the gun up. I am not going — I am not giving my gun to them, ha-ha, no way." In another letter, defendant asked his mother to help him with paperwork for government disability benefits, saying he could receive a monthly check for $700 once he was released from prison. Defendant wrote, "I'm going to talk with a psych while I'm here at Wasco [State Prison]. They always want to put you on those dummy pills that make me shuffle and sleep all day. I'll act like I swallowed 'em, and spit 'em out in the toilet when I get on my way with it. For 700 — for $700 bills a month, why not?" In response to the prosecutor's question whether she helped defendant with his disability benefits application, Ms. Merriman said, "Yes and no," adding that defendant needed assistance for a surgery that she could not afford.

During closing argument, the prosecutor returned to the subject of interactions between defendant and his mother, remarking that the relationship between defendant and Ms. Merriman was relevant to her credibility because the person in control was *defendant* and he had "completely skewed her reality about what's going on in the world." The prosecutor illustrated the point, not by referring to the letters concerning the .45-caliber gun or the disability benefits application, but rather by replaying a taped conversation at jail between defendant and his mother in which Ms. Merriman told defendant she was planning to give a

97

refrigerator to defendant's sister but changed her mind when defendant expressed his disapproval.

### b. Discussion

Defendant contends that the trial court's ruling admitting evidence that he asked his mother to carry out on his behalf potentially criminal activity relating to firearms and disability benefits fraud permitted the jury to hear even more evidence of uncharged offenses having no bearing on Katrina's murder. More specifically, he argues that the letters in question are akin to the improper evidence that led to reversal of the defendant's voluntary manslaughter conviction in *People v. Ortiz* (1979) 95 Cal.App.3d 926. The Court of Appeal in *Ortiz* concluded the trial court committed prejudicial error by allowing the prosecutor to elicit and comment upon irrelevant and highly inflammatory testimony describing in detail how the defendant performed animal sacrifices in connection with his membership in a religious cult. (*Id*. at pp. 933-936.) In reversing the defendant's conviction, the appellate court concluded that the defendant's religious practice was irrelevant to any issue in the case (*id*. at p. 933), and that the prosecutor's repeated reference to animal sacrifices posed a substantial danger of undue prejudice because it "create[d] a negative image of defendant in the minds of the jury." (*Id*. at p. 934.)

Contrary to defendant's contention, *Ortiz* is distinguishable from the present matter in important respects. Unlike in *Ortiz*, the evidence in question here was relevant in that it bolstered the prosecutor's attack on Ms. Merriman's credibility, that is, it tended to show she would do and say anything defendant told her to do and say. (See Evid. Code, § 210.) Furthermore, unlike in *Ortiz*, there was no risk of undue prejudice from the admission of the letters. The prosecutor's cross-examination in this regard was brief and mostly involved having Ms. Merriman read the letters aloud to the jury. Notably, the prosecutor did not refer to the

letters at all during closing remarks.  Given the minor role this evidence played in the prosecutor's vigorous attempts to cast doubt on Ms. Merriman's veracity, and the court's admonition to the jury to disregard the prosecutor's question describing the evidence as requests to engage in *criminal* activities, defendant fails to persuade that the admission of the letters asking his mother to retrieve a gun and to help him apply for disability benefits were likely to have created such "a negative image of [him] in the minds of the jury" (*People v. Ortiz, supra*, 95 Cal.App.3d at p. 934) as to outweigh the probative value of the evidence.  We conclude there was no error in the court's implied finding under Evidence Code section 352 permitting the evidence for purposes of impeaching the defense's main witness.

### 5.  *Admission of items seized from defendant's bedroom*

Defendant next challenges the admission of two pornographic magazines and two Polaroid photographs showing defendant and a fellow gang member with knives in their hands, all of which were seized during a search of his bedroom five years after Katrina's disappearance.

Well-settled law governs our review of the trial court's rulings admitting the evidence in question.  As previously explained, a trial court is authorized to admit only relevant evidence, that is, evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see *id.*, § 350.)  A trial court has considerable discretion to exclude even relevant evidence, however, if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects.  (Evid. Code, § 352; see *People v. Clark, supra*, 52 Cal.4th at p. 893.)  A trial court's rulings in this regard will be upheld on appeal unless it is shown " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'

[Citation.]" (*People v. Brown, supra,* 31 Cal.4th at p. 534.) For the reasons explained below, we conclude defendant fails to show an abuse of discretion.

### a. Pornographic magazines

During the prosecution's case-in-chief, the court considered the admissibility of two pornographic magazines proffered by the prosecutor as a representative sample of the 100-plus pornographic magazines discovered by investigators during their search of defendant's bedroom. One of the magazines was an adult sexual fantasy comic book with an "evil woman" theme that included illustrations of scantily clad, seductively posed women with exaggerated features. The other magazine was a copy of Bridled, which featured staged photographs of nude adult women who had been gagged and bound, with some of the photographs suggesting the subjects were being whipped. The court did not disagree with defense counsel that most people would find such images "disgusting." The court was persuaded, however, that the magazines were admissible to confirm the testimony of the alleged sexual assault victims, whose testimony had been vigorously challenged by the defense during cross-examination. The court also found the magazines relevant to rebut character evidence, also elicited by the defense, that some of the female witnesses considered defendant a "good guy."

The magazines were admitted into evidence a short time later during the testimony of Detective Volpei, the investigator who conducted the search of defendant's bedroom. Volpei provided a brief description of the magazines' contents and informed the jury that he had found over 100 such publications in defendant's dresser drawer. The two magazines were not provided to the jury at that time, however.

Contrary to defendant's assertion, the court could reasonably find that the two pornographic magazines seized from his bedroom were relevant. Billie B.,

100

Robyn G., and Kristen S. each testified that defendant forced her to orally copulate or masturbate him while he flipped through pornographic magazines. The evidence of defendant's extensive collection of such material tended to corroborate their testimony regarding the circumstances of the sexual assaults. (See *People v. Gann* (1968) 259 Cal.App.2d 706, 713 [numerous photographs depicting nude men and women engaged in sexual intercourse that were seized from the defendant's residence were properly admitted to corroborate the molestation victims' reports that they had been shown such photographs before the lewd acts occurred]; cf. *People v. Scheid* (1997) 16 Cal.4th 1, 15 [crime scene photograph was relevant to illustrate and corroborate the witnesses' testimony regarding the circumstances of the crime].) Because the pornographic magazine evidence tended to corroborate the sexual assault victims' testimony, it was highly probative of the factual similarities between the sexual assaults. As previously discussed, the similarities between these incidents, in turn, tended to show defendant's propensity to commit such crimes. (Evid. Code, § 1108; see discussion *ante*, pt. II.C.1.)

Defendant argues that evidence he possessed pornographic magazines would have been sufficient to corroborate the testimony of the sexual assault victims in this regard, and there was no need for the prosecutor to present the actual contents of these materials. It is true that the prosecutor could have asked Investigator Volpei merely to describe the magazines' contents instead of moving the court to admit those materials for the jury's possible inspection during deliberations. Our decisions make clear, however, that the court is not required to exclude photographic or other documentary evidence simply because the images they depict could have been described by a witness. (*People v. Michaels* (2002) 28 Cal.4th 486, 532 [evidence that was cumulative of testimony could assist the jury in evaluating the testimony]; *People v. Scheid, supra*, 16 Cal.4th at p. 19.) So

long as the probative value of graphic or disturbing material is not substantially outweighed by its prejudicial effects, a prosecutor is entitled to use such evidence to "present a persuasive and forceful case." (*People v. Booker* (2011) 51 Cal.4th 141, 171.)

Regarding the potential prejudicial impact, defendant argues that the pornography was highly inflammatory evidence that portrayed him as a person of low moral character. We have recognized that certain sexually explicit magazines and photographs "would undoubtedly be disturbing to most people." (*People v. Memro* (1995) 11 Cal.4th 786, 865.) On the record before us, however, it cannot be said that the risk of undue prejudice from the magazine evidence outweighed its probative value in corroborating the testimony of witnesses whose veracity was being vigorously challenged by the defense. Although the stylized illustrations of "evil women" and images of staged bondage arguably carried a risk of evoking an emotional bias from the jury, it is unlikely that the effect of this evidence would have produced a reaction that differed in any significant respect from the impact of the witnesses' testimony describing the degrading and humiliating circumstances of the sexual assaults against them. This court has recognized that evidence of pornography "may threaten to distract jurors from potentially more probative evidence and to consume undue amounts of time." (*People v. Page* (2008) 44 Cal.4th 1, 41, fn. 17.) No such concerns are presented here, however. The pornography evidence was admitted for the limited purpose of establishing witness credibility, it did not require further explanation or additional evidence, and its presentation comprised only a small part of the prosecution's case-in-chief. We conclude the court did not abuse its discretion in finding that the probative value of the pornography evidence was not substantially outweighed by its potential for undue prejudice.

### b. Photographs of defendant holding knives

The prosecutor initially sought admission of two photographs that were taken in defendant's bedroom one or more years after Katrina's disappearance. After conducting a hearing, the court excluded one photograph and admitted the other. The court found unduly prejudicial and refused to admit a staged photograph that depicted defendant and a fellow gang member holding knives to each other's throats. Over defense objection, the court admitted the other photograph, which showed a hacksaw in the background and defendant and fellow gang member, Mitch Buley, with knives in their hands. The court agreed with the prosecutor that the image was probative of defendant's access to knives and tools in his bedroom. The photograph was admitted into evidence a short time later and handed to the jurors for their examination.

For the next two days, the jury heard testimony by Ryan Bush, one of the two eyewitnesses to Katrina's killing. During the course of that testimony, and over defense objection, the court granted the prosecutor's request to admit another photograph that had been seized during the search of defendant's bedroom. That image, also taken in defendant's bedroom, showed Buley holding a hacksaw to defendant's head in a mock threat and defendant pointing a small knife toward the camera. The court found the photograph probative on the subject of defendant's use of a smaller sized knife in the alleged murder, an issue the court believed had become more prominent after defense counsel's cross-examination of Bush. The court explained furthermore that the proffered evidence was much less prejudicial than the photograph it had previously ruled inadmissible because defendant is not being shown holding a knife to someone's neck. When the prosecution's case resumed, the photograph was admitted into evidence and shown to the jury.

Defendant asserts that the court erred in admitting the photographs of him and his fellow gang member because the presence of knives and a hacksaw in his

103

bedroom one or more years after Katrina's disappearance tended to prove no fact at issue in the case. We observe in this regard that the prosecution did *not* advance the theory at trial that defendant used the knives or the hacksaw depicted in the photographs to murder Katrina. (Cf. *People v. Champion* (1995) 9 Cal.4th 879, 924 [photographs of both defendants holding the type of gun used in killing one of the victims were "obviously relevant"]; *People v. Ringegold* (1970) 13 Cal.App.3d 711, 720 ["an implement by means of which it is likely that a crime was committed is admissible in evidence if it has been connected with the defendant"].)

This court also has observed, however, that evidence of weapons unconnected to the crime may be relevant for other purposes. (*People v. Prince* (2007) 40 Cal.4th 1179, 1249; *People v. Cox* (2003) 30 Cal.4th 916, 955-956.) In the present case, the photographs were relevant in that they tended to show defendant kept knives and tools in his bedroom, which in turn tended to corroborate the testimony of the eyewitnesses Nicassio and Bush regarding defendant's fatal attack on Katrina. Defense counsel vigorously cross-examined Bush regarding his recollection of defendant coming up behind Katrina with a knife and stabbing her in the throat, which arguably called into question his account of the incident. (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 401-402 [photographs of the defendant in battle fatigues and holding various firearms weapons were relevant because they tended to corroborate the testimony of the prosecution's primary witness in the face of substantial attacks by the defense during cross-examination].) Contrary to defendant's argument, the photographs were not admitted simply to ascribe to him additional antisocial behavior. (See *People v. Prince, supra,* 40 Cal.4th at p. 1249 [evidence of knives seized from the defendant's vehicle was relevant to his commission of crimes other than the murder and did not simply constitute bad character evidence].)

As for whether the trial court erred by not excluding the photographs as being more prejudicial than probative under Evidence Code section 352, we conclude the court did not abuse its broad discretion in this regard. The probative value of the evidence for purposes of corroborating the eyewitnesses' testimony was arguably limited, given that the photographs were taken at a time well after the killing. On the other side of the equation, however, the photographs were neither unduly inflammatory nor likely to engender an emotional response by the jury. As the court pointed out when ruling the evidence admissible, neither of the photographs showed defendant threatening anyone with a knife. Furthermore, other testimony presented at trial indicated that defendant and his fellow gang members routinely wielded knives and other weapons. For example, the prosecution's gang expert informed the jury that between 1994 and 1998, eight members of the SHD gang had been convicted of assault with a deadly weapon. Indeed, the jury heard evidence that defendant used a large knife to slash wildly at officers who were attempting to apprehend him when he temporarily exited the tear-gas-filled house in which he had barricaded himself to avoid arrest. The court reasonably could determine that, on balance, the probative value of the photograph evidence was not substantially outweighed by its potential prejudicial effect. No abuse of discretion appears.

### 6. *Admission of evidence that prosecution witnesses were reluctant to testify*

Defendant contends the court erred by allowing the prosecutor to elicit from seven prosecution witnesses that they were nervous and reluctant to testify. As we explain, defendant has forfeited his claim of error regarding all but two of the witnesses in question and his contention lacks merit in any event.

105

### a. Background

To support the vandalism count, the prosecution called Jennifer Bowkley to testify regarding defendant's actions inside the house in which he had barricaded himself prior to his arrest. At the outset of that testimony the prosecutor asked the witness how she was feeling. She responded that she was nervous and scared and "wanted to forget that night." When the witness agreed with the prosecutor that she did not want to be in court, defense counsel moved to strike her answer as irrelevant. The court overruled the objection without comment, and the prosecutor elicited from the witness that after she had been subpoenaed she told investigators that she did not want to have anything to do with the case.

Without objection, sexual assault victims Billie B., Susan V., Robyn G., and Robyn G.'s friend, Elaine Byrd, likewise indicated at the outset of direct examination that they were nervous. Billie B., Corie G., Robyn G., and Kristin S. also expressed reluctance to openly discuss the sexual assaults against them. For example, before testifying regarding the details of the sexual assaults, Billie B. stated that the incidents were something she would "rather not talk about in front of people."

The prosecutor asked two of these witnesses whether testifying at trial was more difficult and stressful than testifying at the grand jury proceeding. Over defense counsel's relevancy objection, Corie G. stated that giving trial testimony was harder for her because defendant and his mother were "right there." Without objection, Robyn G. testified to the contrary that she was more nervous testifying in front of the grand jury because she did not want to be labeled a rat. On further questioning, she indicated that she had asked to be excused from that proceeding because she was scared, embarrassed, and trying not to be involved.

Also without objection, the prosecutor elicited from two witnesses that they felt fearful testifying in court. Billie B. admitted that she had not reported the

106

sexual assaults to police but indicated that she believed if she had done so, there would have been attacks on her home, herself, and her children. When asked whether she harbored similar fears by being in court, she said she did. Corie G. likewise testified that she did not consider reporting the sexual assault to police because she feared defendant and his friends. Confirming that she no longer resided in the area, she added, "I hate being in Ventura; there's fear."

### b. Discussion

Defendant complains that the prosecutor's inquiry into the female witnesses' discomfort and nervousness on the witness stand should not have been allowed because the line of questioning was irrelevant to an assessment of these witnesses' credibility and it improperly suggested to the jury that the witnesses had been threatened by defendant and feared him.

As a threshold matter, we agree with the Attorney General that defendant has forfeited his claim of error regarding the admission of evidence that prosecution witnesses were reluctant to testify, except to the extent he challenges as irrelevant the above described testimony by Jennifer Bowkley and Corie G. Absent a timely objection in the trial court on the ground or grounds urged on appeal, we generally will not review challenges to the admissibility of evidence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670; *People v. Waidla* (2000) 22 Cal.4th 690, 717.)

Defendant acknowledges that his counsel did not object to most of the testimony in question, but argues that after the initial objection it was "clear" that the court would have overruled any further defense challenges to similar questioning. Defendant's bare assertion that further objection would have been futile is unconvincing. In challenging Jennifer Bowkley's testimony to the effect that she did not want to be in court, defense counsel simply stated, "Objection, Your Honor; irrelevant." The court, in turn, overruled the objection without

107

comment and counsel raised no further objection to the witness's continued testimony in this regard. On the present record, we cannot presume that because the court overruled the objection to Bowkley's testimony, it necessarily would have overruled subsequent challenges to evidence of other witnesses' reluctance to testify. (*People v. Valdez* (2012) 55 Cal.4th 82, 138-139.) Defendant's claim is forfeited except to the extent it challenges the relevance of testimony by Bowkley and Corie G. regarding their reluctance to testify.

Defendant's challenge to evidence that prosecution witnesses were nervous and reluctant to testify lacks merit in any event. Contrary to defendant's assertion, such evidence was relevant to the evaluation of the witnesses' credibility. Under Evidence Code section 780, which concerns the scope of questioning at trial, a jury may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of [a witness's] testimony," unless such evidence is inadmissible under some other statutory provision. Such matters include the witness's "demeanor while testifying and the manner in which" the witness testified (Evid. Code, § 780, subd. (a)), and the witness's "attitude toward the action" or "toward the giving of testimony" (*Id*. subd. (j)).

The trial court did not abuse its discretion in overruling the defense relevancy objection to Jennifer Bowkley's testimony that she did not want to be in court. (*People v. Williams, supra,* 43 Cal.4th at p. 634 [a trial court is vested with "considerable discretion" in determining the relevance of evidence].) As the Evidence Code makes clear, the witness's attitude toward testifying would have assisted the jury in evaluating her credibility. (Evid. Code, § 780, subd. (j).)

Nor did the court abuse its discretion in overruling defense counsel's relevancy objection to Corie G.'s testimony that it was more difficult for her to testify at trial than it had been to testify at the grand jury proceeding because defendant and his mother were present in the courtroom. Just prior to eliciting that

108

testimony, the prosecutor confirmed with the witness that she had been uncomfortable talking to investigators about the sexual assault and found it difficult to testify about the incident at the grand jury proceeding. Her testimony regarding the additional discomfort she felt in describing the incident in front of defendant and his mother was relevant to her demeanor on the witness stand. Although the cold record does not fully disclose the witness's emotional state at the outset of questioning, it strongly suggests she was nervous and shaken. Immediately following the challenged testimony, the prosecutor asked the witness, "Are you gonna be able to do this?" After the witness nodded her head affirmatively, the prosecutor reassured her, saying, "Take your time. We'll go slow, all right." The witness's testimony indicating it was difficult for her to testify in front of defendant and his mother tended to explain her demeanor on the witness stand and therefore was relevant to her credibility. (Evid. Code, § 780, subd. (a).)

We reach the same conclusion regarding the relevance of Robyn G.'s expression of discomfort and nervousness when testifying at trial. (Evid. Code, § 780, subd. (a); *People v. Scott* (2011) 52 Cal.4th 452, 493 [a witness's " 'demeanor is always relevant to credibility' "]; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358 [observing that witness demeanor is " ' "part of the evidence" ' " and " 'of considerable legal consequence' "].) Robyn G.'s testimony indicating she was uncomfortable talking openly about the sexual assaults was not only relevant to her demeanor at trial, but also tended to explain why she had not disclosed during her grand jury testimony that defendant inserted a gun into her vagina. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [evidence of factors that may have affected a witness's prior statements or testimony is relevant to the witness's credibility].)

Regarding the two witnesses who indicated that they feared retaliation for testifying at trial, such evidence was clearly relevant. As this court has previously recognized, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness . . . . [as is an] explanation of the basis for the witness's fear . . . ." (*People v. Burgener* (2003) 29 Cal.4th 833, 869; accord, *People v. Guerra* (2006) 37 Cal.4th 1067, 1141-1142.) "A witness who testifies despite fear of recrimination of any kind by anyone is more credible because of his or her personal stake in the testimony. . . . [¶] Regardless of [the source of the threat], the jury would be entitled to evaluate the witness's testimony knowing it was given under such circumstances." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368-1369, italics omitted.)

Defendant does not dispute that the line of questioning pursued by the prosecutor could be relevant to a witness's credibility. He argues, however, that our decisions have limited such testimony to circumstance in which the witness hesitates in his or her responses or when nervousness or fear interferes with the witness's ability to testify truthfully. (See, e.g., *People v. Guerra, supra,* 37 Cal.4th at p. 1142 ["evidence that [the witness] feared retaliation for testifying against defendant was [properly] offered for the . . . purpose of explaining inconsistencies in portions of her testimony, including her equivocal responses when asked whether she feared retaliation"].) We do not share defendant's understanding of the law. A witness's hesitation in answering questions is only one of any number of reasons that evidence may be relevant to his or her credibility; our cases establish no such limitations. (See *People v. Mendoza, supra,* 52 Cal.4th at p. 1086 [inconsistent testimony is not a prerequisite for admission of evidence of a witness's fear of testifying].) Indeed, as *People v. Mendoza* explains, a trial court has discretion, within the strictures of Evidence Code section 352, to permit the prosecution to introduce evidence supporting a

110

witness's credibility even on direct examination, so long as the prosecution reasonably expects the defense to attack the witness's credibility during cross-examination. (*People v. Mendoza*, *supra*, at p. 1085.)  In the present matter, the witnesses in question were former drug users.  Most of the witnesses had been involved in consensual sexual relationships with defendant and none had reported the sexual assaults to law enforcement until years after the incidents occurred. The prosecutor reasonably could anticipate, first from the defense motion to sever charges and then from defense counsel's cross-examination during various pretrial hearings that the defense would vigorously challenge these witnesses' credibility at trial.  The prosecutor was entitled to present evidence of the witnesses' reluctance to testify to preemptively counter such an effort.  (See *People v. Sapp, supra,* 31 Cal.4th at pp. 280-281 [trial court properly allowed the prosecutor to present evidence that the defendant's friends warned the prosecution witness against giving the police information regarding the murder victim's disappearance in order to counter evidence that the witness had not come forward to report what she knew].)

Defendant argues furthermore that the prosecutor's questioning was an improper attempt to convey to the jury that defendant had directly threatened the witnesses, which was especially prejudicial given that he had been charged with witness dissuasion.  We disagree with the premise of defendant's assertion. Nothing in the prosecutor's line of questioning or in the witnesses' testimony suggested that the reason for anyone's reluctance to testify was because defendant had threatened or intimidated her.  Indeed, there was ample evidence from which to infer that the witnesses were reluctant to testify, not because defendant had threatened them, but because of their desire to distance themselves from their prior association with the SHD gang's culture and lifestyle.  There was no error in

111

eliciting from the seven witnesses in question that they were reluctant to testify at trial.

## D. Instruction on Circumstantial Evidence

Defendant complains that he was denied due process and other constitutional rights because, he alleges, the instruction that explained to the jury how to consider circumstantial evidence were contrary to the requirement of proof beyond a reasonable doubt. We have repeatedly rejected similar challenges to the circumstantial evidence instructions, and find no basis on which to reach a different conclusion here.

The court instructed with CALJIC Nos. 2.01 and 8.83 regarding the sufficiency of circumstantial evidence to prove guilt and the special circumstance allegations, respectively. In relevant part, both instructions informed the jury that if one interpretation of the circumstantial evidence "appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

Defendant contends that telling the jurors they must accept an interpretation of the evidence "that appears to be reasonable" allows a finding of guilt based on proof less than beyond a reasonable doubt. (See *Cage v. Louisiana* (1990) 498 U.S. 39, 41.) We have long rejected the identical contention. " 'When the questioned phrase is read in context, not only with the remaining language within each instruction but also together with related instructions, including the reasonable doubt instruction, it is clear that the jury was required only to reject unreasonable interpretations of the evidence and to accept a reasonable interpretation that was consistent with the evidence.' [Citations.]" (*People v. Myles* (2012) 53 Cal.4th 1181, 1216.)

Defendant also criticizes the circumstantial evidence instructions for *requiring* the jury to draw an incriminatory inference when such an inference appears to be merely reasonable. According to defendant, imposing on the jurors a duty to accept an interpretation of evidence pointing to his guilt creates an impermissible mandatory, conclusive presumption. (*Carella v. California* (1989) 491 U.S. 263, 265-266.) We have consistently rejected the identical contention, and do so again here. (*People v. Jones* (2013) 57 Cal.4th 899, 972; *People v. Myles, supra*, 53 Cal.4th at pp. 1216-1217.)

### E. Juror Misconduct

Defendant contends that a juror's misconduct during jury selection and later at the guilt phase requires reversal of the judgment. We agree with defendant that misconduct occurred during the guilt phase but conclude after an independent review of the entire record that the presumption of prejudice arising from that misconduct has been rebutted and that defendant is not entitled to relief.

### 1. Background

The jury returned its guilt phase verdicts on February 13, 2001, finding defendant guilty of murder and all other charges but one, and finding true all of the associated sentencing allegations, including the rape-murder and oral-copulation-murder special-circumstance allegations. The penalty phase of trial commenced just shy of two weeks later, on February 27. On March 5, during the prosecution's rebuttal case, the court met with counsel outside the jury's presence to inform them that two juror-related problems had arisen that morning. First, Juror No. 1 had left a message saying she would be unavailable to come to court due to a family illness. Second, one of the sheriff's deputies assigned to the courtroom reported to the court that he had learned from a fellow officer, Deputy Kathleen

113

Baker, that Baker and a seated juror with whom she was acquainted may have discussed the case over lunch.

With counsel's assent, the court called the jurors into the courtroom and asked them as a group whether anyone knew or may have had contact with Deputy Baker. No juror gave an affirmative response. Outside the jury's presence, the sheriff's deputy who had reported the communication to the court then provided more details about his encounter with Deputy Baker, which had occurred when they ran into each other in a bookstore the previous day. According to the officer, Deputy Baker told him she had had lunch with a juror who said that she had been on a murder trial for two months and that "they were gonna fry him."

A short time later, again outside the jury's presence but with counsel's assent and involvement, the court placed a telephone call to Juror No. 1. The court first inquired about Juror No. 1's message regarding her unavailability. She explained that she could not attend trial all week because she had to care for her adult daughter, who was recuperating from a serious surgery. When the court then asked her whether she was acquainted with Deputy Baker, Juror No. 1 indicated that Deputy Baker was her other daughter's sister-in-law and that her daughter had told her that Deputy Baker was working near the courthouse. Juror No.1 admitted that she had spoken to Deputy Baker by telephone on the day the jury announced its guilt phase verdicts and on one other occasion, between two and four weeks earlier, to set up a lunch date. She explained, however, that they never met for lunch because Deputy Baker's superiors ordered her not to. Juror No. 1 repeatedly denied telling Deputy Baker, "We're gonna fry him." According to Juror No. 1, Deputy Baker ascertained during their first telephone conversation that she was serving as a juror in defendant's case, although Juror No. 1 could not remember whether she or Deputy Baker commented on the trial.

114

With no objection from counsel for either side, the court excused Juror No. 1 from the jury and appointed an alternate juror to take her place. A hearing regarding possible misconduct commenced the same afternoon.

*a. Hearing on juror misconduct*

Deputy Baker was the first witness to testify at the hearing. She confirmed that her brother was married to Juror No. 1's daughter and indicated that she had seen Juror No. 1 once a year or so at family gatherings. Deputy Baker testified that Juror No. 1 had left a message on her home answering machine about three or four weeks earlier, mentioning that she was on jury duty in the Ventura County courthouse and suggesting they meet for lunch. Under the impression that Juror No. 1 had simply been summoned to appear for jury selection, Deputy Baker returned the call. During the course of that five-minute conversation, they spoke a little about Deputy Baker's brother. In response to Deputy Baker's questions about jury duty, Juror No. 1 told her she had been a juror on defendant's case for the past two months and that she liked the experience. Deputy Baker recalled Juror No. 1 then blurting out, "Yeah, we . . . we all want to fry him." According to Deputy Baker, she "really didn't think anything of [Juror No. 1's statement]" and did not respond to it. During questioning by the prosecutor, however, Deputy Baker described Juror No. 1 as a "sweet," "older gal" and agreed with him that it seemed unlikely Juror No. 1 would use that type of language. Deputy Baker acknowledged it was "possible" she was only interpreting what Juror No. 1 had said to her. She was certain, however, that Juror No. 1 had not discussed the case or the jury's deliberations with her. Deputy Baker believed their first conversation had occurred three or four weeks earlier, on a Sunday. A couple of days after that, they had a second, very brief telephone conversation in which Deputy Baker told Juror No. 1 that, at her supervisor's directive, she could not have lunch with her.

115

Deputy Baker indicated during questioning that she had related Juror No. 1's statement to several individuals, including her husband and two supervising officers, all of whom testified at the hearing when it resumed the following day. Sergeant Richard Barber testified that Deputy Baker mentioned to him she was planning to have lunch with a "Merriman juror" who said they were going to "hang him" or "fry him." Captain Gordon Hansen testified that he overheard Deputy Baker's conversation with Barber and recalled hearing Baker say the juror indicated "[they] were anxious to convict [defendant] of the charges" and "looking forward to frying this guy." Captain Hansen could not recall the precise date he overheard Deputy Baker relate the juror's statement to Sergeant Barber, but he believed it was midmorning on the day before the newspaper reported the guilty verdicts.

The testimony of Deputy Baker's husband Michael, who also was a deputy sheriff, mostly echoed that of his wife but differed in one significant respect. Like Deputy Baker, he described Juror No. 1 as a family acquaintance with whom they had socialized no more than four or five times, and not a close relative. He also indicated that within the last 30 days Juror No. 1 had called their residence several times when his wife was not at home, and that she once left a message on their answering machine. Deputy Baker's husband testified that if his wife had told him that her brother's mother-in-law was a juror in the Merriman case, it likely "would have went in one ear and out the other." He did not recall his wife telling him that Juror No. 1 said "they're going to fry Merriman," but he believed that such terminology would be something he *would* remember.

The sheriff's deputy who had first reported to the trial court Deputy Baker's communication with a juror also gave sworn testimony at the hearing, repeating his account of the casual, off-duty conversation with Deputy Baker two days

116

earlier in which she told him she had had lunch with a Merriman trial juror who told her "they were looking forward to frying him."

At one point during the hearing, the trial court judicially noticed the jury's guilt phase verdicts in the case. Specifically, the court took judicial notice that the verdicts on the murder count and special circumstance allegations were dated Tuesday, February 13, 2001, and the verdicts on all other counts and allegations were dated Friday, February 9.

Juror No. 1 was the hearing's final witness and she was extensively questioned by the court and the attorneys, this time while under oath. After her telephone conversation with the court on the previous morning, she had been trying to recall the events in question and brought along the notes she had written in this regard, which she referred to during the hearing and later gave to the court.

Some of Juror No. 1's testimony was consistent with that given by Deputy Baker and Baker's husband. For example, she indicated that, at her daughter's suggestion, she had called the Bakers' residence, and that when Deputy Baker returned her call, they chatted for three to five minutes about family matters and Deputy Baker's job, and made tentative plans to have lunch. A second conversation occurred when she called Deputy Baker from the courthouse on February 13, 2001, during a recess between the time the verdicts had been signed and when they were formally announced in open court. Deputy Baker informed her at that time that she was not permitted to have lunch with her, and neither of them discussed the case.

Juror No. 1 confirmed that the subject of the Merriman trial arose at one point during her first telephone conversation with Deputy Baker. But her recollection of the exchange was markedly different from Baker's. According to Juror No. 1, Baker "said something like, 'I hope you put him away,' " to which Juror No. 1 replied, "He will be put away" or "He will be." As Juror No. 1

117

explained at the hearing, "it was a capital case and [defendant] was either gonna spend his life in prison or [get] the death penalty."

Juror No. 1 repeatedly testified she was unsure when the first conversation took place but believed it was before, rather than during deliberations. When the prosecutor pointed out that Juror No. 1's response to Deputy Baker's comment suggested that defendant already would have been convicted of something, Juror No. 1 explained that the reason for her remark was that the evidence was so overwhelming. She further explained that her response was an expression of her own opinion, no one else's, and that she did not discuss the conversation with anyone else, including any of her fellow jurors.

Referencing Juror No. 1's statement regarding the overwhelming evidence of guilt, defense counsel observed that it sounded as though she had made up her mind prior to deliberations. Juror No. 1 replied, "[t]hat probably is true." She then explained, however, that deliberations were conducted "very conscientiously" and "everything that was deliberated upon was . . . judged by evidence."

Juror No. 1 did not recall saying, "We're gonna fry him," even jokingly, and she agreed with the prosecutor that those were words she normally would not use. She acknowledged it was possible she did so, however.

When the court resumed questioning, it focused initially on whether there was any comment or conversations either before or during deliberations with regard to penalty. Juror No. 1 did not recall any.

The court then further probed Juror No. 1's affirmative response to defense counsel's suggestion that she probably had made up her mind before deliberations because the evidence at trial was overwhelming. When the court asked Juror No. 1 whether she went into deliberations with an open mind and considered everything the other jurors had to say, she indicated that she did. Highlighting the apparent conflict between those responses, the court asked Juror No. 1 to explain.

118

She clarified that she and the other jurors did not vote on the counts until they had examined all of the exhibits that backed up each of the charges. In response to the court's question whether she based her votes on her impressions before deliberations had started or on the deliberations, Juror No. 1 said she voted based on "when we found the evidence." As she further explained, "everything was backed up so we knew."

The court continued its inquiry into whether Juror No. 1 had prejudged the case by focusing on her purported statement to Deputy Baker that defendant "will be put away." Juror No. 1 indicated that she had not actually made up her mind when she made that statement. As she explained, the evidence was overwhelming but during deliberations she and the other jurors examined each count individually to determine whether it was verified by the exhibits and then voted on it.

At the conclusion of questioning, Juror No. 1 apologized for making an inappropriate remark to Deputy Baker, and she assured the court she would abide by the court's admonition not to discuss the case or the present proceeding until informed otherwise.

The next day, at the behest of defense counsel, the trial court individually questioned each juror and the remaining alternate juror, asking whether he or she had participated in or overheard any discussions with another juror or nonjuror regarding what the penalty or punishment should or was likely to be in the case. All jurors but one indicated that they had neither participated in nor were aware of any such discussions. Juror No. 4 related that she had told an acquaintance that she was a juror in the penalty phase of a capital case and that the choice was between two penalties. In response to further inquiry, the juror assured the court that she could potentially vote either way on penalty and planned to participate fully in deliberations.

Defense counsel then moved for mistrial on the ground that Juror No. 1 had committed prejudicial misconduct by prejudging defendant's guilt, and the penalty he should receive, before engaging in guilt phase deliberations. Counsel further argued that Juror No. 1 had committed misconduct during voir dire by concealing her relationship with Deputy Baker. Had her relationship with a Ventura County Sheriff's Department deputy been mentioned in the juror questionnaire, counsel asserted, the defense would not have wanted to keep Juror No. 1 on the jury. After hearing the prosecutor's argument opposing the motion, the court took the matter under submission.

### b. Denial of the mistrial motion

The court denied the mistrial motion the day following the hearing, giving an extensive explanation of its factual findings and legal conclusions. Regarding certain conflicts in the testimony, the court credited the testimony of Juror No. 1 over that of Deputy Baker.

The court found that on Friday, February 9, 2001, the jury reached guilt phase verdicts on all counts except the murder charge and special circumstance allegations and there was a three-day recess until deliberations resumed on Tuesday, February 13. During that recess, Juror No. 1 either contacted, or was contacted by Deputy Baker, the sister of Juror No. 1's son-in-law. The court determined that Juror No. 1 and Deputy Baker were acquaintances with infrequent contact, not close relatives.

The reason for the communication, the court found, was because Juror No. 1 had learned from a family member that Deputy Baker worked in the same county government complex where the trial was being held. Deputy Baker either was aware or became aware that Juror No. 1 was a juror in a criminal case, but she knew little about the case itself.

120

With regard to the substance of the conversation between Juror No. 1 and Deputy Baker, the court found that Deputy Baker said something to the effect that she hoped the jury would put defendant away. Juror No. 1 responded that defendant "would be put away one way or the other." By this, Juror No. 1 was contemplating only two possible penalties, life without parole or death. The court found it "highly likely" that Juror No. 1 added some sort of statement to the effect that she expected death would be imposed, either using the word "fry" or possibly assenting to Deputy Baker's use of the word. The court was of the view that it could not make a definitive finding in that regard. In either case, the court found, Juror No. 1's remark was an " 'off-the-cuff' comment in response to a provocative statement by Baker." The court further found that Juror No. 1's "prediction" regarding penalty was not the result of improper discussion of penalty by some or all of the jurors, and that Juror No. 1 did not interject into the conversation with Deputy Baker any issue or information related to defendant's case or commit any other improprieties.

As for Juror No. 1's state of mind at the time of deliberations, the court credited Juror No. 1's testimony and found that she remained open-minded and able to vote either way on the murder count and special circumstance allegations. Noting the numerous charges of which defense counsel conceded defendant's guilt during closing argument, the court found the jury would have begun deliberating on the murder count on Friday, February 9, before the conversation between Juror No. 1 and Deputy Baker occurred.

Based upon its factual findings, the court saw several areas of possible misconduct and addressed each in turn. First, the court found Juror No. 1's failure to mention Deputy Baker in her juror questionnaire did not amount to misconduct. In the court's view, the omission was inadvertent and understandable in light of the distant nature of the relationship and their limited contact. The court found it

121

significant that during voir dire Juror No. 1 was not questioned directly about the extent of her acquaintances with individuals in law enforcement.

The court concluded that Deputy Baker's comment to Juror No. 1 to the effect that she hoped defendant would be "put away," and the response it prompted from Juror No. 1, *did* constitute misconduct. It further concluded, however, that the presumption of prejudice arising from that misconduct had been rebutted, finding no reasonable likelihood the improper conversation influenced the verdicts. The court noted that the exchange was brief and not initiated by the Juror No. 1. It also observed that the conversation had little prominence in Juror No. 1's mind and that she did not share it with any other juror. In the court's view, the misconduct occurred at a stage in the proceedings in which Juror No. 1 would be expected to be forming opinions on guilt, and it credited her testimony regarding being open-minded. The court also found that the brevity of deliberations suggested the jury shared Juror No. 1's view regarding the strength of the evidence of guilt.

Regarding the question whether Juror No. 1 had prejudged the case, the court's answer was twofold. The court found that the substance of Juror No. 1's comment suggested that she had prejudged penalty but that because she no longer was a seated juror, the question of prejudice was moot. The court further concluded that Juror No. 1 had not prejudged defendant's guilt. Crediting Juror No. 1's testimony, the court reasoned in relevant part that Deputy Baker's comment, which put Juror No. 1 on the spot, prompted a response (that defendant "would be put away one way or the other") that should be interpreted as a prediction of what would happen were the case to proceed to the penalty phase.

## 2. *Discussion*

Defendant claims that Juror No. 1 committed prejudicial misconduct in two separate, but interrelated ways, first, by failing to mention in her juror questionnaire or during voir dire questioning her relationship with Deputy Baker and second, by communicating with Deputy Baker about the case. Defendant argues that the misconduct was prejudicial because, he contends, Juror No. 1 had made up her mind regarding defendant's guilt prior to deliberations and therefore was actually biased against him. The judgment must be reversed, he asserts, because Juror No. 1's presence on the jury deprived him of his state and federal constitutional rights to an unbiased jury, fair trial, effective representation of counsel, and due process of law.

The legal principles that guide our consideration of defendant's claim of prejudicial juror misconduct are well established. A criminal defendant has a constitutional right to trial by an impartial and unbiased jury. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) A deprivation of that right occurs even if only one juror is biased. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (lead opn. of George, C.J.).)

A juror's misconduct or involuntary exposure to certain events or materials other than what is presented at trial generally raises a rebuttable presumption that the defendant was prejudiced and may establish juror bias. (*In re Hamilton* (1999) 20 Cal.4th 273, 295-296.) As relevant here, it is misconduct, and therefore presumptively prejudicial, for a juror to conceal relevant facts during the jury selection process (*In re Hitchings, supra,* 6 Cal.4th at p. 111), or to discuss the case with a nonjuror during trial (*In re Hamilton, supra*, at p. 295). A nonjuror's unauthorized communication with a juror during trial that concerns the matter pending before the jury likewise raises a presumption of prejudice. (*In re Price* (2011) 51 Cal.4th 547, 560; *In re Hamilton, supra*, at pp. 295, 305-306.)

123

Relevant to defendant's claims of misconduct here, the presumption of prejudice is rebutted, and the verdict will not be disturbed, if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant. (*In re Price, supra*, 51 Cal.4th at p. 560; *In re Carpenter* (1995) 9 Cal.4th 634, 654.) Our inquiry in this regard is a "mixed question of law and fact" subject to independent appellate review. (*People v. Nesler, supra*, 16 Cal.4th at p. 582.) But " '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citations.]" (*People v. Schmeck* (2005) 37 Cal.4th 240, 294.)

Applying these principles, we conclude that although misconduct occurred, the presumption of prejudice was rebutted and defendant is not entitled to reversal of the judgment, as explained more fully below.

### a. Failure to mention Deputy Baker during jury selection

Question No. 32 on the jury questionnaire asked, "Do you have any relatives or close friends who are in law enforcement or are lawyers, or judges?" Juror No. 1 checked "Yes" and answered question No. 32a, which asked prospective jurors who had responded affirmatively to question No. 32 to list the relationship, occupation, and name of such persons. Juror No. 1 wrote, "Richard Walsh — Guard — Tehachapi Prison."

The subject of relatives or close friends in law enforcement did not arise during voir dire questioning, and Juror No. 1 did not offer any additional information in that regard. When the trial court asked Juror No. 1 in the post-guilt-phase telephone call on March 5, 2001, whether she was acquainted with

Deputy Sheriff Kathleen Baker, however, Juror No. 1 readily indicated that the officer was her daughter's sister-in-law.

During the hearing on possible juror misconduct, Deputy Baker and her husband both testified that their contact with Juror No. 1 had been infrequent, possibly four or five times in as many years, and that they were not close to her. Deputy Baker's husband testified further that when Juror No. 1 called the house the first time, she introduced herself to him and reminded him who she was. Based on this evidence, the trial court found that Juror No. 1 had infrequent contacts and only a distant relationship with Deputy Baker, and concluded that Juror No. 1's failure to mention Deputy Baker in her questionnaire and during voir dire questioning was an inadvertent omission that did not amount to misconduct.

Defendant insists the trial court mischaracterized the relationship between Juror No. 1 and Deputy Baker, arguing that they were instead well-acquainted relatives. We reject defendant's assertion. As recounted above, substantial evidence supports the trial court's finding that the relationship between Juror No. 1 and Deputy Baker was distant. (*People v. Schmeck, supra,* 37 Cal.4th at p. 294.)

Indeed, there is some question that Juror No. 1 and Deputy Baker could be considered "relatives" at all. Deputy Baker was the sister-in-law of Juror No. 1's daughter. Although Deputy Baker certainly was a relative of Juror No. 1's daughter and son-in-law, it is not clear what the nature of her familial relationship was, if any, to Juror No. 1. (Cf. *People v. Tuggles* (2009) 179 Cal.App.4th 339, 373 [juror did not improperly conceal during voir dire her acquaintance with a man under investigation for rape whom she barely knew by not mentioning him in response to the court's question whether a "close friend" had been accused of any offense]; *People v. Duran* (1996) 50 Cal.App.4th 103, 107, 114-115 [juror's failure during jury selection to identify a certain individual as a person "close" to

125

her who had been the victim of a violent crime did not amount to misconduct because there was no evidence establishing her relationship with him was anything more than casual].)

But even were we to conclude that Juror No. 1 should have included Deputy Baker in her list of relatives in law enforcement, reversal is not warranted. We have made clear that "an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias." (*In re Hamilton*, *supra*, 20 Cal.4th at p. 300.) The trial court concluded that Juror No. 1's failure to mention Deputy Baker in her questionnaire and during voir dire questioning was an inadvertent omission. Based on our own review of the record, we reach a similar conclusion that Juror No. 1's failure to report that relationship during jury selection was, at most, an inadvertent omission and not a deliberate attempt to conceal bias. Juror No. 1 testified that she learned from her daughter that Deputy Baker worked near the courthouse and that, at her daughter's suggestion, she called Deputy Baker to set up a lunch date. Such testimony, when coupled with the court's finding of a mere distant relationship between Juror No. 1 and Deputy Baker, supports the inference that Deputy Baker was not someone who would have come to mind when Juror No. 1 was responding to the questionnaire item regarding relatives and close friends in law enforcement. Notably, neither the court nor the parties asked Juror No. 1 any questions on that subject or made any statements during voir dire questioning that might have jogged her memory or clarified for her the types of relationships that would be of interest to the parties in their evaluation of prospective jurors. When Juror No. 1 was asked by the court in their post-guilt-phase telephone conversation whether she was acquainted with Deputy Baker, she did not hesitate to report that she was. The record as a whole strongly supports the conclusion that Juror No. 1's failure to mention Deputy Baker, if a mistake, was honestly made.

126

Nor is there anything in the record from which to infer Juror No. 1 deliberately concealed her relationship with Deputy Baker in order to hide any alleged bias against defendant.  We have observed that "good faith when answering voir dire questions is the most significant indicator that there was no bias." (*In re Hamilton, supra*, 20 Cal.4th at p. 300; accord, *In re Boyette* (2013) 56 Cal.4th 866, 890.)  After hearing the testimony of Juror No. 1 and others, the trial court found that her failure to mention Deputy Baker during voir dire was inadvertent, not deliberate.  That finding amply supports the conclusion that Juror No. 1 did not omit any mention of Deputy Baker in order to conceal her bias against defendant.  (See *In re Boyette, supra*, at p. 890 [referee's findings that juror's failure to disclose his own criminal history and drug use and that of his friends and relatives was neither intentional nor deliberate supports the conclusion that the juror was not biased against the defendant].)

### b.  Conversation with Deputy Baker

The trial court determined that misconduct occurred when Juror No. 1 and Deputy Baker spoke by telephone about the case shortly before the conclusion of the guilt phase deliberations, but concluded that the presumption of prejudice arising from that misconduct had been rebutted.  Based upon our independent review, we reach a similar conclusion.

As set forth in more detail above in the summary of the hearing on possible juror misconduct, substantial evidence supports the court's factual findings regarding the substance of the improper conversation and its surrounding circumstances.  To briefly recap the court's findings, Juror No. 1 and Deputy Baker had a short telephone conversation on the weekend between the second and final day of guilt phase deliberations during which Deputy Baker said something to the effect that she hoped the jury would put defendant away.  Juror No. 1

127

responded to Deputy Baker's comment by saying that defendant "would be put away one way or the other," and the court found it "highly likely" she added that she expected a death verdict, either using the word "fry" herself or by assenting to Deputy Baker's use of that word.

As previously mentioned, any unauthorized communication between a juror and a nonjuror regarding the matter pending before the jury is misconduct and presumptively prejudicial. (*In re Hamilton, supra*, 20 Cal.4th at p. 295.) In the present case, the communication between Juror No. 1 and Deputy Baker was not a trivial violation of the court's directive not to discuss the case with anyone. (Cf. *People v. Stewart, supra,* 33 Cal.4th at p. 510 [a juror's technical violation of the court's admonition not to discuss the case with nonjurors was " 'trifling' misconduct" that could not have prejudiced the defendant].) Rather, it amounted to serious misconduct. (See *People v. Pierce* (1979) 24 Cal.3d 199, 207 [juror who conversed midtrial with his police officer neighbor regarding shortcomings in the prosecution's case committed serious misconduct].)

Having determined that serious misconduct occurred, we examine whether the presumption of prejudice arising from that misconduct has been rebutted. Based upon our review of the nature of the misconduct and its surrounding circumstances, and taking into account the court's credibility determinations and factual findings supported by substantial evidence, we conclude that the presumption of prejudice has been rebutted because there is no substantial likelihood that Juror No. 1, or any other juror, was actually biased against defendant, as we explain below. (*In re Price, supra*, 51 Cal.4th at p. 560.)

Juror No. 1's telephone call to Deputy Baker was prompted, not by a desire to discuss the case, but rather to make arrangements for a lunchtime get-together suggested by her daughter. During that conversation, Juror No. 1 spoke generally about her positive experience as a juror, but not about the case specifically. As the

128

trial court found, it was Deputy Baker's unsolicited comment to the effect that she hoped the jury would "put defendant away" that prompted Juror No. 1's "off-the-cuff" response predicting that death would be imposed, and there was no further discussion regarding the pending case. The nature and surrounding circumstances of the misconduct do not suggest Juror No. 1 was actually biased against defendant.

The misconduct in this matter is distinguishable in significant respects from the misconduct at issue in cases in which we have concluded that the presumption of prejudice was *not* rebutted. In *In re Hitchings, supra*, 6 Cal.4th 97, for example, the juror engaged in repeated conversations with a friend regarding the defendant's trial while it was pending and on one occasion spoke directly about the case, heatedly expressing her view that the defendant deserved to be "horribly mutilated for his crimes." (*Id*. at p. 120, see *id*. at pp. 106-107, 120-122.) Nor is Juror No. 1's misconduct comparable to that at issue in *People v. Pierce, supra*, 24 Cal.3d 199. In *Pierce*, after the prosecution had rested, a juror initiated a conversation with his police officer neighbor to inquire about the fingerprinting process. The information obtained by the juror allayed his concerns regarding the sufficiency of the prosecution's evidence in that no fingerprints had been lifted from the murder weapon. (*Id.* at pp. 206, 208-209.)

Our conclusion that the record shows no substantial likelihood that Juror No. 1, or any other juror, was actually biased against defendant is further bolstered by the court's findings, supported by substantial evidence, that Juror No. 1 did not share with her fellow jurors the fact or substance of her conversation with Deputy Baker, and that the jurors did not discuss penalty during the guilt phase. (See *People v. Danks* (2004) 32 Cal.4th 269, 307, 310.) Moreover, there is no evidence suggesting that, but for Juror No. 1's conversation with Deputy Baker, she would have held out for acquittal on the murder count. To the contrary, Juror No. 1

testified at the hearing that she found the evidence of defendant's guilt on that charge "overwhelming." As the trial court observed, the speed with which deliberations were carried out strongly suggested that the other jurors shared that view. (Cf. *People v. Pierce, supra*, 24 Cal.3d at p. 208 [rejecting as "sheer speculation" the People's argument that the errant juror necessarily would have voted to convict even had he not spoken with his police officer neighbor].)

Defendant argues that Juror No. 1's actual bias was demonstrated by evidence that she made up her mind regarding defendant's guilt prior to deliberations. He acknowledges the court's finding that Juror No. 1 remained open-minded and capable of voting either way on the murder count after her conversation with Deputy Baker. According to defendant, however, that determination was "fundamentally flawed" because Juror No. 1 was neither forthright nor honest, and clearly testified that she *had* already made up her mind. His argument fails because, in essence, he is asking this court to reweigh the trial court's credibility determinations, a task we do not undertake when those determinations are supported by substantial evidence. (See *People v. Schmeck, supra,* 37 Cal.4th at p. 294.) As we explain, the court's finding that Juror No. 1 maintained an open mind regarding defendant's guilt is supported by substantial evidence, and that finding further supports our conclusion that the presumption of prejudice arising from the juror's misconduct was adequately rebutted.

Admittedly, there is some evidence in the record suggesting that Juror No. 1 had made up her mind based on the evidence prior to deliberations. For example, when defense counsel remarked to Juror No. 1 at the hearing that it sounded as though she had done so, Juror No. 1 responded that it "probably [was] true." And in the hearing transcript pages cited by defendant to support his argument, Juror No. 1 did indicate that she went into deliberations with the impression that the evidence was strong. When then asked by the court whether she could have been

130

persuaded otherwise if someone was able to convince her, Juror No. 1 equivocated, saying, "Well, I suppose, but, um, the evidence was all there by then."

However, Juror No. 1 indicated in her responses to the court's further questioning on the subject that she had an open mind during the deliberative process. The court asked Juror No. 1 directly, "Is it possible you had already made up your mind on how you were going to vote [at the time you spoke with Deputy Baker] as opposed to remaining open-minded through the time you actually did vote?" Juror No. 1 replied, "No. . . I hadn't actually made up my mind at that time, at that point. All the evidence was so overwhelming, but when we got into deliberations, it was all . . . individually verified by [the] exhibits. Whatever the charges were, they were all examined, each one of them individually, and then everybody voted." The court was entitled to credit Juror No. 1's more precise and fully developed description of her state of mind over her earlier, equivocal responses.

We conclude based upon the record summarized above that substantial evidence supports the court's finding that Juror No. 1 remained open-minded as deliberations continued on the murder count. The court observed firsthand Juror No. 1's responses and demeanor and this court has recognized in a different context that " ' "a trial judge who observes and speaks with a . . . juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." [Citation.]' [Citation.]" (*People v. Bramit* (2009) 46 Cal.4th 1221, 1235.)

We observe furthermore that, contrary to defendant's suggestion, a juror who forms an opinion regarding the strength of the prosecution's case before the start of deliberations has not necessarily prejudged the case. As this court recently

131

explained, "[t]he reality that a juror may hold an opinion at the outset of deliberations is . . . reflective of human nature. It is certainly not unheard of that a foreperson may actually take a vote as deliberations begin to acquire an early sense of how jurors are leaning. We cannot reasonably expect a juror to enter deliberations as a *tabula rasa*, only allowed to form ideas as conversations continue. What we can, and do, require is that each juror maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75.) We concluded above that there is substantial evidence in the record supporting the court's finding that Juror No. 1 maintained an open mind and, with her fellow jurors, considered all the evidence before casting her vote on the murder count. That she held an opinion regarding the strength of the prosecution's case before deliberating does not undermine the court's finding.

We observe finally that the evidence of prejudgment in the present matter is far different from, and significantly less than, the circumstances that required reversal of the judgment for juror misconduct in *People v. Weatherton*. The juror in that case repeatedly discussed the case with fellow jurors prior to deliberations, conveying to them his belief that the defendant was guilty, and advocating for a verdict of guilt, long before the prosecution had finished its presentation of evidence and the defense had an opportunity to call that evidence into question. Indeed, the record showed that as early as the first day of trial, the errant juror indicated to some jurors that "there was no denying" the veracity of the prosecution's star witness and that he believed her testimony was dispositive of guilt. Both before and during deliberations, the juror expressed the view that the defendant deserved the death penalty, further suggesting that he had made up his mind regarding defendant's guilt. (*People v. Weatherton* (2014) 59 Cal.4th 589,

132

598-601.)  By contrast here, substantial evidence supports the court's finding that Juror No. 1 remained open-minded as deliberations continued on the murder count. There was no substantial likelihood that she or any other juror was actually biased against defendant.

### F.  Cumulative Effect of Asserted Errors at the Guilt Phase

Defendant contends that his convictions must be reversed because, even if none of the errors at the guilt phase is prejudicial individually, their cumulative effect is sufficiently prejudicial as to violate due process.  (*Taylor v. Kentucky* (1978) 436 U.S. 478, 487, fn. 15.)  We have concluded that juror misconduct occurred but that the presumption of prejudice arising from the misconduct was rebutted.  We also have assumed for argument that the trial court abused its discretion in admitting evidence of Katrina's out-of-court statement to her mother describing a sexual assault by defendant that occurred several months before the murder, but concluded furthermore that any error was harmless.  Defendant fails to establish any other error at the guilt phase.  Accordingly, there can be no prejudicial cumulative effect warranting reversal.  Contrary to defendant's assertion, he received a fair trial on guilt.

### G.  Admission of Evidence in Aggravation

Defendant claims he is entitled to reversal of the penalty judgment because much of the evidence the jury was permitted to consider during the penalty phase concerned his unsavory lifestyle, neo-Nazi beliefs, and other evidence of his bad character that did not correspond to any of the statutorily permissible aggravating factors.  We reject defendant's argument both procedurally and on the merits.

As a threshold matter, we agree with the Attorney General that defendant has forfeited his claim of error by not objecting to the admission of the "bad character" evidence on the ground he now asserts.  (Evid. Code, § 353, subd. (a); *People v.*

133

*Kipp* (2011) 26 Cal.4th 1100, 1135.)  Defendant cites no authority for his contention that the trial court was obligated, on its own initiative, to reassess the balance of prejudice and probative value of evidence adduced at the guilt phase before placing it before the jury for its consideration during the penalty proceedings.  In any event, defendant's claim of error fails on the merits.

Defendant is correct that a prosecutor is not permitted to present aggravating evidence that is irrelevant to the factors in aggravation listed in section 190.3.  (*People v. Boyd* (1985) 38 Cal.3d 762, 772-776.)  He also correctly observes, more specifically, that "[e]vidence of a defendant's background, character, or conduct that is not probative of any specific sentencing factor is irrelevant to the prosecution's case in aggravation and therefore inadmissible." (*People v. Nelson* (2011) 51 Cal.4th 198, 222; *People v. Boyd, supra*, at pp. 773-774.)  Under section 190.3, aggravating factors include the circumstances of the capital offense, other violent criminal conduct by the defendant, and the defendant's prior felony convictions.  (§ 190.3, factors (a)-(c).)  These three factors, and the defendant's age at the time of the crime (§ 190.3, factor (i)), are the only factors that may be considered in aggravation of penalty.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 108-109, but see *id*. at p. 109 [evidence presented by the prosecution to rebut defense evidence in mitigation need not relate to an aggravating factor].)

Defendant's argument that the jurors at the penalty phase were exposed to inadmissible evidence of his bad character unrelated to the aggravating factors mostly reprises his claims of error regarding (1) the joinder of the murder charge with all other counts and (2) the admission of evidence of his uncharged crimes.  As we have explained, *ante*, in parts II.A. and II.C.1., the joinder of the counts in question and admission of uncharged crimes evidence did not violate state law or deprive defendant of any state or federal constitutional rights.  Because the counts were properly joined and the challenged evidence properly admitted at the guilt

134

phase, evidence supporting the uncharged crimes involving violence and the felony offenses of which defendant was convicted was relevant to one or more of the statutory factors in aggravation and properly could be considered by the jury during the penalty phase. (See *People v. Blair* (2005) 36 Cal.4th 686, 749 [" 'circumstances of the crime' " includes that which surrounds it " ' "materially, morally, or logically" ' "]; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1013-1014 [evidence of circumstances surrounding the conduct that amounts to a statutory factor in aggravation is admissible to give context to the incident in question, even when such circumstances include activity that, standing alone, would not be admissible].) We note that, in an apparent abundance of caution, the trial court expressly instructed the jury it could *not* consider the vandalism and drug offense convictions associated with the incident that culminated in defendant's arrest.

Defendant acknowledges that the court also expressly instructed the jury that it could not consider evidence of defendant's "lifestyle or background" as an aggravating factor. He argues, however, that the instruction was so vague as to provide no practical guidance for the jury to be able to distinguish between his "lifestyle and background" and the circumstances of the crime. Defendant is barred from challenging the adequacy of the court's instruction because the defense asked that it be given.

Under the invited error doctrine, a defendant cannot complain that the court erred in giving an instruction that he requested. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 138.) The invited error doctrine applies when the defense has made a " ' " ' 'conscious and deliberate tactical choice' " ' " in asking for the instruction in question. (*People v. Harris* (2008) 43 Cal.4th 1269, 1293.) The record supports the conclusion that counsel made such a choice in this case. During discussion regarding penalty phase instructions, defense counsel pointed out that the jurors would be told they could consider as aggravating factors defendant's

convictions, including the gang finding. But he expressed concern that jurors might not realize it would be improper to also consider as aggravating evidence defendant's membership in the SHD gang, or certain aspects of his lifestyle such as getting tattoos, drinking beer while underage, and going to punk rock concerts. Indeed, when the court suggested that the word "lifestyle" might not be appropriate in this context, defense counsel insisted that it was. Defendant may not now complain about the inadequacy of the instruction.

Defendant argues finally that permitting the jury to consider at the penalty phase the evidence regarding his membership in a skinhead gang, and the beliefs espoused by that gang, contravened his First Amendment rights to freedom of association and speech. For support, he relies upon the United States Supreme Court's decision in *Dawson v. Delaware* (1992) 503 U.S. 159, but that decision does not assist him. In *Dawson*, the prosecution introduced a stipulation at the penalty phase that the defendant belonged to a " 'white racist prison gang' " called the Aryan Brotherhood. (*Id*. at p. 165.) The high court held the admission of the Aryan Brotherhood stipulation violated the defendant's First Amendment rights. As the court explained, evidence of the gang's racist beliefs was not linked to the murder, nor was it relevant to help prove any other aggravating circumstance or to rebut any mitigating evidence. Rather, it showed only the defendant's "abstract beliefs." (*Id*. at p. 167.)

In the present case, by contrast, evidence of defendant's membership in the SHD gang, and the gang's shared antisocial beliefs, proved more than defendant's association and abstract beliefs. Such evidence was highly relevant to the circumstances surrounding the capital offense (§ 190.3, factor (a)), as previously discussed *ante*, in part II.A.4. For example, testimony regarding defendant's leadership role in the SHD gang and the gang's code of silence helped explain why the investigation into Katrina's disappearance languished for so many years.

136

Evidence relating to defendant's gang membership also bore on defendant's other violent criminal behavior and some of the noncapital convictions. (§ 190.3, factors (b)-(c).) Evidence of defendant's White supremacist views, for example, tended to show reasons for his 1990 attack on a fellow ward at the juvenile detention facility, and his fight with Black inmates at the Ventura County jail in 1994. (See *People v. Gurule* (2002) 28 Cal.4th 557, 653-654 [evidence of the defendant's membership in a juvenile gang was properly admitted at the penalty phase as a circumstance of his prior acts of violence].) *Dawson* made clear that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." (*Dawson v. Delaware, supra*, 503 U.S. at p. 165.) No constitutional violation occurred here. (See *People v. Smith* (2003) 30 Cal.4th 581, 626 [admission of evidence of the defendant's racist remarks, properly admitted at the penalty phase as relevant to his actual criminal conduct, did not violate the defendant's free speech rights].)

## H.  Constitutionality of California's Death Penalty Scheme

Defendant raises numerous challenges to the constitutionality of California's death penalty law. He acknowledges that his contentions are identical to those that previously have been considered and rejected by this court. We decline his request to reconsider our prior conclusions. (*People v. Schmeck, supra,* 37 Cal.4th at pp. 303-304.)

### 1.  Narrowing function

The various special circumstances in section 190.2 that render a murderer eligible for the death penalty, including the felony-murder special circumstance, are not so numerous and broadly defined that they fail to genuinely narrow the class of murderers who are subject to capital punishment, as required by the

137

Eighth and Fourteenth Amendments. Contrary to defendant's assertion, voters did not intend by their enactment of the 1978 death penalty law to make all murderers death eligible. (*People v. Jones, supra,* 54 Cal.4th at p. 85; *People v. Myles, supra,* 53 Cal.4th at p. 1224; *People v. Williams* (2010) 49 Cal.4th 405, 469.)

### 2. *Circumstances of the crime as a factor in aggravation*

Application of section 190.3, factor (a), which allows jurors to consider as a factor in aggravation the "circumstances of the crime," does not result in the " 'wanton, and freakish' " imposition of the death penalty in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments by permitting prosecutors to characterize as aggravating almost all features of every murder, including polar opposite and mutually exclusive circumstances. (*People v. Jones, supra,* 54 Cal.4th at p. 85; see *People v. Brown* (2004) 33 Cal.4th 382, 401; see also *People v. Clark, supra*, 52 Cal.4th at p. 1007.) As defendant acknowledges, the high court has found no constitutional infirmity in factor (a). (*Tuilaepa v. California* (1994) 512 U.S. 967, 975-976.)

### 3. *Penalty phase procedures*

The federal Constitution does not require the jury to make written findings unanimously concluding beyond a reasonable doubt that the aggravating factors exist, that they outweigh the factors in mitigation, or that death is the appropriate penalty. (*People v. Whalen, supra,* 56 Cal.4th at pp. 90-91; *People v. Clark, supra,* 52 Cal.4th at p. 106; *People v. Manriquez* (2005) 37 Cal.4th 547, 589.) Nor is there either a constitutional or statutory command that these determinations be proved by some lesser standard of proof, or that the jury be told explicitly that neither side bears the burden of proof. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1429; *People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [penalty phase determinations are not subject to burden of proof quantification because they are

" 'moral and normative, not factual' "].)  Contrary to defendant's argument, the high court's decisions interpreting the Sixth Amendment, from *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 through *Cunningham v. California* (2007) 549 U.S. 270, do not compel a different conclusion.  (*People v. Williams* (2013) 58 Cal.4th 197, 295; *People v. Whalen, supra*, at pp. 90-91.)  As we have explained, determining the balance of evidence of aggravation and mitigation and the appropriate penalty do not entail the finding of facts but rather "a single fundamentally normative assessment [citations] that is outside the scope of *Ring* and *Apprendi.*"  (*People v. Griffin, supra,* 33 Cal.4th at p. 595; *People v. Prieto* (2003) 30 Cal.4th 226, 262-263.)

California's automatic appeals procedure does not violate constitutional guarantees by failing to provide for intercase proportionality review.  (*People v. Whalen, supra*, 56 Cal.4th at p. 91; *People v. Myles, supra,* 53 Cal.4th at p. 1224.)

Nor does the jury's reliance on evidence of defendant's unadjudicated criminal activity as a factor in aggravation, in the absence of unanimous agreement that such activity was proved beyond a reasonable doubt, violate due process or render a death sentence unreliable.  (*People v. Thomas* (2012) 53 Cal.4th 771, 836; *People v. Martinez, supra*, 47 Cal.4th 399, 455.)

There is no constitutional requirement that the jury be instructed regarding which of the statutory factors in section 190.3 are aggravating, which are mitigating, and which could be either aggravating or mitigating.  (*People v. Edwards* (2013) 57 Cal.4th 658, 766 [the statutory instruction directing " 'the jury to consider "whether or not" ' " certain mitigating factors exist did not invite the jury to aggravate defendant's sentence on " ' " " 'the basis of nonexistent or irrational . . . factors' " ' "].)  The use of the adjectives "extreme" and "substantial" to describe mitigating factors involving "mental or emotional disturbance" and "duress or domination" (§ 190.3, factors (d), (g)), does not erect

a barrier to the jury's consideration of mitigating evidence in violation of constitutional guarantees.  (*People v. Manibusan, supra,* 58 Cal.4th at p. 100; *People v. DeHoyos, supra*, 57 Cal.4th at p. 150.)

Prosecutorial discretion and the absence of standards for deciding whether or not to seek the death penalty in an eligible case do not create a substantial risk of arbitrary outcomes that vary from county to county or otherwise offend constitutional guarantees of due process or equal protection, or the prohibition against cruel and unusual punishment.  (*People v. Myles, supra*, 53 Cal.4th at p. 1224; *People v. Keenan* (1988) 46 Cal.3d 478, 505.)

Because capital and noncapital defendants are not similarly situated, the death penalty scheme does not violate equal protection by failing to provide capital defendants with the same procedural protections that are afforded to noncapital defendants.  (*People v. Edwards, supra,* 57 Cal.4th at p. 768; *People v. DeHoyos, supra,* 57 Cal.4th at p. 151.)

### *4. International law*

Defendant contends that, even assuming that the death penalty itself does not violate international norms of decency, the broad reach of California's capital punishment scheme and use of the death penalty as a regular form of punishment for substantial numbers of crimes is contrary to those international standards and constitute a violation of the Eighth Amendment.  We have addressed and repeatedly rejected the identical argument that California imposes death as " 'regular punishment for substantial numbers of crimes.' "  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43, italics omitted; accord, *People v. DeHoyos, supra*, 57 Cal.4th at p. 151; *People v. Souza* (2012) 54 Cal.4th 90, 142.) Defendant presents no new arguments that would prompt reconsideration of our prior conclusion.

### I. Cumulative Effect of Asserted Guilt and Penalty Phase Errors

Defendant argues that even if none of the asserted errors at the guilt and penalty phase warrant reversal when considered individually, the cumulative weight of those asserted errors was prejudicial, depriving him of a fair trial and penalty determination and other constitutional rights. We have concluded that there was no cumulative effect of error at the guilt phase (see *ante*, pt. II.F.), and found no error at the penalty phase. Accordingly, there were no additional errors to cumulate and therefore no cumulative prejudice.

### III. CONCLUSION

The judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
SIMONS, J.*

---

\* Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Merriman

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S097363
**Date Filed:** August 18, 2014

_____

**Court:** Superior
**County:** Ventura
**Judge:** Vincent J. O'Neill, Jr.

_____

**Counsel:**

Glen Niemy, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Glen Niemy
P.O. Box 764
Bridgton, ME 04009
(207) 647-2600

Jaime L. Fuster
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2354